1  Michael S. Kogan (SBN 128500)
   John W. Shenk (SBN 261573)
2  **ERVIN, COHEN & JESSUP LLP**
   9401 Wilshire Boulevard, Ninth Floor
3  Beverly Hills, California 90212-2974
   Telephone  (310) 273-6333
4  Facsimile  (310) 859-2325
   mkogan@ecjlaw.com
5
   Attorneys for the Debtor
6

7

8                **UNITED STATES BANKRUPTCY COURT**

9                **CENTRAL DISTRICT OF CALIFORNIA**

10                    **LOS ANGELES DIVISION**

11  In re CENTERSTONE DIAMONDS, INC., )    Case No. 2:09-bk-23944-VZ
12                                     )
         Debtor.                       )    Chapter 11
13                                     )
    *Jointly Administered with*        )    Jointly Administered With 2:09-bk-23945-VZ
14                                     )
    In re MICHAEL BEAUDRY, INC.,       )    **MOTION TO APPROVE COMPROMISE OF**
15                                     )    **CONTROVERSY WITH FCC, LLC;**
         Debtor.                       )    **MEMORANDUM OF POINTS AND**
16                                     )    **AUTHORITIES AND DECLARATION OF**
                                       )    **MICHAEL BEAUDRY IN SUPPORT**
17  ☐ Applies only to Centerstone Diamonds, )  **THEREOF**
    Inc.                               )
18  ☐ Applies only to Michael Beaudry, Inc. )  DATE:     June 22, 2010
                                       )    TIME:     11:00 a.m.
19                                     )    PLACE:    Courtroom 1368
                                       )
20  _____)

21        Centerstone Diamonds, Inc. ("CDI") and Michael Beaudry Inc. ("MBI"), the debtors and

22  debtors in possession herein in these jointly administered bankruptcy cases (collectively, the

23  "Debtors" or "Beaudry"), hereby submits its Motion to Approve Compromise of Controversy with

24  FCC, LLC (the "Motion"), and represents as follows:

25                                      **I.**

26                               **INTRODUCTION**

27        Through this Motion, the Debtors seeks Court approval of a settlement (the "Settlement

28  Agreement") by and between FCC, LLC, a Florida limited liability company doing business as

Ervin, Cohen
& Jessup LLP

IDOCS:12999.3:1002292.2

## TABLE OF CONTENTS

**Page**

I    . INTRODUCTION ................................................................................................1

II    . BACKGROUND AND SETTLEMENT ...........................................................3

Background. ...........................................................................................................3

Summary of the Settlement Agreement .................................................................8

III    . THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT ......22

    1.    The Proposed Settlement is in the Best Interests of the Estate .................22

    2.    The Probability of Success .......................................................................25

    3.    The Difficulties if any, to be Encountered in the Manner of Collections ...............27

    4.    The Complexity of the Potential Claims, and the Attendant Time Energy and Inconvenience ...................................................................................28

    5.    The Paramount Interest of Creditors .........................................................28

    6.    The Settlement Agreement Was Negotiated In Good Faith And Is Reasonably Believed To Be The Best Compromise Under The Facts ...................29

IV    . CONCLUSION .................................................................................................30

Ervin, Cohen
& Jessup LLP

IDOCS:12999.3:1002292.2

i

# TABLE OF AUTHORITIES

**Page**

## CASES

In re A&C Properties, 784 F.2d 1377 (9th Cir. 1986) .................................................................. 23

In re AWECO, 725 F.2d 293, reh'g denied, 732 F.2d 941 (5th Cir. 1984) ................................... 25

In re Blair, 538 F.2d 849 (9th Cir. 1976) ...................................................................................... 25

In re Carson, 82 B.R. 847 (Bankr. S.D. Ohio 1987) ..................................................................... 24

In re Equity Funding Corporation of America, 529 F.2d 1274 (9th Cir. 1975) ............................ 24

In re Hallet, 33 B.R. 564 (Bankr. D. Me. 1983) ............................................................................ 24

In re Hydraulic Enterprise, Inc., 58 B.R. 363 (Bankr. D. R.I. 1986) ........................................... 25

In re Mobile Air Drilling Co., Inc., 53 B.R. 605 (Bankr. N.D. Ohio 1985) .................................. 25

In re W.T. Grant & Co., 699 F.2d 599, 608 (2nd. Cir. 1983), cert. denied, 464 U.S. 822
    (1984) ...................................................................................................................................... 25

In re Walsh Construction, Inc., 669 F.2d 1325 (9th Cir. 1982) .................................................... 25

In the Matter of Carla Leather, Inc., 44 B.R. 457 (Bankr. S.D.N.Y. 1984) ................................. 25

Prospective Committee Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S.
    414, 88 S.Ct. 1157 L.Ed.2d 1 (1968) ..................................................................................... 23

1   First Capital Western Region, LLC, ("FCC"), CDI, MBI and Michael Beaudry ("M. Beaudry"),

2   Laura Beaudry ("L. Beaudry"), and MGB – 8th Street, L.P. ("MGB"), (each a "Party" and

3   collectively "Parties") resolving FCC's claims against the bankruptcy estates and parties related to

4   M. Beaudry, a sale of the Debtors' inventory which will provide for the continued ability of the

5   Debtors to sell the inventory for certain periods of time, or a payment of enough funds to enable

6   the Debtors to continue its business operation and reorganize. The settlement will resolve

7   substantially all of the issues in the bankruptcy cases between the Parties, and should provide for a

8   successful reorganization, in which unsecured creditors will receive a significant distribution on

9   their claims.  The Settlement Agreement also includes, among other items, a provision to grant

10  FCC relief from the automatic stay to the extent necessary to permit FCC to carry out the

11  provisions of, and to enforce its rights and remedies under, and enjoy the benefits of, the

12  Settlement Agreement.  A copy of the Settlement Agreement is attached as Exhibit "A" and is

13  incorporated herein by this reference. **The Debtors have concurrently filed a Motion Of Debtor**

14  **For Sale Of Property Free And Clear Of Liens (the "Sale Motion") to provide for the**

15  **auction of the assets to be sold under the Settlement Agreement.**

16          The Settlement Agreement contemplates that, subject to certain terms and conditions, FCC

17  will reduce its secured claim against the Debtors' chapter 11 estates (the "Estates"), stop accruing

18  interest and other charges on the outstanding indebtedness owed it by the Debtors and accept the

19  inventory and certain other collateral by a credit bid sale in full satisfaction of this indebtedness.

20  The Settlement Agreement will also afford the Debtors the opportunity to obtain a consignment of

21  the foreclosed inventory for sale in the ordinary course by the Debtors.[1] Under the terms of a

22  concurrent consignment agreement, the Debtors will retain the profits from such sales that exceed

23  certain established thresholds, thereby providing a source of revenue to the Debtors and assets

24  from which the unsecured creditors of the Debtors' Estates can be paid. As set forth below,

25  approval of the Stipulation is in the best interests of the Estates and is a critical step toward a

26

27  [1] This assumes that FCC is the successful bidder at the bankruptcy sale, if FCC is not the successful
       bidder, the Debtor will receive the excess proceeds above the credit bid amount to continue its
28     operations and reorganization.

1   successful reorganization of the Debtors' business for the benefit of the Estates and their creditors.

2       The Debtors are confident that the Court will find that the Settlement Agreement is fair and

3   equitable. Each of the factors necessary to approve settlements in this Circuit are present in this

4   case and, as a result, the settlement should be found to be in the best interests of the Debtors and

5   approved by the Court.

6                                      **II.**

7                          **BACKGROUND AND SETTLEMENT**

8   <u>**Background.**</u>

9       On or about June 4, 2009, the Debtors commenced this case by filing a Voluntary Petition

10  under Chapter 11 of the Bankruptcy Code (the "Petition Date").  CDI, as the manufacturing

11  company of "Beaudry" and MBI, as the sales and marketing company of "Beaudry", are one of the

12  finest designer and manufacturers of unique handcrafted, custom, one-of-a kind jewelry in the

13  world. Beaudry's products are marketed through a variety of channels (***"Sales Channels"***),

14  including upscale department stores, jewelry stores, a sales team and internet auction sites, with

15  many products placed in sales outlets on consignment. M Beaudry, the President of the Debtors

16  and sole shareholder of CDI and MBI, is a master diamond cutter, and considered a visionary

17  designer and manufacturer.

18      From 2001 to 2004, Beaudry experienced business growth of a rough average of 20% per

19  annum. From 2004 to 2007, Beaudry's business had been relatively stable, with gross earnings

20  averaging approximately $20,000,000 and taxable income surpassing $1,000,000 or more. In

21  2008, despite a historic decline in the U.S. retail market, Beaudry's business was relatively stable

22  showing a slight overall decline of approximately 10 to 15% through October of 2008.

23  Unfortunately, starting in October of 2008 and continuing to the present time, Beaudry's business

24  has declined over 50% from its five year historical averages.

25      Compared to prior years, the Debtors have been impacted by a sharp drop in sales

26  primarily due to (i) reduced consumer discretionary spending, given the national economic

27  downturn; (ii) lower inventory selection as a result of the Debtors' tight liquidity position and

28  reduced, less favorable payment terms from its vendors; (iii) the Debtors' inability to devote

1  sufficient resources to marketing and advertising due to liquidity constraints; (iv) the amount of

2  time, energy and focus that has been devoted necessarily to the issues and negotiations by and

3  between the Debtors and FCC prior to and during these bankruptcy cases; and (v) the further

4  tightening of the Debtors' liquidity resulting from FCC's adjustments and reductions of the

5  formulas used to calculate what funds would be advanced to the Debtors under the loans with

6  FCC. Moreover, poor capital market conditions have severely hindered the Debtors' ability to raise

7  new capital to restructure their operations.

8      Given the worsening condition in 2008, the Debtors began implementing various measures

9  designed to stabilize the business and increase profitability, including (i) refocusing their

10  marketing strategies and branding; (ii) cutting operational costs, particularly labor costs through

11  reductions in workforce and outsourcing production and manufacturing of jewelry; (iii) reworking

12  any inventory that was deemed not to be easily marketable and scrapping some inventory for sale

13  at commodity value as diamonds and/or precious metal; (iv) focusing more strongly on the special

14  order Beaudry business; and (v) selling some of their aged or lower priced inventory at smaller

15  margins through special events, private buyer sales and other extraordinary efforts, and marketing

16  to retailers with customers in markets commensurate with the nation's economic environment.

17  Continuing these efforts should facilitate the ongoing operations of the Debtors' business in an

18  efficient and productive manner. Based on current indications that the economic climate is

19  improving, increasing number of sales and inquiries about new production, discussions with

20  existing Beaudry accounts, the Debtors now expect that their 2010 performance will exceed 2009's

21  performance.

22      FCC and Beaudry are parties to that certain Factoring and Inventory and Advances and

23  Security Agreement dated as of May 2, 2007 (*"Factoring Agreement"*) and various other

24  documents related to the Factoring Agreement listed on Exhibit A to the Settlement Agreement

25  (collectively, *"Factoring Facility"*).  Under the Factoring Facility, FCC advanced money for

26  Beaudry's use in the operation of the Business, repayment of which is secured by a first lien and

27  security interest in substantially all of the assets owned by Beaudry (*"FCC Lien"*), including,

28  without limitation, all: (a) cash and cash equivalents (*"Cash"*); (b) accounts receivable (*"AR"*); (c)

1  inventories of finished goods, works in progress and raw materials for the design and production

2  of finished goods (collectively, *"Inventory"*); and (d) equipment used in the design and

3  fabrication of jewelry and other personal property used in the operation of the Business

4  (*"Personal Property"*).  FCC contends that the amount currently owed by Beaudry under the

5  Factoring Facility (*"Debt"*) is in excess of Eight Million Five Hundred Thousand Dollars

6  ($8,500,000).

7      In addition to the first priority security interest granted to FCC on substantially all of the

8  Debtors' assets under the Factoring Agreement, M. Beaudry personally guarantied repayment of

9  the Debt under the Factoring Facility pursuant to a Continuing Guaranty dated May 2, 2007

10  executed by M. Beaudry in favor of FCC (*"M. Beaudry Guaranty"*).  The M. Beaudry Guaranty

11  is secured by a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated

12  May 3, 2007 executed by M. Beaudry, as Trustor, for the benefit of FCC, as beneficiary, recorded

13  in the Official Records of El Dorado County, California (*"El Dorado County Records"*) on May

14  22, 2007 as Document No. 2007-0034235-00 (*"Camino Trust Deed"*) on real property owned by

15  M. Beaudry and located at 3600 Fuji Court, Camino, California (*"Camino Property"*).

16      M. Beaudry also provided a further guaranty for repayment of a portion of the Debt, in the

17  amount of One Million Five Hundred Thousand Dollars ($1,500,000), through that certain

18  Continuing Guaranty dated May 3, 2007 executed by MGB, which is  controlled by M. Beaudry,

19  in favor of FCC (*"MGB Guaranty"* and with the M. Beaudry Guaranty *"Guaranties"*).  The

20  MGB Guaranty is secured by a Deed of Trust, Assignment of Rents, Security Agreement and

21  Fixture Filing dated May 3, 2007 executed by MGB, as Trustor, for the benefit of FCC, as

22  beneficiary (*"8th Street Trust Deed"*), and recorded in the Official Records of Los Angeles

23  County, California (*"Los Angeles County Records"*) on May 22, 2007 as Document No.

24  20071238539, which grants a lien on property owned by MGB located at 323 West 8th Street, Los

25  Angeles, California (*"8th Street Property"*). The 8th Street Property currently is listed for sale for

26  $6.45 million and most recently has been appraised at $6.5 million. In addition, prepetition, M.

27  Beaudry borrowed $1 million using both the 8th Street Property and his personal residence as

28  security for this personal loan, and paid FCC approximately $800,000 from the loan proceeds to

1    reduce the amount of the FCC obligation.

2        Commencing in late 2008, Beaudry failed to make certain interest and fee payments owed

3    to FCC under the Factoring Facility.  Without waiving Beaudry's default, FCC and Beaudry

4    entered into a forbearance agreement pursuant to which, for a period of at least six months, FCC

5    and Beaudry attempted to work together to enable Beaudry to continue Business operations with

6    specific continued advances under the Factoring Facility.  During this six-month period, Beaudry

7    paid substantial amounts owed to FCC under the Factoring Facility. Prior to the Petition Date, the

8    Debtors had been in discussions with both FCC and many of their trade creditors regarding a

9    potential consensual resolution of the Debtors' financial difficulties, including proposed asset

10   sales.

11       Shortly after the Petition Date, on or about June 15, 2009, the Debtors filed an emergency

12   motion for the use of cash collateral. The Debtors' cash collateral motion, as supplemented, was

13   opposed strenuously by FCC. Both the Debtors and FCC expended significant time and expense

14   preparing papers to be filed and collating evidence, including expert testimony with respect to the

15   valuation of the assets, to support each position. After several interim hearings, the Court granted

16   the Debtors' request for authority to use cash collateral.

17       Prior to the commencement of the bankruptcy cases, FCC filed an action in Los Angeles

18   Superior Court against the Debtors for the recovery of specific personal property, judicial

19   foreclosure and injunctive relief arising from the obligations and interests under the Factoring

20   Facility (the "Superior Court Action"). On May 13, 2009, the Los Angeles Superior Court granted

21   a temporary restraining order that enjoined the Debtors from (i) selling inventory outside the

22   ordinary course of business, (ii) moving inventory outside of California, and (iii) selling inventory

23   on a basis other than cash (the "TRO"). After entry of the TRO, FCC noticed a hearing for June 5,

24   2009 on an application for a writ of possession and a motion for the appointment of a receiver.

25   The chapter 11 cases were commenced the day of the hearing on FCC's motion for appointment of

26   a receiver.

27       On or about September 18, 2009, FCC brought a motion before the Court requesting relief

28   from the automatic stay to allow FCC to continue the Superior Court Action and seek to foreclose

1   on its security interest in the Debtors' assets. FCC contended that such a liquidation would result in

2   net revenues of approximately 35% of the cost of jewelry inventory - $3.5 million, based on the

3   undisputed $10 million cost of the inventory. The Debtors opposed the relief from stay motion

4   and, after a hearing on September 8, 2009; the Court denied FCC's motion for relief from the

5   automatic stay, without prejudice. The Court's Order Denying Motion for Relief From the

6   Automatic Stay, however, provides that the Debtors must make monthly adequate protection

7   payments of $35,000 to FCC, and that failure to make such payments will entitle FCC to an

8   immediate order for relief from the automatic stay.

9          On or about March 16, 2010, CDI and MBI filed with the Bankruptcy Court a Complaint

10  and Objection to Claim Filed of FCC, LLC, designated Adversary Number LA:10-01345-VZ

11  (***"Beaudry Complaint"***).  The Beaudry Complaint seeks the following relief from the Bankruptcy

12  Court: (1) Declaratory Relief As To The Amount Of The FCC Claim; (2) Offset Against FCC

13  Claim Amount For Damages Sustained By Debtors; (3) Equitable Subordination Under 11

14  U.S.C.§ 510(c); and (4) For Preliminary Injunction and Injunction Against Actions By the

15  Defendant – 11 U.S.C. § 105(a).   Following service of the Beaudry Complaint, Beaudry and FCC

16  stipulated to continue the time in which FCC must respond to the Beaudry Complaint in order to

17  continue negotiations of the settlement herein.

18         In conjunction with the filing of the Beaudry Complaint, Beaudry filed its Disclosure

19  Statement and Plan of Reorganization (collectively, the "Disclosure Statement") which effectively

20  sought to subordinate a portion of FCC's claims upon the same basis as contained in the Beaudry

21  Complaint. Following service of the Disclosure Statement, Beaudry and FCC stipulated to

22  continue the hearing on the Disclosure Statement in order to continue negotiations of the

23  settlement herein. On or about May 18, 2010, FCC filed its Motion for Relief From Stay (the

24  "FCC Relief Motion") after negotiations between the Parties seemed to have failed. After the

25  filing of the FCC Relief Motion, the Parties resolved the final terms of the Settlement Agreement,

26  and agreed to continue the FCC Relief Motion.

27         On or about May 21, 2010, the Debtors and FCC after many months of negotiating a

28  settlement, formalized the terms of an agreement designed to resolve all of the issues and disputes

1  between the parties, subject to the approval of the Bankruptcy Court in these bankruptcy cases.

2  The Settlement Agreement is the initial and most substantial piece of the overall settlement

3  agreement. A true and correct copy of the Settlement Agreement is attached as Exhibit "A" and

4  incorporated herein by reference. The material terms of the Settlement Agreement are as follows.

5  **Summary of the Settlement Agreement**

6      1.    <u>Consignment Agreement.</u>

7          (a)    <u>Value of FCC Inventory; Cash Payment; Assignment of AR</u>.  FCC and
Beaudry stipulate and agree that as of March 12, 2010, the cost value of the FCC Inventory was

8  Nine Million Three Hundred Seventy Seven Thousand Two Hundred Fifty Four Dollars
($9,377,254).  In addition to the transfer of the FCC Inventory to FCC (as opposed to a Full

9  Satisfaction Payment), Beaudry will, on the Effective Date: (i) pay to FCC, by wire transfer of
immediately available funds to an account designated by FCC, One Hundred Twelve Thousand

10  Five Hundred Seventy Dollars ($112,570) ("Cash Supplement"); and (ii) assign to FCC, pursuant
to an Assignment in a form reasonably acceptable to FCC and Beaudry, AR generated between

11  October 14, 2009 and March 12, 2010 in the amount of Ninety Seven Thousand Eight Hundred
Thirty Three Dollars ($97,833) ("Assigned New AR").  Beaudry will use its best efforts to collect,

12  on behalf of FCC, the Assigned New AR.  From and after the Effective Date, Beaudry: (i)
guarantees and warrants collection of the Assigned New AR and specifically guarantees and

13  warrants that FCC will have received the full amount of Ninety Seven Thousand Eight Hundred
Thirty Three Dollars ($97,833) from collection of the Assigned New AR no later than July 15,

14  2010; and (ii) to secure such guaranty and any amounts owed to FCC pursuant to Section 4(c),
grants to FCC a security interest in all of Beaudry's AR remaining after assignment of the

15  Assigned New AR and in all Inventory purchased by Beaudry after March 12, 2010, which
security interest will be further memorialized pursuant to a Security Agreement in a form

16  reasonably acceptable to FCC and Beaudry.  Failure of FCC to receive timely payment of the Cash
Supplement shall constitute an Event of Default under this Agreement and the Consignment

17  Agreement.  Failure of FCC to receive, in cash, the face amount of the Assigned New AR by
August 15, 2010 also shall constitute an Event of Default under this Agreement and the

18  Consignment Agreement.

19          (b)    <u>Consignment</u>.  Following the Effective Date, if FCC is the successful bidder
for the FCC Inventory, then, upon FCC's receipt of the Free And Clear Transfer, and if a court

20  order granting all of the relief provided for in paragraph 3(b) above has been entered and Beaudry
is not in default hereunder, then FCC and Beaudry will enter into and exchange executed originals

21  of a consignment agreement, in form and substance satisfactory to both FCC and Beaudry,
pursuant to which FCC will consign to Beaudry the right to retain physical possession of a portion

22  of the FCC Inventory, and to sell all the FCC Inventory, on the terms and conditions set forth

23  therein (**"Consignment Agreement"**).  The Consignment Agreement will be effective as of the
Effective Consignment Date (as defined in Section 4(c)(iv)(1)) and shall contain the terms and

24  conditions set forth in Section 4(c) and such additional terms and conditions to which FCC and

25  Beaudry mutually agree.  Upon execution of the Consignment Agreement, to the extent that there
are any conflicts between the terms and provisions of the Consignment Agreement and the terms

26  and provisions of this Section 4(c), the terms and provisions of the Consignment Agreement will
control.

27

28          (c)    <u>Terms and Conditions.</u>

Ervin, Cohen
& Jessup LLP

1    (i)    Consigned FCC Inventory.    Under the Consignment Agreement, Beaudry will retain possession of the Consigned Inventory (as hereinafter defined).    As used

2   herein, *"Consigned Inventory"* means: (A) FCC Inventory that has been consigned, prior to the Effective Date, to, and as of the Effective Date, is in the possession of, any of the department

3   stores and other consignees separately listed as described below (*"Department Store Inventory"*)

4   which, as of the Effective Date, will have a cost value of no less than Two Million Three Hundred Forty Four Thousand Three Hundred Thirteen Dollars ($2,344,313); and (B) FCC Inventory, in

5   addition to the Department Store Inventory, with a cost value of Five Million Two Hundred Seventy Four Thousand Seven Hundred Six Dollars ($5,274,706) (which is an amount equal to (I)

6   seventy five percent (75%) of (II) the cost value of all FCC Inventory minus the Department Store

7   Inventory).    The separate listing of Department Store Inventory has been approved by FCC, is signed by all parties to this Agreement and, by this reference, is incorporated herein and made a

8   part hereof.    The Consigned Inventory will be chosen by Beaudry, subject to FCC's reasonable consent, will be placed into Lots in accordance with Section 4(c)(iii) and otherwise will be subject

9   to all the terms and conditions of the Consignment Agreement.

10    (ii)    Retained FCC Inventory.    On the Effective Date, Beaudry will deliver to FCC all unsold FCC Inventory that is not Consigned Inventory (*"FCC Retained*

11   *Inventory"*), which will have a cost value of One Million Seven Hundred Fifty Eight Thousand Two Hundred Thirty Five Dollars ($1,758,235).    FCC will retain possession of the FCC Retained

12   Inventory subject to the following:

13

14    (1)    At all times prior to the termination of the Consignment Agreement, Beaudry will have the right to sell any item of FCC Retained Inventory to a third

15   party customer in accordance with the provisions of Section 4(c)(iv), and to show the FCC Retained Inventory to potential customers in connection with such sales or potential sales.    FCC

16   will keep the FCC Retained Inventory in a location to which Beaudry and its sales personnel will have access for such showings and sales on no less than one business day's telephonic notice to

17   FCC.    Upon Beaudry's sale of any item of FCC Retained Inventory, FCC promptly shall cause such item to be released to Beaudry for delivery to the purchaser, or directly to the purchaser, as

18   requested by Beaudry.    Beaudry will cause all payments for such sales to be made directly to the *"Lockbox"*, as defined and in accordance with Section 4(c)(v)(2).

19

20    (2)    Without limiting Beaudry's rights under Section 4(c)(ii)(1), Beaudry will have the right to list and display all FCC Retained Inventory on one or more internet

21   auction sites selected by Beaudry in its reasonable discretion, provided Beaudry complies with all rules and procedures of such site.    Beaudry's agreement with any such auction site will provide for

22   notice of all sales from the site, and all accountings with respect to such sales, to be delivered to Beaudry and FCC, and for payment for all sales from the site to be made directly to the Lockbox.

23   Promptly upon FCC's receipt of notice of any sale on any internet auction site, FCC will cause the purchased item to be released to the online action site for delivery to the purchaser.

24

25    (3)    For each $350,000 in cash that FCC receives, in the aggregate, from FCC's share of sales proceeds of Consigned Inventory pursuant to Section

26   4(c)(iv) or (v), FCC shall consign and deliver to Beaudry to-be-determined items of FCC Retained Inventory with an aggregate cost value up to the lesser of either Eighty Seven Thousand Nine

27   Hundred Twelve Dollars ($87,912) or the cost value of the FCC Retained Inventory then still in FCC's possession at the time of its selection, as provided in the next sentence (*"Released FCC*

28

*Inventory"*), which is an amount up to five percent (5%) of the cost value of the FCC Retained Inventory initially delivered to FCC pursuant to Section 4(c)(ii). Beaudry shall have the right to select, in its sole discretion, the items of FCC Retained Inventory to be included in each delivery of Released FCC Inventory to Beaudry. Upon delivery of any Released FCC Inventory to Beaudry, such Released FCC Inventory shall be deemed to be included in the Consigned Inventory and, thereafter, shall be subject to all of the terms and conditions of the Consignment Agreement.

(iii)    Lots. As of the date of this Agreement, all FCC Retained Inventory and Consigned Inventory has been divided, segregated and itemized into three lots, called Lot A-1, Lot A-2 and Lot B (*"collectively, "Lots"*) in an itemized list separately delivered to and approved by FCC. The items of FCC Inventory in each Lot are as follows:

(1)    Lot A-1 consists of FCC Inventory selected by M. Beaudry, subject to the reasonable approval of FCC, with a cost value equal to Two Million Three Hundred Forty Seven Thousand Five Hundred Twenty Dollars ($2,347,520);

(2)    Lot A-2 consists of FCC Inventory selected by M. Beaudry with a cost value equal to Two Million Three Hundred Forty Two Thousand Two Hundred Fourteen Dollars ($2,342,214); and

(3)    Lot B consists of: (A) *"Laura's Jewelry"* (as defined in Section 6(c)(ii)(2)); and (B) all other FCC Inventory not included in Lot A-1 or Lot A-2, and has a cost value of no less than Four Million Six Hundred Eighty Seven Thousand Five Hundred Nineteen Dollars ($4,687,519).

(iv)    Liquidation.

(1)    Lot A-1. The term of the consignment for Lot A-1 will commence if and when the Consignment Agreement becomes operative pursuant to Section 4(b) (*"Effective Consignment Date"*) and shall continue through August 31, 2010, subject to customary consignment terms and defaults as provided in the Consignment Agreement. Beaudry will be authorized to sell Lot A-1 Inventory through any and all Sales Channels, at Beaudry's discretion; however, the Consignment Agreement will set parameters with respect to pricing as mutually agreed by FCC and Beaudry. FCC will receive one hundred percent (100%) of the proceeds from the sale of Lot A-1 Inventory.

(2)    Lot A-2. The term of the consignment for Lot A-2 will commence on the Effective Consignment Date and continue through August 31, 2010, subject to customary consignment terms and defaults as provided in the Consignment Agreement. Beaudry will be authorized to sell Lot A-2 Inventory only through wholesale channels, such as department stores and other wholesale clients approved in advance by FCC, at wholesale prices determined by M. Beaudry, but subject to floors set forth in the Consignment Agreement as mutually agreed by FCC and Beaudry. FCC will receive all proceeds from the sale of Lot A-2 Inventory up to one hundred percent (100%) of the cost value of the Lot A-2 Inventory. Beaudry will retain all proceeds from the sale of Lot A-2 Inventory in excess of the cost value of the Lot A-2 Inventory.

(3)    Lot B. The term of the consignment for Lot B will commence on the Effective Consignment Date and continue through February 28, 2011, subject to

customary consignment terms and defaults as provided in the Consignment Agreement. Beaudry will be authorized to sell Lot B Inventory through any and all Sales Channels, at Beaudry's discretion, subject to FCC's right to approve credit sales as provided in Section 4(c)(v)(3), at prices determined by M. Beaudry, but subject to floors set forth in the Consignment Agreement as mutually agreed by FCC and Beaudry. FCC will receive proceeds from the sale of Lot B Inventory as follows: (i) for the first fifty percent (50%) of the cost value of Lot B Inventory sold, FCC will receive one hundred five percent (105%) of the cost value of such Lot B Inventory sold; and (ii) for the second fifty percent (50%) of the cost value of Lot B Inventory sold, FCC will receive one hundred ten percent (110%) of such Lot B Inventory sold. Beaudry will retain all proceeds from the sale of Lot B Inventory in excess of the amounts owed to FCC pursuant to the previous sentence.

(4)    Extension of Consignment Terms for Lot A-1 and Lot A-2.

a.    In the event that Beaudry has not sold all FCC Inventory in Lot A-1 or Lot A-2, respectively, by August 31, 2010, the term of the consignment for Lot A-1 and/or Lot A-2 will be extended, as applicable, to February 28, 2011, subject to customary consignment terms and defaults as provided in the Consignment Agreement, *if* from the Effective Date and continuing through August 31, 2010, Beaudry has made payments, excluding the Adequate Protection Payments, to FCC, or has caused payments to be made to FCC from any Source (as hereinafter defined), on account of amounts owed by Beaudry to FCC pursuant to this Agreement or the Consignment Agreement (collectively, *"Consignment Payments"*), in the aggregate amount of no less than Two Million Five Hundred Thousand Dollars ($2,500,000). As used herein, *"Source"* means: (i) M. Beaudry or any Affiliate of M. Beaudry; (ii) the Cash Supplement; (iii) proceeds from the sale of FCC Inventory from Lot A-1, Lot A-2 and/or Lot B, whether such sale is made by FCC (with respect to FCC Retained Inventory during the Operative Consignment Term following an Event of Default), Beaudry, any Third Party Consignee (as defined in Section 4(d)(i)) or any Affiliated Consignee (as defined in Section 4(d)(ii)); (iv) proceeds from the collection of the Assigned New AR or amounts paid by Beaudry to FCC under its guaranty of amounts to be paid under the Assigned New AR pursuant to Section 4(a); (v) amounts paid pursuant to the New Guaranties (as defined in Section 6(c)) or the sale or other disposal of any security given for either of the New Guaranties; and (vi) any insurance proceeds paid to FCC pursuant to any insurance policies covering the FCC Inventory held by FCC or held by Beaudry and naming FCC as an additional insured, either pursuant to the Consignment Agreement, the Security Agreement (as defined in Section 6(b)(i)) or otherwise.

b.    If the term of the consignment for Lot A-1 and Lot A-2 has been extended pursuant to the preceding subparagraph and Beaudry has not sold all FCC Inventory in Lot A-1 or Lot A-2, respectively, by February 28, 2011, the term of the consignment for Lot A-1 and/or Lot A-2 will be extended, as applicable, to August 31, 2011, subject to customary consignment terms and defaults as provided in the Consignment Agreement, *if* from the Effective Date and continuing through February 28, 2011, Beaudry has made Consignment Payments to FCC in the aggregate amount of no less than Five Million Seven Hundred Fifty Thousand Dollars ($5,750,000).

1

(5)    Extension of Consignment Terms for Lot B.

2

3

4

5

a.    In the event that Beaudry has not sold all FCC Inventory in Lot B by February 28, 2011, the term of the consignment for Lot B will be extended to August 31, 2011, subject to customary consignment terms and defaults as provided in the Consignment Agreement, *if* from the Effective Date and continuing through June 30, 2011, Beaudry has made Consignment Payments to FCC in the aggregate amount of no less than Five Million Seven Hundred Fifty Thousand Dollars ($5,750,000).

6

7

8

9

10

b.    If the term of the consignment for Lot B has been extended pursuant the preceding subparagraph and Beaudry has not sold all FCC Inventory in Lot B by August 31, 2011, the term of the consignment for Lot B will be extended to February 28, 2012, subject to customary consignment terms and defaults as provided in the Consignment Agreement, *if* from the Effective Date and continuing through August 31, 2011, Beaudry has made Consignment Payments to FCC in the aggregate amount of no less than Six Million Five Hundred Thousand Dollars ($6,500,000).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

(6)    Return of FCC Inventory to FCC. At the end of the initial consignment term or any extended consignment term, as provided either in this Agreement or to which the parties may otherwise agree in writing, for Lot A-1, Lot A-2 or Lot B, respectively (collectively, ***"Designated Consignment Period"***), Beaudry shall forthwith return to FCC all unsold Consigned Inventory in such Lot and the consignment of such Consigned Inventory, as well as Beaudry's right to sell FCC Inventory from such Lot, shall terminate, but such termination, so long as Beaudry is not then in default under this Agreement or the Consignment Agreement, shall not terminate the consignment of any Consigned Inventory in, or any right Beaudry may then have to sell FCC Inventory from, the remaining Lots. In the event that FCC receives payment, in cash, from any Source in the aggregate amount of Seven Million Dollars Three Hundred Thousand Dollars ($7,300,000) (***"Consignment Value"***) prior to the return of all Consigned Inventory to FCC as such return may be required pursuant to the preceding sentence, Beaudry may, at its election and so long as it is not in default under this Agreement or the Consignment Agreement, continue to market and sell the Consigned Inventory in each Lot then still in Beaudry's possession, for the duration of the initial consignment term and all applicable extended consignment terms for each such Lot, in accordance with the provisions of this Agreement and the Consignment Agreement, including, without limitation, the right to share in the proceeds of such sales of FCC Inventory in each such Lot pursuant to Section 4(c)(iv)(1), (2) and (3), until the consignment term for each such Lot can no longer be extended pursuant to Section 4(c)(iv)(4), (5) and (6). In the event that FCC does not receive Consignment Payments in the amount of the Consignment Value prior to the return, pursuant to the first sentence of this paragraph, of any FCC Inventory in any Lot, then the fair market value of the FCC Retained Inventory in such Lot as of the end of the Designated Consignment Term, and the fair market value of the returned Consigned Inventory in such Lot as of the date such Consigned Inventory is returned, shall be treated as a payment to FCC for purposes of determining the balance of the Consignment Value and the Guaranteed Amounts (as defined in Section 6(e)(1)). The fair market value of such FCC Inventory shall be determined by agreement of FCC and Beaudry or, if FCC and Beaudry cannot agree upon such fair market value, by one or more independent appraisers selected by FCC and Beaudry pursuant to the appraiser selection procedure set forth in Exhibit C.

28

(v)    <u>Payment Terms.</u>

(1)    <u>Collection Efforts.</u>    So long as Beaudry is not in default under this Agreement or the Consignment Agreement: (A) Beaudry shall be responsible for preparing and delivering all invoices for all amounts due from all customers for the purchase and sale of FCC Inventory sold by Beaudry (***"Invoices"***); (B) Beaudry shall have sole control of all collection efforts with respect to the Invoices; and (C) FCC shall have no right to contact any customers to which Beaudry has sent Invoices or to otherwise engage in any collection efforts with respect to Invoices. Irrespective of whether Beaudry is in default under this Agreement or the Consignment Agreement, Beaudry shall account to FCC for each transfer, transaction, sale or movement of FCC Inventory in strict accordance with the procedures and processes set forth in the FCC Inventory Control Memorandum (***"FICM"***) attached as a Schedule to the Consignment Agreement.

(2)    <u>Lockbox.</u>

a.    All Invoices will provide for payments to be made payable to MBI, but to be addressed and mailed, or wire transferred, directly to an account (***"Lockbox"***) opened by FCC solely for the deposit of payments to MBI for FCC Inventory (***"MBI Payments"***). The Lockbox will be controlled by, and any and all funds in the Lockbox will be accessible only by, FCC; however, MBI will have electronic access to the Lockbox for the sole purpose of monitoring and recording all deposits into the Lockbox. M. Beaudry shall execute any and all documents, and take all other action, reasonably necessary to authorize direct deposit into the Lockbox of all MBI Payments. In the event that any payments for FCC Inventory sold during the period from March 12, 2010 through the Effective Date are delivered to Beaudry prior to the Effective Date, no later than seven (7) days following the Effective Date, Beaudry will deposit FCC's share of such payments, pursuant to Section 4(c)(iv), into the Lockbox. In the event that, following the Effective Date, any payments for FCC Inventory come directly to Beaudry, in any form, including cash, then, within two (2) business days following Beaudry's receipt of such payments, Beaudry will deliver any such payments to the Lockbox.

b.    At least once every twenty-four (24) hours during business days, Beaudry will deliver to FCC an accounting (***"Beaudry Accounting"***) which shall contain a list of each MBI Payment deposited into the Lockbox since the later of (I) the opening of the Lockbox or (II) the last Beaudry Accounting delivered to FCC, which Beaudry Accounting shall state: (A) the name of the customer submitting each MBI Payment; (B) the amount of each MBI Payment; (C) the Invoice number: (D) the item(s) of Inventory for which each MBI Payment was made (in whole or in part) and, for each item of Inventory on the list: (y) the Lot from which such item of FCC Inventory was sold; and (z) an allocation of the payment for such item of FCC Inventory between FCC and Beaudry in accordance with Section 4(c)(iv). In the event Inventory is sold that is: (I) comprised of FCC Inventory from more than one Lot, the proceeds from such sale will be treated as sales from each such Lot, prorated in proportion to the cost value of each item of FCC Inventory; or (II) comprised of FCC Inventory and Inventory that is not FCC Inventory; (x) the proceeds from such sale will be prorated in proportion to the cost value of the FCC Inventory and the cost value of the Inventory that is not FCC Inventory, respectively; (y) the portion that is allocated to FCC Inventory will be further allocated between FCC and Beaudry in accordance with Section 4(c)(iv); and (z) the balance will be allocated one hundred percent (100%) to Beaudry. In the event that payments are delivered to the Lockbox for Inventory sold by

Beaudry but not included in the FCC Inventory at all, Beaudry shall list such Inventory on the Beaudry Accounting separate from the FCC Inventory and allocate one hundred percent (100%) of such payments as due to MBI. So long as Beaudry is in full compliance with the FICM, then, no later than two (2) business days following FCC's receipt of each Beaudry Accounting, unless FCC notifies Beaudry by email, facsimile or otherwise in writing of its objection to the Beaudry Accounting, FCC will deliver all amounts due to Beaudry as shown on the Beaudry Accounting by wire transfer to an account designated by Beaudry, without any deduction or offset for any reason except as expressly authorized by the Consignment Agreement. In the event FCC gives Beaudry notice of its objection to the Beaudry Accounting, the dispute resolution procedures set forth in Section 25 of the Consignment Agreement shall control.

c.    Each of FCC and Beaudry shall pay one-half (1/2) of all costs associated with opening and maintaining the Lockbox, as follows. FCC shall pay one hundred percent (100%) of all such costs to the provider of the Lockbox, and shall deliver to Beaudry, no more frequently than once a month, copies of all invoices for such costs for Beaudry's review and reasonable approval. Unless, within seven (7) business days following FCC's delivery of any such invoice to Beaudry, Beaudry notifies FCC by facsimile, email or otherwise in writing that Beaudry objects to such invoice or any charge thereon, Beaudry will be deemed to have approved such invoice and all charges thereon and FCC will have the right to offset against amounts due to Beaudry, as shown on any then outstanding Beaudry Accounting, an amount equal to Beaudry's one-half (1/2) share of such invoice. In the event Beaudry timely notifies FCC that it objects to any invoice, FCC and Beaudry shall resolve such objection in accordance with the dispute resolution provisions of the Consignment Agreement.

(3)    Credit Sales.

a.    Notwithstanding anything in this Section 4(c)(v) to the contrary, Beaudry will have the right to make sales of FCC Inventory pursuant to credit agreements or other credit arrangements ("*Credit Sales*") to any customer to which Beaudry had made Credit Sales prior to the Effective Date and has, by the Effective Date, notified FCC of Beaudry's intention to make Credit Sales to such customer subsequent to the Effective Date, unless, within fifteen (15) days following the Effective Date, FCC gives written notice to Beaudry that FCC does not consent to Credit Sales to any one or more named customers, and upon receipt of such notice, Beaudry will not make any further Credit Sales to any customer named in such notice without FCC's prior written consent. Following the Effective Date, Beaudry will not make any Credit Sales to any customer to which Beaudry has not made Credit Sales prior to the Effective Date unless and until Beaudry has given FCC notice that Beaudry desires to make a Credit Sale to such customer ("*Credit Sales Notice*"), which Credit Sales Notice will include the name of the customer, the amount of such sale and all credit information that such customer has provided to Beaudry in connection with such Credit Sale, and FCC has approved such Credit Sale to such customer, which approval FCC shall not unreasonably withhold, condition or delay. FCC will have three business days from Beaudry's delivery of the Credit Sales Notice to approve or disapprove the Credit Sale subject to the Credit Sales Notice; if FCC fails to approve or disapprove such Credit Sale in such three business days, FCC will be deemed to have approved the Credit Sale.

b.    Notwithstanding Beaudry's right to make credit sales pursuant to Section 4(c)(v)(3)(a), Beaudry will, no later than ninety (90) days following the date of

each such Credit Sale (***"Credit Sale Payment Deadline"***), pay to FCC an amount equal to FCC's share of amounts due from the Credit Sale customer on account of such Credit Sale, computed in accordance with the allocation formula set forth in Section 4(c)(iv), if, by that date (I) FCC has not previously received payment of its share of the proceeds of such sale or (II) the FCC Inventory sold in such credit sale has not been returned to Beaudry. Failure of FCC to receive, in cash, the amount due by the Credit Sale Payment Deadline, unless the subject FCC Inventory has been returned to Beaudry by the Credit Sale Payment Deadline, shall constitute an Event of Default under this Agreement and the Consignment Agreement.

(vi)    <u>Default</u>.    Notwithstanding anything in this Agreement to the contrary, the Consignment Agreement will define Events of Default by Beaudry thereunder and provide that, upon an Event of Default, FCC will have the right, among other remedies, to immediately terminate the consignment (***"Early Consignment Termination"***) granted therein and retake possession of the Consigned Inventory.

(vii)    <u>MBI Exclusive Right to Sell and Limited Right of First Refusal</u>.

(1)    At all times prior to an Early Consignment Termination or the end of the Designated Consignment Period, whichever occurs first ("Operative Consignment Term"), and provided that Beaudry is not in default under this Agreement or the Consignment Agreement, FCC will not market or otherwise attempt to sell any of the FCC Inventory, and Beaudry will have the exclusive right to sell the FCC Inventory pursuant to Section 4(c)(ii)(1).

(2)    At any time during the Operative Consignment Term that Beaudry is in default under this Agreement or the Consignment Agreement, and regardless of whether the Consignment Agreement has been terminated as a result of such default, FCC may sell any item of FCC Retained Inventory that has not been released to Beaudry pursuant to Section 4(c)(ii)(3), or that has not otherwise been deemed to be Consigned Inventory. FCC may make such sales, and may use the Beaudry Trademark (as defined in Section 6(b)(i)(1)) in connection therewith, without the need to obtain any assignment of or license to the Beaudry Trademark in connection therewith. Following any sale by FCC of FCC Retained Inventory, FCC shall deposit all proceeds from such sale into the Lockbox and Beaudry shall allocate such proceeds between FCC and Beaudry in accordance with the provisions of Section 4(c)(iv) and (v), and thereafter, all such proceeds shall be included as payments toward the Consignment Value and the Guaranteed Amounts for all purposes under this Agreement, including without limitation Section 6(b) and (c), and under the Consignment Agreement.

(3)    Following the end of the Operative Consignment Term, FCC may sell any of the then unsold FCC Inventory, wherever located, and on whatever terms and conditions, and at whatever prices, at FCC determines in its sole and absolute discretion; provided that, if there has not occurred an Early Consignment Termination and none of the Consigned Inventory was returned to FCC due to a default by Beaudry under this Agreement or the Consignment Agreement, M. Beaudry, or his designee, will have a right of first refusal to purchase any of such FCC Inventory on the same terms and conditions as any third party to which FCC intends to sell such FCC Inventory.

(4)    The Consignment Agreement will set forth the terms, conditions and mechanisms for notice of any intended sale by FCC as to which M. Beaudry, or his designee, possesses a right of first refusal, along with the manner of M. Beaudry's, or his

designee's, exercise of such right of first refusal with respect thereto, as mutually agreed by FCC, Beaudry and M. Beaudry.

        (d)    <u>Further Consignment of FCC Inventory</u>.

        (i)    <u>Notice to Third Party Consignees</u>. Following the consummation of the 363 Sale, Beaudry will deliver written notice to each Person who is not an Affiliate of Beaudry and who then holds any FCC Inventory on consignment from Beaudry (***"Third Party Consignee"***) that ownership of the FCC Inventory has been transferred to FCC, and that FCC requires that Beaudry and each such Third Party Consignee enter into a new agreement with Beaudry (***"Third Party Consignee Agreement"***), which Third Party Consignee Agreement will: (i) acknowledge FCC's ownership of the FCC Inventory and consignment of the Consigned Inventory to Beaudry, as well as FCC's right to terminate the Third Party Consignee Agreement, in accordance with the provisions of this Agreement and the Consignment Agreement; (ii) authorize, upon the commencement of the consignment to Beaudry in accordance with this Agreement and the Consignment Agreement (***"Consignment Commencement"***), the further consignment by Beaudry to such Third Party Consignee of the FCC Inventory then consigned, but only after such Third Party Consignee's express consent, along with its taking of such action as FCC may reasonably request, to enable FCC to record appropriate financing statements, or take other reasonable and appropriate action, to evidence FCC's ownership and consignment of the FCC Inventory; (iii) provide for the consignment of additional FCC Inventory to such Third Party Consignee on terms acceptable to FCC; (iv) provide for such Third Party Consignee's acknowledgment and agreement that FCC shall have the right to deliver notice to such Third Party Consignee that FCC is terminating the Third Party Consignee Agreement with such Third Party Consignee upon the occurrence of either of the following: (A) the expiration or termination of the term of the consignment from FCC to Beaudry of the FCC Inventory that is consigned to such Third Party Consignee; or (B) following any breach or default by Beaudry under this Agreement or the Consignment Agreement; and that, upon such Third Party Consignee's receipt of such notice, such Third Party Consignee immediately will return to FCC all FCC Inventory subject to the such Third Party Consignee Agreement; and (v) contain such other terms and conditions as reasonably requested by FCC and agreed to by Beaudry and such Third Party Consignee. The Third Party Consignee must execute the Third Party Consignee Agreement before Beaudry may make any further consignment of FCC Inventory to such Third Party Consignee.

        (ii)    <u>Consignment to Affiliates</u>. Following the Consignment Commencement, and so long as Beaudry is not in default under this Agreement or the Consignment Agreement, Beaudry will have the right to consign Consigned Inventory to any Affiliate of Beaudry ("Affiliated Consignee") without requiring the advance consent of FCC; provided that all transfers of Consigned Inventory to any Affiliated Consignee will be made by cash sale or pursuant to an agreement with terms and conditions, including, without limitation, terms for payment by the Affiliated Consignee, substantially the same as the terms and conditions in a standard Third Party Consignee Agreement; and provided that the Affiliated Consignee must execute an agreement with terms and conditions substantially the same as those in the Third Party Consignee Agreement before Beaudry may make any further consignment of FCC Inventory to such Affiliated Consignee.

        (iii)    <u>Payment for Inventory on Further Consignment</u>. Notwithstanding Beaudry's right to further consign FCC Inventory pursuant to Section 4(d)(i) and (ii), Beaudry

shall, no later than ninety (90) days following the date of its receipt of notice of any sale of FCC Inventory by a Third Party Consignee, and no later than ninety (90) days following the date of any sale of FCC Inventory by an Affiliated Consignee (*"Consignment Payment Deadline"*), pay to FCC an amount equal to FCC's share of amounts due from such Consignee or Affiliated Consignee from such sale, computed in accordance with the allocation formula set forth in Section 4(c)(iv), if, by the Consignment Payment Deadline, FCC has not previously received payment of its share of the proceeds of such sale, and regardless of whether the Consignee or the Affiliated Consignee has made payment for such sale to Beaudry by the Consignment Payment Deadline. Failure of FCC to receive, in cash, the amount due by the Consignment Payment Deadline shall constitute an Event of Default under this Agreement and the Consignment Agreement

Costs. Beaudry will pay: (i) all costs incurred in connection with preparing invoices and its collection efforts pursuant to Section 4(c)(v)(1); (ii) all costs associated with any Third-Party Consignee Agreement or any agreement with any Affiliated Consignee entered into or maintained pursuant to Section 4(d); (iii) one-half (1/2) of all costs associated with opening and maintaining the Lockbox, pursuant to Section 4(c)(v)(2)(c) hereof; and (iv) all costs otherwise incurred in performing its obligations under the Consignment Agreement. FCC will pay: (i) the costs of any audit of the FCC Inventory during the term of the Consignment Agreement, including without limitation upon the return of any Consigned Inventory pursuant to Section 4(c)(iv)(6); (ii) one-half (1/2) of all costs associated with opening and maintaining the Lockbox, pursuant to Section 4(c)(v)(2)(c) hereof; and (iii) all costs otherwise incurred in performing its obligations under the Consignment Agreement. Under no circumstances shall FCC have any right to charge Beaudry for any such costs or, except as expressly provided in Section 4(c)(v)(2)(c) hereof or in the Consignment Agreement, to deduct or offset any sums from amounts owed to Beaudry pursuant to any Beaudry Accounting.

2.   **AR.**   Subject to FCC's right to receive proceeds from the FCC Inventory sold from the Lots in accordance with Section 4(c)(iv) and 4(c)(v)(3), the assignment of Assigned New AR to FCC in accordance with Section 4(a), and the enforcement of FCC's rights and remedies under the security interest to be given FCC pursuant to Section 6(b), Beaudry will have the right to collect and retain all residual proceeds, not otherwise due or owed to FCC, from AR, including, without limitation, all AR generated before October 14, 2009, all New AR and all AR generated after March 12, 2010, and the right to use all such retained AR in its sole discretion.

3.   Security; Trademark License; Guarantees.

(a)   Release of Existing Security Interests.   Effective upon the occurrence of a Full Satisfaction, whether by Free And Clear Delivery or a Full Satisfaction Payment ("Full Satisfaction Event"):

(i)   FCC hereby releases its security interest in, and all its right, title and interest in and to, all assets subject to the FCC Lien, including, without limitation, all Cash, the AR, the Inventory and the Personal Property;

(ii)   Beaudry will have the right to file UCC-3 terminations for all UCC-1 financing statement(s) filed in any State with respect to the FCC Lien;

(iii)   M. Beaudry will be exonerated from all obligations under the M. Beaudry Guaranty and MGB will be exonerated from all obligations under the MGB Guaranty, each of those guaranties are terminated and of no further force or effect and as soon as

commercially reasonable following the Effective Date, FCC will return each of the original Guaranties marked "Cancelled" to M. Beaudry;

(iv)    FCC will deliver to M. Beaudry a Full Reconveyance of the Camino Trust Deed, duly executed by FCC and notarized, in a form acceptable for recording in the El Dorado County Records and a Full Reconveyance of the 8th Street Trust Deed, duly executed by FCC and notarized, in a form acceptable for recording in the Los Angeles County Records and thereafter, M. Beaudry and MGB will have the right to record such Full Reconveyances in the El Dorado County Records and the Los Angeles County Records, respectively; and

(v)    upon Beaudry's request, FCC shall deliver such further documents and take such further actions as may be necessary to fully release, and to memorialize the full release of, all such assets, liens and guaranties.

(b)    New Security Interests.

(i)    Creation.    Upon the occurrence of a Free and Clear Delivery, Beaudry and/or M. Beaudry, as applicable, will grant to FCC a security interest, pursuant to a Security Agreement in a form reasonably acceptable to FCC and Beaudry, in the following assets of Beaudry and/or M. Beaudry, as applicable, to secure payment of all amounts due to FCC under Section 4 of this Agreement and the Consignment Agreement, and to secure any rights or remedies of FCC which may arise from any failure by Beaudry to return or account for any Inventory as may be required pursuant to this Agreement or the Consignment Agreement:

(1)    Beaudry Trademark.    The service marks owned by Michael Beaudry, Inc. and registered with the United States Patent and Trademark Office listed on Exhibit D hereto, together with all trade dress, logos, insignias, designs or variations thereof associated with such service mark (collectively, *"Beaudry Trademark"*).

(2)    Accounts and Inventory.    All of Beaudry's Inventory and AR, including, to the extent Beaudry has rights in AR generated by the sale of FCC Inventory in the Lots (*"Lot AR"*).

(ii)    Further Documents.    Following the Effective Date, upon FCC's request, Beaudry and M. Beaudry, respectively, will execute and deliver such documents and take such actions as may be necessary to grant and allow FCC to perfect the security interests provided in this Section 6(b).

(c)    Trademark License.    In the event that FCC is the successful bidder at the 363 Sale, if at the end of the Operative Consignment Term there is any FCC Retained Inventory still in FCC's possession, or if MBI returns any Consigned Inventory to FCC pursuant to Section 4(c)(iv)(6), Beaudry will grant to FCC, by separate agreement in form and substance acceptable to both FCC and Beaudry, a non-exclusive license to use the Beaudry Trademark solely in connection with the sale of the remaining FCC Inventory (*"Trademark License"*), without the requirement of any payment by FCC for such Trademark License. Following the Effective Date, upon FCC's request, Beaudry and M. Beaudry, respectively, will execute and deliver such documents and take such actions as may be necessary to grant and allow FCC to perfect the interests of FCC granted in the Trademark License. Upon FCC's sale or other disposal of all remaining FCC Inventory, FCC will execute and deliver to Beaudry all such documents and take all such actions as may be necessary to terminate the Trademark License and all registrations and/or recordations of the Trademark License in any public records.

(d)    Release.  Upon FCC's receipt, in cash, of Consignment Payments at least equal to the Consignment Value, or the return of all Consigned Inventory to FCC and payment to FCC of all amounts due to FCC under Section 4 of this Agreement and the Consignment Agreement, FCC will release its security interests and all liens in and against the Beaudry Trademark, all Inventory, all AR and all other assets of Beaudry granted pursuant to Section 6(b), and M. Beaudry and FCC will deliver to Beaudry or file or record, as appropriate, all documents, and take all actions, as may be necessary to fully release, and to memorialize the full release of, all such assets from such security interests and liens.

(e)    Guaranties; Trust Deed.  On the Effective Date, M. Beaudry will deliver to FCC a new performance guaranty (*"New M. Beaudry Guaranty"*) and MGB will deliver to FCC a new performance guaranty (*"New MGB Guaranty"* and together with the New M. Beaudry Guaranty *"New Guaranties"*) each of which New Guaranties will guaranty payment to FCC of the amounts set forth in Section 6(c)(i), in form and substance mutually acceptable to Beaudry, M. Beaudry and MGB, on the one hand, and FCC, on the other hand, respectively.  The New M. Beaudry Guaranty will be unsecured and the New MGB Guaranty will be secured by a Deed of Trust on the 8th Street Property (*"New 8th Street Trust Deed"*) which MGB will deliver to FCC concurrently with the New MGB Guaranty and which FCC will have the right to record in the Los Angeles County Records at any time thereafter.  The New Guaranties will further provide, in part, as follows:

(i)    Guaranteed Amount.  The guaranty under each of the New M. Beaudry Guaranty and the New MGB Guaranty is of an aggregate minimum payment, in cash, to FCC from Consignment Payments, on or before the last day of the term of the Consignment Agreement, as such term may be extended as provided in Section 4(c)(iv)(4), (5) and/or (6), of: (I) with respect to the M. Beaudry Guaranty, Six Million Five Hundred Thousand Dollars ($6,500,000) (subject to potential reduction under Section 6(c)(i)(1) (*"M. Beaudry Guaranteed Amount"*); and (II) with respect to the New MGB Guaranty, Seven Million Three Hundred Thousand Dollars ($7,300,000) (*"MGB Guaranteed Amount"* and together with the M. Beaudry Guaranteed Amount, *"Guaranteed Amounts"*); provided, however, that MGB's maximum liability under the New MGB Guaranty will be One Million Five Hundred ($1,500,000), and provided, further, that neither guaranty will be increased.

(ii)    Reduction; Release of Laura's Jewelry.

(1)    Each of the Guaranteed Amounts will be reduced by the amount of all Consignment Payments made to FCC, dollar for dollar, and by the fair market value of: (A) any Consigned Inventory returned to FCC pursuant to Section 4(c)(iv)(7) and (B) any unsold FCC Retained Inventory in the same Lot as such returned Consigned Inventory, so that, notwithstanding that the Consignment Value is Seven Million Three Hundred Thousand Dollars ($7,300,000), upon Beaudry's making of Consignment Payments to FCC of the M. Beaudry Guaranteed Amount, the M. Beaudry Guaranty will be released and terminated, and upon Beaudry's making of Consignment Payments to FCC of the MGB Guaranteed Amount, the MGB Guaranty will be released and terminated.

(2)    In addition to reductions to the M. Beaudry Guaranteed Amount pursuant to Section 6(c)(ii)(1), if from the Effective Date and continuing through August 31, 2010, Beaudry has made Consignment Payments to FCC in the aggregate amount of no less than Two Million Five Hundred Thousand Dollars ($2,500,000) (excluding the Adequate Protection Payments), FCC will: (A) reduce the M. Beaudry Guaranteed Amount by an additional

One Million Dollars ($1,000,000); and (B) transfer to Beaudry by a bill of sale in a form reasonably acceptable to FCC and Beaudry all right, title and interest in and to certain jewelry described and itemized on a list separately delivered to and approved by FCC (*"Laura's Jewelry"*), which separate listing has been approved by FCC, is signed by all parties to this Agreement and, by this reference, is incorporated herein and made a part hereof.

(3)    If from the Effective Date and continuing through February 28, 2011, Beaudry has made Consignment Payments in the aggregate amount of no less than Five Million Dollars ($5,000,000) (excluding the Adequate Protection Payments), FCC will release the New M. Beaudry Guaranty in its entirety.

(4)    In addition to the right to have Laura's Jewelry transferred to Beaudry pursuant to Section 6(c)(ii)(2), M. Beaudry and/or L. Beaudry will have the right, at any time during the Operative Consignment Term for Lot B, in accordance with this Agreement or the Consignment Agreement, to purchase Laura's Jewelry or any portion thereof, by paying to FCC an amount equal to one hundred five percent (105%) of the cost value of Laura's Jewelry. Upon FCC's receipt of such payment, FCC will apply such amount as part of the aggregate payments made toward the Consignment Value and the Guaranteed Amounts. Following any transfer of any portion of Laura's Jewelry to Beaudry, pursuant to Section 6(c)(ii)(2), this Section 6(c)(ii)(4) or otherwise, then, upon M. Beaudry's or L. Beaudry's request, FCC will deliver such further documents and take such further actions as may be reasonably necessary to evidence or memorialize the transfer to such acquirer of all right, title and interest to such portion of Laura's Jewelry as may be acquired.

(iii)    <u>Release of New Guaranties and/or New 8th Street Trust Deed.</u>

(1)    <u>Upon Payment of Guaranteed Amount.</u> Upon the release of each of the New Guaranties, respectively, FCC will return the respective original New Guaranties marked "Cancelled" to M. Beaudry, and upon the release of the MGB Guaranty, FCC additionally will deliver to M. Beaudry a Full Reconveyance of the New 8th Street Trust Deed, duly executed by FCC and notarized, in a form acceptable for recording in the Los Angeles County Records and thereafter, M. Beaudry will have the right to record such Full Reconveyance in the Los Angeles County Records.

(2)    <u>Upon Sale of 8th Street Property.</u> Notwithstanding anything in Section 6(c) to the contrary, at the written request of MGB, FCC will release and cause a full reconveyance of the New 8th Street Trust Deed prior to FCC's receipt of the MBG Guaranteed Amount under the following circumstance: (A) if MGB enters into an arms-length sale of the 8th Street Property for a purchase price that will allow MGB to realize net proceeds of at least Five Hundred Thousand Dollars ($500,000) in excess of the aggregate amount of all liens and encumbrances against the 8th Street Property senior to the New 8th Street Trust Deed; and (B) at the close of escrow for such sale, FCC is paid Five Hundred Thousand Dollars ($500,000). Upon FCC's receipt of such Five Hundred Thousand Dollars ($500,000) and such written request, FCC will: (I) apply such Five Hundred Thousand Dollars ($500,000) as part of the aggregate payments made toward the Consignment Value, the M. Beaudry Guaranteed Amount, the MGB Guaranteed Amount and MGB's maximum liability under the New MGB Guaranty; and (II) deliver to M. Beaudry a Full Reconveyance of the New 8th Street Trust Deed, duly executed by FCC and notarized, in a form acceptable for recording in the Los Angeles County Records, and, thereafter,

1    M. Beaudry will have the right to record such Full Reconveyance in the Los Angeles County

2    Records.

3        4.    Mutual Releases,Of CDI, MBI, M. Beaudry and L. Beaudry.  Except for the terms,
     conditions and obligations set forth in this Agreement and the documents executed in connection
     with or specifically referenced in this Agreement (**"Ancillary Agreements"**), and except for

4    Claims (as hereinafter defined) arising as a result of any breach by Beaudry of any representation
     or warranty made in connection with any financial information pertaining to Beaudry delivered to

5    FCC during the Interim Period or in connection with the negotiation and execution of this
     Agreement, in consideration of the mutual promises and covenants contained herein, effective

6    upon the occurrence of a Full Satisfaction Event, FCC, for itself and to the full extent legally
     possible, on behalf of each of its predecessors, successors, assigns, members, managers, officers,

7    employees, agents, Affiliates, representatives, insurers and all Persons acting through or on behalf
     of it, hereby fully and forever releases and discharges each of CDI, MBI, M. Beaudry, L. Beaudry

8    and MGB, and each of their respective predecessors, successors, assigns, shareholders, directors,
     officers, employees, trustees, beneficiaries, executors, administrators, heirs, agents,

9    representatives, insurers and all Persons acting through or on behalf of any of them, from any and
     all claims, demands, causes of action, actions, obligations, costs, expenses, damages, losses and

10   liabilities, of whatever kind or nature, in law, in equity or otherwise, whether known or unknown,
     anticipated or unanticipated, or certain or speculative, arising or occurring prior to the Agreement

11   Date, which FCC had, now has or at any time may hereafter have, for or by reason of any matter
     whatsoever (**"Claims"**), including without limitation, any and all Claims arising in connection

12   with or in any way related to the Factoring Facility or any matters alleged in any documents filed
     in the FCC Action, the Bankruptcy Cases or the Beaudry Complaint.

13

14       (b)    Of FCC  Except for the terms, conditions and obligations set forth in this
     Agreement and the Ancillary Agreements, in consideration of the mutual promises and covenants
     contained herein, effective upon the occurrence of a Full Satisfaction Event, each of CDI, MBI, M.

15   Beaudry, L. Beaudry and MGB, for themselves and to the full extent legally possible, on behalf of
     each of their respective predecessors, successors, assigns, shareholders, members, directors,

16   officers, employees, trustees, beneficiaries, executors, administrators, heirs, agents,
     representatives, insurers and all Persons acting through or on behalf of any of them, hereby release

17   and forever discharge FCC and each of its predecessors, successors, assigns, members, managers,
     officers, employees, agents, representatives, insurers and all Persons acting through or on behalf of

18   it, from any and all Claims, arising or occurring prior to the Agreement Date, which any of CDI,
     MBI, M. Beaudry, L. Beaudry or MGB had, now has or at any time may hereafter have, for or by

19   reason of any matter whatsoever, including without limitation, any and all Claims arising in
     connection with or in any way related to the Factoring Facility or any matters alleged in any

20   documents filed in the FCC Action, the Bankruptcy Cases or the Beaudry Complaint.

21       The Settlement Agreement also provides that the Bankruptcy Court will grant FCC relief

22   from the automatic stay in the Bankruptcy Cases pursuant to Section 362 of the Bankruptcy Code

23   to the extent necessary to permit FCC to carry out the provisions of, enforce its rights and

24   remedies under, and enjoy the benefits of, the Settlement Agreement.  Without limiting the

25   generality of the foregoing, to the extent such relief from the automatic stay might be necessary,

26   FCC shall be granted relief from stay in connection with FCC's retrieval of FCC Inventory in the

27   possession of Beaudry or any third party, either upon FCC's purchase of the FCC Inventory at the

28   363 Sale or at any subsequent time, so long as such retrieval is in accordance with the terms of the

1    Settlement Agreement.

2        The Debtors believes this settlement is in its best interest because it reduces the risks of

3    litigation and provides a reduction of an obligation of the estate .

4                                      **III.**

5            **THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT**

6        A compromise of the kind contemplated by the Debtors is permissible pursuant to Rule

7    9019(a) of the Federal Rules of Bankruptcy Procedure. Rule 9019(a) specifically provides that,

8    after the filing of a duly noticed motion, "the court may approve a compromise or settlement."

9    Here, the Debtors have filed this Motion and provided the requisite notice to all interested parties

10    in accordance with Rule 9019 and the Local Bankruptcy Rules adopted by this Court. Therefore,

11    this Court has the authority to consider, and ultimately grant, the relief requested by the Debtors

12    through this Motion.

13    1.    <u>The Proposed Settlement is in the Best Interests of the Estate</u>

14        Compromises are generally favored by Bankruptcy Courts. However, while compromises

15    are generally favored, it is still necessary that this Court undertake to determine whether or not the

16    proffered settlement or compromise of the controversy is in the best interests of the estate. The

17    standards for making this determination were enumerated by the United States Supreme Court in

18    <u>Prospective Committee Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 88

19    S.Ct. 1157, 20 L.Ed.2d 1 (1968). In <u>TMT</u>, the Supreme Court stated that

20        Compromises are 'a natural part of the process of reorganization.' In

21        administering the reorganization proceedings in an economical and

22        practical manner it will often be wise to arrange the settlement of

23        claims as to which there are substantial and reasonable doubts. At

24        the same time, however, it is essential that every important

25        determination and reorganization proceeding receive the informed

26        and independent judgment of the Bankruptcy Court. There can be no

27        informed and independent judgment as to whether a proposed

28        compromise is fair and equitable until the Bankruptcy Judge has

1    apprised himself of all the facts necessary for an intelligent and

2    objective opinion of the probabilities of ultimate success should the

3    claim be litigated. Further, the judge should form an educated

4    estimate of the complexity, expense, and likely duration of such

5    litigation, the possible difficulties of collecting on any judgment

6    which might be obtained, and all other facts relevant to a full and

7    fair assessment of the wisdom of the proposed compromise. Basic to

8    this process in every instance, of course, is the need to compare the

9    terms of the compromise with the likely rewards of litigation.

10   Id. at 424-25.

11        The instructions of the Supreme Court in TMT were further elaborated upon by the Ninth

12   Circuit in In re A&C Properties, 784 F.2d 1377 (9th Cir. 1986), where a Debtor sought approval of

13   a settlement with respect to his administration of the debtor's assets. As the Ninth Circuit stated in

14   A&C Properties,

15        The purpose of a compromise agreement is to allow the Debtor and

16        the creditors to avoid the expenses and burdens associated with

17        litigating sharply contested and dubious claims. (Citations omitted).

18        The law favors compromise and not litigation for its own sake ... and

19        as long as the Bankruptcy Court amply considered the various

20        factors that determined the reasonableness of the compromise, the

21        Court's decision must be affirmed.

22   Id. at 1381.

23        Consequently, the standard for approval of compromises and settlements under the

24   Bankruptcy Act is identical to that applied by Courts under the Code. It is necessary, therefore, for

25   a Court to determine whether a proposed settlement by a debtor is reasonable, given the particular

26   circumstances of a case. See In re Equity Funding Corporation of America, 529 F.2d 1274 (9th

27   Cir. 1975). The court in A&C Properties provided further guidance in determining whether or not

28   this Court should approve the Debtor's proposed Settlement Agreement when it stated that:

1    In determining the fairness, reasonableness, and adequacy of a proposed settlement

2  agreement, the Court must consider:

3    (a)    the probability of success in litigation;

4    (b)    the difficulties, if any, to be encountered in the manner of collections;

5    (c)    the complexity of the litigation involved, and the expense, inconvenience, and

6  delay necessarily attending it; and

7    (d)    the paramount interest of creditors.

8    Obviously, the decision as to whether a compromise should be accepted or rejected lies

9  within the sound discretion of this Court. In re Carson, 82 B.R. 847 (Bankr. S.D. Ohio 1987); In re

10 Hallet, 33 B.R. 564 (Bankr. D. Me. 1983); In re Mobile Air Drilling Co., Inc., 53 B.R. 605 (Bankr.

11 N.D. Ohio 1985); In re Hydraulic Enterprise, Inc., 58 B.R. 363 (Bankr. D. R.I. 1986).

12    A Court, however, should not substitute its own judgment for the judgment of the Debtor.

13 In the Matter of Carla Leather, Inc., 44 B.R. 457 (Bankr. S.D.N.Y. 1984). A Court, in reviewing a

14 proposed settlement, is not "to decide the numerous questions of law and fact ... but rather to

15 canvass the issues and see whether the settlement falls below the lowest point in the range of

16 reasonableness". See In re W.T. Grant & Co., 699 F.2d 599, 608 (2nd. Cir. 1983), cert. denied,

17 464 U.S. 822 (1984). A "mini-trial" on the merits of the claims which are the subject of the

18 compromise is not required and should not be undertaken by the Court. In re Blair, 538 F.2d 849

19 (9th Cir. 1976). Neither is an exhaustive examination into the disputed claims required. In re

20 Walsh Construction, Inc., 669 F.2d 1325 (9th Cir. 1982).

21    Rather, the Court must apprise itself of all of the facts necessary for an objective and

22 intelligent decision on the validity of claims to be compromised. This also involves the Court's

23 reaching an intelligent, objective and educated evaluation of the proposed compromise. In re

24 AWECO, 725 F.2d 293, reh'g denied, 732 F.2d 941 (5th Cir. 1984). In a practical sense, this

25 requires the Court not to resolve the issues to be compromised, but to identify them so that the

26 bounds of reasonableness can be seen with some clarity.

27    In this regard, the Debtor's burden is to persuade the Court that the compromise is fair and

28 equitable. In this case, the Debtors have negotiated with FCC and the issues were resolved after

1  extensive negotiations between the parties. After settlement negotiations and discussions, the

2  Debtors elected to enter into the Settlement Agreement for a number of reasons, including, **(i)**

3  analysis of the potential outcome of continued litigation with FCC, and the likelihood of

4  confirming a plan of reorganization over their objections, **(ii)** the state of law with respect to the

5  Debtors' disputes with FCC, **(iii)** whether or not the Debtors would be successful in asserting its

6  position against FCC, and **(iv)** whether the Debtors would be best served by settlement with FCC.

7  As will be demonstrated in more detail, the Debtors submits that under the applicable standards

8  adopted by the Ninth Circuit, the settlement should be approved.

9    B.    Each of the Factors Necessary to Approve the Settlement is Present in This Case

10    As noted earlier, in determining whether to approve this settlement, the standards

11  described above do not require a total and complete analysis of the entire history of the disputed or

12  alleged claims. Rather, the Court need only determine if the proposed compromise falls within the

13  bounds of reasonableness under the circumstances. It is not even necessary that the proposed

14  compromise be the best possible compromise, only that it be reasonable.

15    In this case, even if the Court rejected the settlement and forced the Debtors to continue its

16  disputes with FCC, the result would in all likelihood be no more beneficial to the Debtors than the

17  terms set forth in the Settlement Agreement. In fact, the result could be more deleterious because

18  the Debtors believe that the terms of the Settlement Agreement reflect a reasonable resolution of

19  its disputes with FCC and creating a workable framework for a plan of reorganization. Moreover,

20  the Debtors are  convinced that the costs of litigation, if such a course were pursued, would simply

21  diminish any return and place it in serious risk of obtaining a far less favorable outcome.

22    2.    The Probability of Success

23    One of the primary factors which the Debtors considered in this decision to enter into the

24  settlement was an analysis of the potential outcome of continued litigation with FCC, and the

25  likelihood of confirming a plan of reorganization over their objections.  Bearing this in mind, the

26  Debtors considered the applicability of the relevant law to the facts of this case, and the relative

27  strengths and weaknesses in the position of each party.  After recognizing the difficult road ahead

28  of it, the Debtors concluded that there was no assurance of the Debtors' success in confirming a

1    plan of reorganization with a resolution of its disputes with FCC, better than the amount set forth

2    herein. Consequently, the Debtor decided to settle its potential claims according to the Settlement

3    Agreement.

4          The Settlement Agreement would eliminate certain significant risks to the Debtors arising

5    from the continued litigation with FCC. For example, given the continuing disputes concerning the

6    value of the Debtors' assets and adequate protection for FCC's interests therein, there is a

7    significant possibility that FCC may obtain relief from the automatic stay over the Debtors'

8    objections on the FCC Relief Motion. If FCC were to obtain relief from the automatic stay the

9    Debtors would no longer be able to operate and creditors would likely receive significantly less

10    than if the Settlement Agreement is approved. Thus, there would be a significant risk that the

11    Debtors' operations would be substantially constricted, that a receiver would be appointed, and

12    that the Debtors' assets would be foreclosed upon, leaving no available source of funds to satisfy

13    the claims of the estates' unsecured creditors.

14          The Settlement Agreement confers valuable consideration to the Debtors in exchange for

15    its inventory being sold to FCC or a higher bidder, and facilitates the reorganization of the

16    Debtors' business through the consignment of the inventory to the Debtors for sale by the Debtors.

17    Allowing the Debtors to proceed under the Settlement Agreement will result in the realization of

18    significantly higher proceeds from the sale of the assets and inventory than if the inventory were

19    disposed of in the original method sought by FCC - a bulk sale or ordinary course liquidation,

20    which likely would yield net revenues of approximately 35% of the inventory cost, or $3.5

21    million. Absent the Settlement Agreement, there is a possibility based upon the Debtors not being

22    able to confirm its Plan of Reorganization, that FCC would be granted relief to ultimately

23    foreclose on or otherwise liquidate the assets, as a result of which, given FCC's secured claim, the

24    unsecured creditors would be left with no assets or value from which to realize any recovery on

25    account of their claims.

26          On the other hand, the arrangement under the Settlement Agreement provides the best

27    chance for the claims of the unsecured creditors to be paid.  While the Debtors have suffered

28    significant operating losses since the Petition Date, the Settlement Agreement will enable the

1   Debtors to reduce operating expenses, avoid litigation with FCC, and focus on sales.  Historically,

2   the Debtors typically sold inventory at a gross margin of 44%.  While the Debtors recently have

3   not been able to consistently achieve those margins, if the Debtors were able to sell inventory at

4   such a gross margin, the inventory could be sold for approximately $18,000,000, which, even after

5   satisfaction of the obligation owing to FCC under the proposed consignment agreement, would

6   provide substantial recovery to the Debtors' unsecured creditors.  This estimation, however, is

7   based on the assumption that the Debtors would continue to operate as a going concern, which the

8   Settlement Agreement between the parties would allow.

9        In addition, FCC may once again assert that their interest in the cash collateral is not

10   adequately protected going forward. The Debtors are in the process of stabilizing management and

11   employees and streamlining the business, but the Debtors' liquidity is strained. The Debtors are at

12   a crucial point in restructuring the business and any disruption could cause immediate and

13   irreparable harm to the Debtors' business, thereby affecting the Debtors' ability to successfully

14   reorganize and/or facilitate an orderly sale of the Debtors' assets. In order for the Debtors to meet

15   the current obligations to Beaudry customers, continue the operations and preservation of the

16   business, and facilitate new sales, the Debtors must be able to use the revenue generated by the

17   business (which constitutes the Debtors' "cash collateral" pursuant to the Factoring Facility) to pay

18   the expenses of the business. Unless the Debtors are able to utilize the revenue generated by the

19   business to pay the ordinary and necessary operating expenses, the Debtors will not be able to fill

20   existing and future orders or pay employees, all of which would be disastrous and fatal to the

21   Debtors' business operations and cash flow, as well as the jobs of employees who depend on the

22   Debtors for their livelihood. Given the severe and irreparable nature of the injury that the Debtors

23   would suffer if the Court terminated their authority to use cash collateral, and the continuing risk

24   that the Debtors' authority to use cash collateral may be terminated during the course of continued

25   litigation with FCC, the Settlement Agreement provides a far more favorable result for the

26   Debtors.

27       3.   <u>The Difficulties if any, to be Encountered in the Manner of Collections</u>

28        This factor does not appear to apply, as the Debtors are not seeking any monetary recovery

1  against FCC with respect to the disputes arising under the Factoring Facility that would require the

2  Debtors to undertake efforts to collect on any judgment.

3      4.    <u>The Complexity of the Potential Claims, and the Attendant Time Energy and</u>

4      <u>Inconvenience</u>

5      The disputes with FCC necessarily involve numerous factual and legal disputes which are

6  extremely complex and would be litigated. Approval of the Settlement Agreement would allow

7  the Debtors to avoid significant additional expense, inconvenience and delay that otherwise would

8  be incurred in continuing to litigate the issues between the Debtors and FCC in this case and the

9  Superior Court Action, all of which raise complex factual and legal issues. Further, resolution of

10  these issues likely would require expert witness testimony on matter; such as valuation and may

11  require the Debtors to hire additional estate professionals, such as brokers or auctioneers, for the

12  liquidation of the assets. This potential additional discovery and proceedings, along with the

13  possible necessity of additional professionals hired by the bankruptcy estates, would be time-

14  consuming, costly and would create a significant burden on the Estates. .

15      5.    <u>The Paramount Interest of Creditors</u>

16      In analyzing the benefits and risks associated with the possible litigation of the Debtors'

17  disputes with FCC, the Debtors consistently considered the interests of its creditors. When the

18  interests of all creditors were factored into the equation, it became clear that settlement of the

19  Debtors' disputes with FCC was in its best interest. Settlement according to the terms of the

20  Settlement Agreement obviates the expense, delays, and uncertainty inherent in pursuing the

21  litigation while allowing creditors the opportunity to realize a return on their claims in the near

22  future. Rather than expend a significant amount of administrative expenses in prosecuting the

23  action, the Debtors believe that the settlement is a result creditors would favor.

24      **The Settlement Agreement provides an opportunity for the Debtors to resume a**

25  **normal and profitable business experience as the market improves and consumers return to**

26  **a more regular buying pattern.** The Debtors' primary goal in this process is to preserve value in

27  the Debtors' business and interest in the inventory so that the inventory will produce more revenue

28  when sold, thereby providing the Debtors funds with which to pay its unsecured creditors. The

1  inventory consists primarily of precious metals and jewels, primarily diamonds, which, as

2  commodities, are readily marketable assets, certainly far more attractive than almost any other

3  form of consumer product such as clothing, and typically are not subject to changes in consumer

4  tastes. Thus, the Debtors strongly believes that patience and endurance are required to "weather

5  this storm" and be ready for the market to return. In this process, the interests of the creditors will

6  be best served by allowing the Debtors to operate the business under the terms of the Settlement

7  Agreement. The Debtors believes that the approval of the Settlement Agreement will provide the

8  Debtors and its creditors and other stakeholders with the best opportunity possible for maximizing

9  value by realizing upon the Debtors' assets through going concern sales.

10       Furthermore, the Settlement Agreement is a necessary step toward the consummation of

11  the reorganization of the Debtors' business, the preparation of a chapter 11 plan of reorganization,

12  and the eventual distribution to the estates' unsecured creditors. This Settlement Agreement will

13  resolve the estates' significant and costly disputes with its senior secured lender, FCC, and provide

14  the only conceivable mechanism by which the Debtors can continue to operate their business. If

15  the Debtors are required to continue to litigate the disputes with FCC, it may be difficult for a

16  feasible plan providing for any meaningful recovery to the unsecured creditors to be created and

17  confirmed, Under the circumstances, the Settlement Agreement is in the best interests of creditors

18  and should be approved.

19       6.    The Settlement Agreement Was Negotiated In Good Faith And Is Reasonably

20            Believed To Be The Best Compromise Under The Facts

21       The Settlement Agreement was the result of good faith and arms-length negotiations

22  between the Debtors, on the one hand, and FCC, on the other hand, undertaken in an effort to

23  resolve efficiently and effectively the disputes arising from the Factoring Facility and the Debtors'

24  obligations thereunder, which include contested matters related to FCC's ability to foreclose on its

25  collateral and the Debtors' use of cash collateral.

26       In addition, the Settlement Agreement is reasonably believed to be the best compromise

27  negotiable under the facts and circumstances and in the best interest of the estates, given the

28  parties' desire to facilitate the continued operation of the Debtors' business to maximize the profits

1   to be realized from the inventory. Without the Settlement Agreement and the proposed procedure

2   by which the Debtors can maintain the business as a going concern, it would be difficult for the

3   Debtors to be able to propose and confirm a plan of reorganization or make any meaningful

4   distribution to the estates' unsecured creditors.   Therefore, the Settlement Agreement should be

5   approved.

6       As addressed repeatedly, the Debtors believe that the settlement with FCC is in the best

7   interests of all parties and should be approved by the Court. Denial of the Motion will result in

8   nothing less than an extensive, protracted, and uncertain future for creditors in the face of what

9   presently is a certain return. Accordingly, the Court should defer to the business judgment of the

10   Debtors and approve the proposed settlement.

11               **IV.**

12           **CONCLUSION**

13       Based on the foregoing, the Debtors respectfully requests that the Court grant the Motion

14   and approve the Settlement Agreement, and for such other and further relief as the Court deems

15   just and proper.

16   DATED: May 28, 2010          ERVIN, COHEN & JESSUP LLP
                                 Michael S. Kogan

17

18               By:  /s/Michael S. Kogan

19                    Michael S. Kogan
                      Attorneys for the Debtors

20

21

22

23

24

25

26

27

28

## DECLARATION OF MICHAEL BEAUDRY

I, Michael Beaudry, declare and state as follows:

1.      I am over the age of 18. I am the President of Centerstone Diamonds, Inc. ("CDI") and Michael Beaudry Inc. ("MBI"), the debtors and debtors in possession herein in these jointly administered bankruptcy cases (collectively, the "Debtors" or "Beaudry"), and I submit this declaration in support of its Motion to Approve Compromise of Controversy with FCC, LLC (the "Motion"). I have held the position of President for over fifteen (15) years. The contents of this declaration are based upon my personal knowledge and if called upon to testify concerning the facts set forth in this declaration, I could and would do so competently, and concern matters under my supervision or control within the scope of my duties with the Debtors herein.

2.      In my capacity as the chief executive officer of the Debtors, I am responsible for, among other things, supervising all corporate accounting and finance functions, including the preparation of periodic financial statements, and financial projections. The Debtors' financial books and records are maintained in the ordinary course of its business, in a consistent and organized manner.

3.      On or about June 4, 2009, the Debtors commenced this case by filing a Voluntary Petition under Chapter 11 of the Bankruptcy Code (the "Petition Date"). CDI, as the manufacturing company of "Beaudry" and MBI, as the sales and marketing company of "Beaudry", are one of the finest designer and manufacturers of unique handcrafted, custom, one-of-a kind jewelry in the world. Beaudry's products are marketed through a variety of channels (*"Sales Channels"*), including upscale department stores, jewelry stores, a sales team and internet auction sites, with many products placed in sales outlets on consignment. M Beaudry, the President of the Debtors and sole shareholder of CDI and MBI, is a master diamond cutter, and considered a visionary designer and manufacturer.

4.      From 2001 to 2004, Beaudry experienced business growth of a rough average of 20% per annum. From 2004 to 2007, Beaudry's business had been relatively stable, with gross earnings averaging approximately $20,000,000 and taxable income surpassing $1,000,000 or more. In 2008, despite a historic decline in the U.S. retail market, Beaudry's business was

1    relatively stable showing a slight overall decline of approximately 10 to 15% through October of

2    2008. Unfortunately, starting in October of 2008 and continuing to the present time, Beaudry's

3    business has declined over 50% from its five year historical averages.

4        5.     Compared to prior years, the Debtors have been impacted by a sharp drop in sales

5    primarily due to (i) reduced consumer discretionary spending, given the national economic

6    downturn; (ii) lower inventory selection as a result of the Debtors' tight liquidity position and

7    reduced, less favorable payment terms from its vendors; (iii) the Debtors' inability to devote

8    sufficient resources to marketing and advertising due to liquidity constraints; (iv) the amount of

9    time, energy and focus that has been devoted necessarily to the issues and negotiations by and

10    between the Debtors and FCC prior to and during these bankruptcy case; and (v) the further

11    tightening of the Debtors' liquidity resulting from FCC's adjustments and reductions of the

12    formulas used to calculate what funds would be advanced to the Debtors under the loans with

13    FCC. Moreover, poor capital market conditions have severely hindered the Debtors' ability to raise

14    new capital to restructure their operations.

15        6.     Given the worsening condition in 2008, the Debtors began implementing various

16    measures designed to stabilize the business and increase profitability, including (i) refocusing their

17    marketing strategies and branding; (ii) cutting operational costs, particularly labor costs through

18    reductions in workforce and outsourcing production and manufacturing of jewelry; (iii) reworking

19    any inventory that was deemed not to be easily marketable and scrapping some inventory for sale

20    at commodity value as diamonds and/or precious metal; (iv) focusing more strongly on the special

21    order Beaudry business; and (v) selling some of their aged or lower priced inventory at smaller

22    margins through special events, private buyer sales and other extraordinary efforts, and marketing

23    to retailers with customers in markets commensurate with the nation's economic environment.

24    Continuing these efforts should facilitate the ongoing operations of the Debtors' business in an

25    efficient and productive manner. Based on current indications that the economic climate is

26    improving, increasing number of sales and inquiries about new production, discussions with

27    existing Beaudry accounts, and the Debtors now expects that their 2010 performance will exceed

28    2009's performance.

7.    FCC and Beaudry are parties to that certain Factoring and Inventory and Advances and Security Agreement dated as of May 2, 2007 (*"Factoring Agreement"*) and various other documents related to the Factoring Agreement listed on <u>Exhibit A</u> to the Settlement Agreement (collectively, *"Factoring Facility"*).    Under the Factoring Facility, FCC advanced money for Beaudry's use in the operation of the Business, repayment of which is secured by a first lien and security interest in substantially all of the assets owned by Beaudry (*"FCC Lien"*), including, without limitation, all: (a) cash and cash equivalents (*"Cash"*); (b) accounts receivable (*"AR"*); (c) inventories of finished goods, works in progress and raw materials for the design and production of finished goods (collectively, *"Inventory"*); and (d) equipment used in the design and fabrication of jewelry and other personal property used in the operation of the Business (*"Personal Property"*).    FCC contends that the amount currently owed by Beaudry under the Factoring Facility (*"Debt"*) is in excess of Eight Million Five Hundred Thousand Dollars ($8,500,000).

8.    In addition to the first priority security interest granted to FCC on substantially all of the Debtors' assets under the Factoring Agreement, M. Beaudry personally guarantied repayment of the Debt under the Factoring Facility pursuant to a Continuing Guaranty dated May 2, 2007 executed by M. Beaudry in favor of FCC (*"M. Beaudry Guaranty"*).    The M. Beaudry Guaranty is secured by a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated May 3, 2007 executed by M. Beaudry, as Trustor, for the benefit of FCC, as beneficiary, recorded in the Official Records of El Dorado County, California (*"El Dorado County Records"*) on May 22, 2007 as Document No. 2007-0034235-00 (*"Camino Trust Deed"*) on real property owned by M. Beaudry and located at 3600 Fuji Court, Camino, California (*"Camino Property"*).

9.    M. Beaudry also provided a further guaranty for repayment of a portion of the Debt, in the amount of One Million Five Hundred Thousand Dollars ($1,500,000), through that certain Continuing Guaranty dated May 3, 2007 executed by MGB, which is controlled by M. Beaudry, in favor of FCC (*"MGB Guaranty"* and with the M. Beaudry Guaranty *"Guaranties"*). The MGB Guaranty is secured by a Deed of Trust, Assignment of Rents, Security Agreement and

1    Fixture Filing dated May 3, 2007 executed by MGB, as Trustor, for the benefit of FCC, as

2    beneficiary (*"8th Street Trust Deed"*), and recorded in the Official Records of Los Angeles

3    County, California (*"Los Angeles County Records"*) on May 22, 2007 as Document No.

4    20071238539, which grants a lien on property owned by MGB located at 323 West 8th Street, Los

5    Angeles, California (*"8th Street Property"*). The 8th Street Property currently is listed for sale for

6    $6.45 million and most recently has been appraised at $6.5 million. In addition, prepetition, M.

7    Beaudry borrowed $1 million using both the 8th Street Property and his personal residence as

8    security for this personal loan, and paid FCC approximately $800,000 from the loan proceeds to

9    reduce the amount of the FCC obligation.

10           10.    Commencing in late 2008, Beaudry failed to make certain interest and fee

11    payments owed to FCC under the Factoring Facility.  Without waiving Beaudry's default, FCC

12    and Beaudry entered into a forbearance agreement pursuant to which, for a period of at least six

13    months, FCC and Beaudry attempted to work together to enable Beaudry to continue Business

14    operations with specific continued advances under the Factoring Facility.  During this six-month

15    period, Beaudry paid substantial amounts owed to FCC under the Factoring Facility. Prior to the

16    Petition Date, the Debtors had been in discussions with both FCC and many of their trade creditors

17    regarding a potential consensual resolution of the Debtors' financial difficulties, including

18    proposed asset sales.

19           11.    Shortly after the Petition Date, on or about June 15, 2009, the Debtors filed an

20    emergency motion for the use of cash collateral. The Debtors' cash collateral motion, as

21    supplemented, was opposed strenuously by FCC. Both the Debtors and FCC expended significant

22    time and expense preparing papers to be filed and collating evidence, including expert testimony

23    with respect to the valuation of the assets, to support each position. After several interim hearings,

24    the Court granted the Debtors' request for authority to use cash collateral.

25           12.    Prior to the commencement of the bankruptcy cases, FCC filed an action in Los

26    Angeles Superior Court against the Debtors for the recovery of specific personal property, judicial

27    foreclosure and injunctive relief arising from the obligations and interests under the Factoring

28    Facility (the "Superior Court Action"). On May 13, 2009, the Los Angeles Superior Court granted

1   a temporary restraining order that enjoined the Debtors from (i) selling inventory outside the

2   ordinary course of business, (ii) moving inventory outside of California, and (iii) selling inventory

3   on a basis other than cash (the "TRO"). After entry of the TRO, FCC noticed a hearing for June 5,

4   2009 on an application for a writ of possession and a motion for the appointment of a receiver.

5   The chapter 11 cases were commenced the day of the hearing on FCC's motion for appointment of

6   a receiver.

7         13.    On or about September 18, 2009, FCC brought a motion before the Court

8   requesting relief from the automatic stay to allow FCC to continue the Superior Court Action and

9   seek to foreclose on its security interest in the Debtors' assets. FCC contended that such a

10   liquidation would result in net revenues of approximately 35% of the cost of jewelry inventory -

11   $3.5 million, based on the undisputed $10 million cost of the inventory. The Debtors opposed the

12   relief from stay motion and, after a hearing on September 8, 2009; the Court denied FCC's motion

13   for relief from the automatic stay, without prejudice. The Court's Order Denying Motion for Relief

14   From the Automatic Stay, however, provides that the Debtors must make monthly adequate

15   protection payments of $35,000 to FCC, and that failure to make such payments will entitle FCC

16   to an immediate order for relief from the automatic stay.

17         14.    On or about March 16, 2010, CDI and MBI filed with the Bankruptcy Court a

18   Complaint and Objection to Claim Filed of FCC, LLC, designated Adversary Number LA:10-

19   01345-VZ (*"Beaudry Complaint"*). The Beaudry Complaint seeks the following relief from the

20   Bankruptcy Court: (1) Declaratory Relief As To The Amount Of The FCC Claim; (2) Offset

21   Against FCC Claim Amount For Damages Sustained By Debtors; (3) Equitable Subordination

22   Under 11 U.S.C.§ 510(c); and (4) For Preliminary Injunction and Injunction Against Actions By

23   the Defendant – 11 U.S.C. § 105(a).   Following service of the Beaudry Complaint, Beaudry and

24   FCC stipulated to continue the time in which FCC must respond to the Beaudry Complaint in

25   order to continue negotiations of the settlement herein.

26         15.    In conjunction with the filing of the Beaudry Complaint, Beaudry filed its

27   Disclosure Statement and Plan of Reorganization (collectively, the "Disclosure Statement") which

28   effectively sought to subordinate a portion of FCC's claims upon the same basis as contained in

1   the Beaudry Complaint. Following service of the Disclosure Statement, Beaudry and FCC

2   stipulated to continue the hearing on the Disclosure Statement in order to continue negotiations of

3   the settlement herein. On or about May 18, 2010, FCC filed its Motion for Relief From Stay (the

4   "FCC Relief Motion") after negotiations between the Parties seemed to have failed. After the

5   filing of the FCC Relief Motion, the Parties resolved the final terms of the Settlement Agreement,

6   and agreed to continue the FCC Relief Motion.

7        16.    On or about May 21, 2010, the Debtors and FCC after many months of negotiating

8   a settlement, negotiated the terms of a settlement agreement designed to resolve all of the issues

9   and disputes between the parties, subject to the approval of the Bankruptcy Court in these

10   bankruptcy cases. The Settlement Agreement is the initial and most substantial piece of the overall

11   settlement agreement. A true and correct copy of the Settlement Agreement is attached as Exhibit

12   "A" and incorporated herein by reference.

13        17.    The Settlement Agreement contemplates that, subject to certain terms and

14   conditions, FCC will reduce its secured claim against the Debtors' chapter 11 estates (the

15   "Estates"), stop accruing interest and other charges on the outstanding indebtedness owed it by the

16   Debtors and accept the inventory and certain other collateral by a credit bid sale in full satisfaction

17   of this indebtedness. The Settlement Agreement will also afford the Debtors the opportunity to

18   take a consignment back of the foreclosed inventory for sale in the ordinary course by the Debtor.[2]

19   Under the terms of a concurrent consignment agreement, the Debtors will retain the profits from

20   such sales that exceed certain established thresholds, thereby providing a source of revenue to the

21   Debtors and assets from which the unsecured creditors of the Debtors' Estates can be paid. As set

22   forth below, approval of the Stipulation is in the best interests of the Estates and is a critical step

23   toward a successful reorganization of the Debtors' business for the benefit of the Estates and their

24   creditors.

25        18.    The Debtors believes the Settlement Agreement is in the best interests of the estate

26

27   [2] This assumes that FCC is the successful bidder at the bankruptcy sale, if FCC is not the successful bidder, the Debtor will receive the excess proceeds above the credit bid amount to continue its

28       operations and reorganization.

Ervin, Cohen
& Jessup LLP

IDOCS:12999.3:1002292.2

36

MOTION TO APPROVE COMPROMISE OF CONTROVERSY WITH FCC, LLC

1   since it reduces the risks of litigation and provides a reduction of an obligation of the estate.

2       19.    The Debtors have negotiated with FCC and the issues were resolved after extensive

3   negotiations between the parties. After settlement negotiations and discussions, the Debtors

4   elected to enter into the Settlement Agreement for a number of reasons, including, **(i)** analysis of

5   the potential outcome of continued litigation with FCC, and the likelihood of confirming a plan of

6   reorganization over their objections, **(ii)** the state of law with respect to the Debtor's disputes with

7   FCC, **(iii)** whether or not the Debtors would be successful in asserting its position against FCC,

8   and **(iv)** whether the Debtors would be best served by settlement with FCC.

9       20.    In this case, even if the Court rejected the settlement and forced the Debtors to

10  continue its disputes with FCC, the result would in all likelihood be no more beneficial to the

11  Debtors than the terms set forth in the Settlement Agreement. In fact, the result could be more

12  deleterious because the Debtors believe that the terms of the Settlement Agreement reflect a

13  reasonable resolution of its disputes with FCC and creating a workable framework for a plan of

14  reorganization. Moreover, the Debtors are convinced that the costs of litigation, if such a course

15  were pursued, would simply diminish any return and place it in serious risk of obtaining a far less

16  favorable outcome.

17      21.    One of the primary factors which the Debtors considered in this decision to enter

18  into the settlement was an analysis of the potential outcome of continued litigation with FCC, and

19  the likelihood of confirming a plan of reorganization over their objections.. Bearing this in mind,

20  the Debtors considered the applicability of the relevant law to the facts of this case, and the

21  relative strengths and weaknesses in the position of each party. After recognizing the difficult road

22  ahead of it, the Debtors concluded that there was no assurance of the Debtors' success in

23  confirming a plan of reorganization with a resolution of its disputes with FCC, better than the

24  amount set forth herein. Consequently, the Debtors decided to settle its potential claims according

25  to the Settlement Agreement.

26      22.    The Settlement Agreement would eliminate certain significant risks to the Debtors

27  arising from the continued litigation with FCC. For example, given the continuing disputes

28  concerning the value of the Debtors' assets and adequate protection for FCC's interests therein,

1    there is a significant possibility that FCC may obtain relief from the automatic stay over the

2    Debtors' objections on the FCC Relief Motion. If FCC were to obtain relief from the automatic

3    stay the Debtors would no longer be able to operate and creditors would likely receive

4    significantly less than if the Settlement Agreement is approved. Thus, there would be a significant

5    risk that the Debtors' operations would be substantially constricted, that a receiver would be

6    appointed, and that the Debtors' assets would be foreclosed upon, leaving no available source of

7    funds to satisfy the claims of the estates' unsecured creditors.

8        23.    The Settlement Agreement confers valuable consideration to the Debtors in

9    exchange for its inventory being sold to FCC or a higher bidder, and facilitates the reorganization

10   of the Debtors' business through the consignment of the inventory to the Debtors for sale by the

11   Debtors. Allowing the Debtors to proceed under the Settlement Agreement will result in the

12   realization of significantly higher proceeds from the sale of the assets and inventory than if the

13   inventory were disposed of in the original method sought by FCC - a bulk sale or ordinary course

14   liquidation, which likely would yield net revenues of approximately 35% of the inventory cost, or

15   $3.5 million. Absent the Settlement Agreement, there is a possibility based upon the Debtors not

16   being able to confirm its Plan of Reorganization, that FCC would be granted relief to ultimately

17   foreclose on or otherwise liquidate the assets, as a result of which, given FCC's secured claim, the

18   unsecured creditors would be left with no assets or value from which to realize any recovery on

19   account of their claims.

20       24.    On the other hand, the arrangement under the Settlement Agreement provides the

21   best chance for the claims of the unsecured creditors to be paid. While the Debtors have suffered

22   significant operating losses since the Petition Date, the Settlement Agreement will enable the

23   Debtors to reduce operating expenses, avoid litigation with FCC, and focus on sales. Historically,

24   the Debtor typically sold inventory at a gross margin of 44%. While the Debtors recently have not

25   been able to consistently achieve those margins, if the Debtors were able to sell inventory at such a

26   gross margin, the inventory could be sold for approximately $18,000,000, which, even after

27   satisfaction of the obligation owing to FCC under the proposed consignment agreement, would

28   provide substantial recovery to the Debtors' unsecured creditors. This estimation, however, is

1    based on the assumption that the Debtors would continue to operate as a going concern, which the

2    Settlement Agreement between the parties would allow.

3        25.    In addition, FCC may once again assert that their interest in the cash collateral is

4    not adequately protected going forward. The Debtors are in the process of stabilizing management

5    and employees and streamlining the business, but the Debtors' liquidity is strained. The Debtors

6    are at a crucial point in restructuring the business and any disruption could cause immediate and

7    irreparable harm to the Debtors' business, thereby affecting the Debtors' ability to successfully

8    reorganize and/or facilitate an orderly sale of the Debtors' assets. In order for the Debtors to meet

9    the current obligations to Beaudry customers, continue the operations and preservation of the

10   business, and facilitate new sales, the Debtors must be able to use the revenue generated by the

11   business (which constitutes the Debtors' "cash collateral" pursuant to the Factoring Facility) to pay

12   the expenses of the business. Unless the Debtors' are able to utilize the revenue generated by the

13   business to pay the ordinary and necessary operating expenses, the Debtors will not be able to fill

14   existing and future orders or pay employees, all of which would be disastrous and fatal to the

15   Debtors' business operations and cash flow, as well as the jobs of employees who depend on the

16   Debtors for their livelihood. Given the severe and irreparable nature of the injury that the Debtors

17   would suffer if the Court terminated their authority to use cash collateral, and the continuing risk

18   that the Debtors' authority to use cash collateral may be terminated during the course of continued

19   litigation with FCC, the Settlement Agreement provides a far more favorable result for the

20   Debtors.

21       26.    The Debtors believes that the settlement with FCC is in the best interests of all

22   parties and should be approved by the Court. Denial of the Motion will result in nothing less

23   than an extensive, protracted, and uncertain future for creditors in the face of what presently is a

24   certain return. Accordingly, the Court should defer to the business judgment of the Debtors and

25   approve the proposed settlement.

26       Executed this 28th day of May, 2010, at Los Angeles, California.

27

28                                /s/MichaelBeaudry_____

Ervin, Cohen
& Jessup LLP

IDOCS:12999.3:1002292.2                              39
MOTION TO APPROVE COMPROMISE OF CONTROVERSY WITH FCC, LLC

1    Michael Beaudry

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "A"

# SETTLEMENT AGREEMENT
# AND MUTUAL RELEASE OF CLAIMS

This **SETTLEMENT AGREEMENT AND MUTUAL RELEASE OF CLAIMS** (*"Agreement"*) is made as of May 21 , 2010 (*"Agreement Date"*) by and among **FCC, LLC**, a Florida limited liability company doing business as First Capital Western Region, LLC, (*"FCC"*), **CENTERSTONE DIAMONDS, INC.**, a California corporation (*"CDI"*), **MICHAEL BEAUDRY, INC.**, a California corporation (*"MBI"*, and together with CDI, *"Beaudry"*), Michael Beaudry, an individual (*"M. Beaudry"* ), Laura Beaudry, an individual (*"L. Beaudry"*), and MGB – 8th Street, L.P., a California limited partnership (*"MGB"*), each a *"Party"* and collectively *"Parties"*, with reference to the following facts.

A.      Beaudry is in the business of designing, fabricating and selling custom jewelry (*"Business"*) with offices and operations in Los Angeles, California. Beaudry's products are marketed through a variety of channels (*"Sales Channels"*), including upscale department stores, jewelry stores, a sales team and internet auction sites, with many products placed in sales outlets on consignment. CDI is the manufacturing arm and MBI is the sales and marketing arm of Beaudry. M. Beaudry is a principal of, and jewelry designer for, Beaudry. L. Beaudry is the wife of M. Beaudry and works for Beaudry or an Affiliate (as defined in Section 11(o)) of Beaudry.

B.      FCC and Beaudry are parties to that certain Factoring and Inventory and Advances and Security Agreement dated as of May 2, 2007 (*"Factoring Agreement"*) and various other documents related to the Factoring Agreement listed on <u>Exhibit A</u> hereto (collectively, *"Factoring Facility"*). Under the Factoring Facility, FCC advanced money for Beaudry's use in the operation of the Business, repayment of which is secured by a first lien and security interest in substantially all of the assets owned by Beaudry (*"FCC Lien"*), including, without limitation, all: (a) cash and cash equivalents (*"Cash"*); (b) accounts receivable (*"AR"*); (c) inventories of finished goods, works in progress and raw materials for the design and production of finished goods (collectively, *"Inventory"*); and (d) equipment used in the design and fabrication of jewelry and other personal property used in the operation of the Business (*"Personal Property"*). FCC contends that the amount currently owed by Beaudry under the Factoring Facility (*"Debt"*) is in excess of Eight Million Five Hundred Thousand Dollars ($8,500,000).

C.      M. Beaudry personally guarantied repayment of the Debt under the Factoring Facility pursuant to a Continuing Guaranty dated May 2, 2007 executed by M. Beaudry in favor of FCC (*"M. Beaudry Guaranty"*). The M. Beaudry Guaranty is secured by a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated May 3, 2007 executed by M. Beaudry, as Trustor, for the benefit of FCC, as beneficiary, recorded in the Official Records of El Dorado County, California (*"El Dorado County Records"*) on May 22, 2007 as Document No. 2007-0034235-00 (*"Camino Trust Deed"*) on real property owned by M. Beaudry and located at 3600 Fuji Court, Camino, California (*"Camino Property"*).

D.      M. Beaudry also provided a further guaranty for repayment of a portion of the Debt, in the amount of One Million Five Hundred Thousand Dollars ($1,500,000), through that certain Continuing Guaranty dated May 3, 2007 executed by MGB, which is  controlled by M.

Beaudry, in favor of FCC (*"MGB Guaranty"* and with the M. Beaudry Guaranty *"Guaranties"*). The MGB Guaranty is secured by a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated May 3, 2007 executed by MGB, as Trustor, for the benefit of FCC, as beneficiary (*"8th Street Trust Deed"*), and recorded in the Official Records of Los Angeles County, California (*"Los Angeles County Records"*) on May 22, 2007 as Document No. 20071238539, which grants a lien on property owned by MGB located at 323 West 8th Street, Los Angeles, California (*"8th Street Property"*).

E.   Commencing in late 2008, Beaudry failed to make certain interest and fee payments owed to FCC under the Factoring Facility. Without waiving Beaudry's default, FCC and Beaudry entered into a forbearance agreement pursuant to which, for a period of at least six months, FCC and Beaudry attempted to work together to enable Beaudry to continue Business operations with specific continued advances under the Factoring Facility. During this six-month period, Beaudry paid substantial amounts owed to FCC under the Factoring Facility.

F.   On or about May 26, 2009, FCC filed an action against, among others, MBI, CDI, MGB, M. Beaudry and L. Beaudry, in the Superior Court of the State of California, County of Los Angeles, Case No. BC 413687 (*"FCC Action"*) alleging the following causes of action: (1) Breach of Factoring Agreement against MBI and CDI; (2) Breach of Continuing Guaranties against M. Beaudry and MGB; (3) Judicial Foreclosure on Real Property and Deficiency Judgment against, among other defendants, MBI, CDI, M. Beaudry and MGB; (4) Recovery of Specific Personal Property against MBI and CDI; (5) Injunctive Relief against MBI and CDI; and (6) two causes of Action of Avoidance of Fraudulent Transfer against L. Beaudry.

G.   On June 4, 2009, CDI and MBI each filed a Voluntary Petition under Chapter 11 of Title 11 of the United States Code (*"Bankruptcy Code"*) in the United States Bankruptcy Court for the Central District of California (*"Bankruptcy Court"*), Case No. LA:09-bk-23944-VZ (CDI) and Case No. LA:09-bk-23945-VZ (MBI), which are jointly administered (together *"Bankruptcy Cases"*), and which stayed all action in the FCC Action against Beaudry. FCC is the largest secured creditor in the Bankruptcy Cases. Since filing the Bankruptcy Cases, Beaudry has continued to operate the Business as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. As used in this Agreement, *"Interim Period"* means the period commencing on June 4, 2009 and ending on the Effective Date (as defined in Section 2(a)).

H.   On or about March 16, 2010, CDI and MBI filed with the Bankruptcy Court a Complaint and Objection to Claim Filed of FCC, LLC, designated Adversary Number LA:10-01345-VZ (*"Beaudry Complaint"*). The Beaudry Complaint seeks the following relief from the Bankruptcy Court: (1) Declaratory Relief As To The Amount Of The FCC Claim; (2) Offset Against FCC Claim Amount For Damages Sustained By Debtor; (3) Equitable Subordination Under 11 U.S.C.§ 510(c); and (4) For Preliminary Injunction and Injunction Against Actions By the Defendant – 11 U.S.C. § 105(a).   Following service of the Beaudry Complaint, Beaudry and FCC stipulated to continue the time in which FCC must respond to the Beaudry Complaint in order to continue negotiations of the settlement herein.

I.   FCC, on the one hand, and CDI, MBI, M. Beaudry, L. Beaudry and MGB, on the other hand, desire in this agreement to provide, among other things, for full satisfaction of all

amounts owed by Beaudry to FCC under the Factoring Facility, to resolve all existing disputes between them and to release each other from all claims and obligations between them, including without limitation, all claims asserted in the FCC Action and in Beaudry Complaint, all on the terms and conditions set forth herein.

**NOW THEREFORE**, in consideration of the covenants and releases contained herein, the undersigned Parties agree as follows:

1.  <u>Recitals.</u>  Each of the Parties acknowledges the accuracy of and agrees to the foregoing recitals, all of which are incorporated herein and made part of this Agreement.

2.  <u>Effective Date; Interim Operation of Business; Payment of Segregated Amounts; Adequate Protection Payments.</u>

(a)  <u>Effective Date.</u>  Certain obligations contemplated by this Agreement will arise, and certain actions and transactions contemplated by this Agreement will commence, all as expressly set forth in this Agreement, on or following the Effective Date.  As used herein, **"*Effective Date*"** shall be the first business day on which the Sale Order, as hereinafter defined, is not stayed either pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (**"*F.R.B.P. 6004(h)*"**) or pursuant to some other applicable rule, statute or Court order; provided that if the Effective Date and the Full Satisfaction Event (as defined in Section 6(a)), do not both occur prior to June 25, 2010, or such later date as the Parties may agree in a writing signed by all Parties (**"*Deadline Date*"**), or if, prior to the Deadline Date, the Bankruptcy Court denies the request in the Settlement Motion for the entry of the Sale Order (each as defined in Section 3) (**"*Denial Order*"**), this Agreement automatically will terminate and be of no further force or effect as of the Deadline Date, or, in the event of a Denial Order, as of the date of entry of the Denial Order (**"*Termination Date*"**).

(b)  <u>Interim Operation of Business.</u>  From the Agreement Date until the earlier of the Effective Date or the Termination Date, Beaudry will continue to operate the Business pursuant to the terms and conditions of all applicable provisions of the Bankruptcy Code, all applicable orders of the Bankruptcy Court entered in the Bankruptcy Cases and all other applicable statutes, rules or regulations and, following the Effective Date, also in accordance with this Agreement, the order approving this Agreement and the transactions contemplated herein.  Until the earlier of the Effective Date or the Termination Date, FCC consents to Beaudry's continued use of all cash collateral proceeds of AR and Inventory in accordance with the terms, conditions, and limitations of the Stipulation Authorizing Debtor To Use Cash Collateral And Continuing Hearing On Motion For Authority To Use Cash Collateral, filed in the Bankruptcy Cases on April 13, 2010 as Docket No. 255 (**"*Cash Collateral Stipulation*"**), including, without limitation, the obligation to segregate and retain certain proceeds as provided in Section A.3. of the Cash Collateral Stipulation and the restriction on the use of remaining proceeds in accordance with the monthly budget attached as Exhibit 1 thereto, without regard to whether the Bankruptcy Court has entered any order respecting the Cash Collateral Stipulation and so long as: (a) Beaudry continues to operate the Business in the ordinary course pursuant to the terms and conditions of all applicable provisions of the Bankruptcy Code, all applicable orders of the Bankruptcy Court in the Bankruptcy Cases and other applicable statutes, rules or

regulations; and (b) Beaudry retains cash sufficient to pay the amount due to FCC on the Effective Date pursuant to Section 4(a)(i).

(c)     Payment of Segregated Funds.  Beaudry shall pay to FCC, no later than seven (7) days following the Effective Date, all amounts segregated, or required to be segregated, into a separate account pursuant to Section A.3. of the Cash Collateral Stipulation.

(d)     No Further Adequate Protection Payments.  Prior to the Agreement Date, in accordance with an order of the Bankruptcy Court, Beaudry made certain adequate protection payments to FCC in the amount of Thirty-Five Thousand Dollars ($35,000) per month, for a total of Two Hundred Forty-Five Thousand Dollars ($245,000), including for the month of March, 2010.  Following the Agreement Date, Beaudry will have no obligation to make any further adequate protection payments, including without limitation, any amount for the month of April, 2010, pending the occurrence of either the Effective Date or the Termination Date; provided that if a Termination Date occurs, Beaudry will pay to FCC, no later than five (5) business days following the Termination Date, an amount equal to Thirty-Five Thousand Dollars ($35,000) for each month from April 1, 2010 through such Termination Date.

3.     Bankruptcy Court Motion.  No later than May 28, 2010, FCC and Beaudry will file a motion with the Bankruptcy Court (*"Settlement Motion"*) requesting entry of the Sale Order.  As used herein, *"Sale Order"* shall mean a duly issued and entered order of the Bankruptcy Court containing all of the following relief: (a) the approval of this Agreement and of all of the actions and transactions contemplated herein; (b) the approval of a sale Free And Clear (as hereinafter defined) pursuant to Bankruptcy Code Section 363(k) (*"363 Sale"*) of the Inventory owned by Beaudry as of March 12, 2010 (*"FCC Inventory"*), which FCC Inventory is itemized in a separate listing of the Lots (as defined in and in accordance with Section 4(c)(iii)) described below, and the cost value of such FCC Inventory and Lots is summarized in Exhibit B hereto, with a maximum credit bid by FCC of Seven Million Three Hundred Thousand Dollars ($7,300,000) and a minimum overbid of Five Hundred Thousand Dollars ($500,000), with further minimum overbids of Fifty Thousand Dollars ($50,000.00), as further provided in Section 3(a); and (c) the granting to FCC of relief from the automatic stay in the Bankruptcy Cases pursuant to Section 362 of the Bankruptcy Code, as further provided in Section 3(b).  The separate listing of the Lots has been approved by FCC, is signed by all parties to this Agreement and, by this reference, is incorporated herein and made a part hereof.  Without limiting the generality of the foregoing, the Settlement Motion shall seek to have the FCC Inventory and the Assigned New AR (as defined in Section 4(a)) sold free and clear of all liens, claims and encumbrances (*"Free And Clear"*) pursuant to Bankruptcy Code Section 363(b) and (f).  Among other things, the Settlement Motion will set forth FCC's and Beaudry's consent to, and request that the Sale Order shall provide for: (i) the allowance in the Bankruptcy Cases of a secured claim (*"Secured Claim"*) by FCC in the aggregate amount of Seven Million Three Hundred Thousand Dollars ($7,300,000); and (ii) the stipulation of FCC and Beaudry that, for purposes of the settlement herein, the current fair market value of the FCC Inventory, combined with the value of the Cash Supplement (as defined in Section 4(a)) and the value of the Assigned New AR, is Seven Million Three Hundred Thousand Dollars ($7,300,000).  Upon filing the Settlement Motion with the Bankruptcy Court, Beaudry and FCC will use their best efforts to seek and obtain in the Sale Order the Bankruptcy Court's approval of this Agreement and of all of the relief requested in the Settlement Motion.

(a)    363 Sale.  Concurrently with filing the Settlement Motion, Beaudry will give notice of a hearing on the 363 Sale (*"363 Hearing"*)"), including the fact that the assets are to be sold Free And Clear, in accordance with the Bankruptcy Code and corresponding sections, rules and regulations, and Beaudry will ask the Court in the Settlement Motion to provide that the Sale Order shall not be stayed by F.R.B.P. 6004(h), so that the 363 Sale may be consummated effective upon, or immediately following the entry of, the Sale Order.  At the 363 Hearing, FCC shall be permitted to credit bid up to, and will make a credit bid in the amount of Seven Million Three Hundred Thousand Dollars ($7,300,000) (*"Credit Bid"*).  If at the 363 Hearing FCC is the successful bidder for the FCC Inventory, FCC agrees to accept the FCC Inventory, together with receipt of the Cash Supplement and the Assigned New AR, in Full Satisfaction (as hereinafter defined), but only if the FCC Inventory, Cash Supplement, and Assigned New AR are transferred to FCC Free And Clear (collectively, *"Free And Clear Transfer"*).  Alternatively, if a third party (*"Third Party Purchaser"*) purchases the FCC Inventory for any amount equal to or greater than the Credit Bid plus Five Hundred Thousand Dollars ($500,000), FCC hereby agrees to accept payment in cash in the amount of the Credit Bid amount (*"Full Satisfaction Payment"*), in Full Satisfaction.  As used herein, *"Full Satisfaction"* means in full satisfaction of the Debt and the Secured Claim, and of all obligations and liabilities owed by Beaudry to FCC under or otherwise pursuant to the Factoring Facility. Effective upon either a Free And Clear Transfer or a Full Satisfaction Payment, as applicable: (i) FCC waives any and all rights it has or may have to  (A) pursue any deficiency against CDI or MBI or (B) pursue collection of any deficiency or other amount under the M. Beaudry Guaranty or the MGB Guaranty; and (ii) all proceeds from the 363 Sale in excess of the amount of the Credit Bid shall become the property of the bankruptcy estates in the Bankruptcy Cases, as allocated by the Court.

(b)    FCC Relief From Stay.    The Settlement Motion will request that the Bankruptcy Court grant FCC relief from automatic stay in the Bankruptcy Cases pursuant to Section 362 of the Bankruptcy Code to the extent necessary to permit FCC to carry out the provisions of, enforce its rights and remedies under, and enjoy the benefits of, this Agreement. Without limiting the generality of the foregoing, the Settlement Motion will request that, to the extent such relief from the automatic stay might be necessary, FCC shall be granted relief from stay in connection with FCC's retrieval of FCC Inventory in the possession of Beaudry or any third party, either upon FCC's purchase of the FCC Inventory at the 363 Sale or at any subsequent time, so long as such retrieval is in accordance with the terms of this Agreement.

4.    Consignment Agreement.

(a)    Value of FCC Inventory; Cash Payment; Assignment of AR.  FCC and Beaudry stipulate and agree that as of March 12, 2010, the cost value of the FCC Inventory was Nine Million Three Hundred Seventy Seven Thousand Two Hundred Fifty Four Dollars ($9,377,254).  In addition to the transfer of the FCC Inventory to FCC (as opposed to a Full Satisfaction Payment), Beaudry will, on the Effective Date: (i) pay to FCC, by wire transfer of immediately available funds to an account designated by FCC, One Hundred Twelve Thousand Five Hundred Seventy Dollars ($112,570) (*"Cash Supplement"*); and (ii) assign to FCC, pursuant to an Assignment in a form reasonably acceptable to FCC and Beaudry, AR generated between October 14, 2009 and March 12, 2010  in the amount of Ninety Seven Thousand Eight Hundred Thirty Three Dollars ($97,833) (*"Assigned New AR"*).  Beaudry will use its best efforts

to collect, on behalf of FCC, the Assigned New AR. From and after the Effective Date, Beaudry: (i) guarantees and warrants collection of the Assigned New AR and specifically guarantees and warrants that FCC will have received the full amount of Ninety Seven Thousand Eight Hundred Thirty Three Dollars ($97,833) from collection of the Assigned New AR no later than July 15, 2010; and (ii) to secure such guaranty and any amounts owed to FCC pursuant to Section 4(c), grants to FCC a security interest in all of Beaudry's AR remaining after assignment of the Assigned New AR and in all Inventory purchased by Beaudry after March 12, 2010, which security interest will be further memorialized pursuant to a Security Agreement in a form reasonably acceptable to FCC and Beaudry. Failure of FCC to receive timely payment of the Cash Supplement shall constitute an Event of Default under this Agreement and the Consignment Agreement. Failure of FCC to receive, in cash, the face amount of the Assigned New AR by August 15, 2010 also shall constitute an Event of Default under this Agreement and the Consignment Agreement.

(b)    Consignment. Following the Effective Date, if FCC is the successful bidder for the FCC Inventory, then, upon FCC's receipt of the Free And Clear Transfer, and if a court order granting all of the relief provided for in paragraph 3(b) above has been entered and Beaudry is not in default hereunder, then FCC and Beaudry will enter into and exchange executed originals of a consignment agreement, in form and substance satisfactory to both FCC and Beaudry, pursuant to which FCC will consign to Beaudry the right to retain physical possession of a portion of the FCC Inventory, and to sell all the FCC Inventory, on the terms and conditions set forth therein (*"Consignment Agreement"*). The Consignment Agreement will be effective as of the Effective Consignment Date (as defined in Section 4(c)(iv)(1)) and shall contain the terms and conditions set forth in Section 4(c) and such additional terms and conditions to which FCC and Beaudry mutually agree. Upon execution of the Consignment Agreement, to the extent that there are any conflicts between the terms and provisions of the Consignment Agreement and the terms and provisions of this Section 4(c), the terms and provisions of the Consignment Agreement will control.

(c)    Terms and Conditions.

(i)    Consigned FCC Inventory. Under the Consignment Agreement, Beaudry will retain possession of the Consigned Inventory (as hereinafter defined). As used herein, *"Consigned Inventory"* means: (A) FCC Inventory that has been consigned, prior to the Effective Date, to, and as of the Effective Date, is in the possession of, any of the department stores and other consignees separately listed as described below (*"Department Store Inventory"*) which, as of the Effective Date, will have a cost value of no less than Two Million Three Hundred Forty Four Thousand Three Hundred Thirteen Dollars ($2,344,313); and (B) FCC Inventory, in addition to the Department Store Inventory, with a cost value of Five Million Two Hundred Seventy Four Thousand Seven Hundred Six Dollars ($5,274,706) (which is an amount equal to (I) seventy five percent (75%) of (II) the cost value of all FCC Inventory minus the Department Store Inventory). The separate listing of Department Store Inventory has been approved by FCC, is signed by all parties to this Agreement and, by this reference, is incorporated herein and made a part hereof. The Consigned Inventory will be chosen by Beaudry, subject to FCC's reasonable consent, will be placed into Lots in accordance with Section 4(c)(iii) and otherwise will be subject to all the terms and conditions of the Consignment Agreement.

(ii)   Retained FCC Inventory.  On the Effective Date, Beaudry will deliver to FCC all unsold FCC Inventory that is not Consigned Inventory (*"FCC Retained Inventory"*), which will have a cost value of One Million Seven Hundred Fifty Eight Thousand Two Hundred Thirty Five Dollars ($1,758,235).  FCC will retain possession of the FCC Retained Inventory subject to the following:

(1)   At all times prior to the termination of the Consignment Agreement, Beaudry will have the right to sell any item of FCC Retained Inventory to a third party customer in accordance with the provisions of Section 4(c)(iv), and to show the FCC Retained Inventory to potential customers in connection with such sales or potential sales.  FCC will keep the FCC Retained Inventory in a location to which Beaudry and its sales personnel will have access for such showings and sales on no less than one business day's telephonic notice to FCC.  Upon Beaudry's sale of any item of FCC Retained Inventory, FCC promptly shall cause such item to be released to Beaudry for delivery to the purchaser, or directly to the purchaser, as requested by Beaudry.  Beaudry will cause all payments for such sales to be made directly to the *"Lockbox"*, as defined and in accordance with Section 4(c)(v)(2).

(2)   Without limiting Beaudry's rights under Section 4(c)(ii)(1), Beaudry will have the right to list and display all FCC Retained Inventory on one or more internet auction sites selected by Beaudry in its reasonable discretion, provided Beaudry complies with all rules and procedures of such site.  Beaudry's agreement with any such auction site will provide for notice of all sales from the site, and all accountings with respect to such sales, to be delivered to Beaudry and FCC, and for payment for all sales from the site to be made directly to the Lockbox.  Promptly upon FCC's receipt of notice of any sale on any internet auction site, FCC will cause the purchased item to be released to the online action site for delivery to the purchaser.

(3)   For each $350,000 in cash that FCC receives, in the aggregate, from FCC's share of sales proceeds of Consigned Inventory pursuant to Section 4(c)(iv) or (v), FCC shall consign and deliver to Beaudry to-be-determined items of FCC Retained Inventory with an aggregate cost value up to the lesser of either Eighty Seven Thousand Nine Hundred Twelve Dollars ($87,912) or the cost value of the FCC Retained Inventory then still in FCC's possession at the time of its selection, as provided in the next sentence (*"Released FCC Inventory"*), which is an amount up to five percent (5%) of the cost value of the FCC Retained Inventory initially delivered to FCC pursuant to Section 4(c)(ii).  Beaudry shall have the right to select, in its sole discretion, the items of FCC Retained Inventory to be included in each delivery of Released FCC Inventory to Beaudry.  Upon delivery of any Released FCC Inventory to Beaudry, such Released FCC Inventory shall be deemed to be included in the Consigned Inventory and, thereafter, shall be subject to all of the terms and conditions of the Consignment Agreement.

(iii)   Lots.  As of the date of this Agreement, all FCC Retained Inventory and Consigned Inventory has been divided, segregated and itemized into three lots, called Lot A-1, Lot A-2 and Lot B (*"collectively, "Lots"*) in an itemized list separately delivered to and approved by FCC.  The items of FCC Inventory in each Lot are as follows:

(1)    Lot A-1 consists of FCC Inventory selected by M. Beaudry, subject to the reasonable approval of FCC, with a cost value equal to Two Million Three Hundred Forty Seven Thousand Five Hundred Twenty Dollars ($2,347,520);

(2)    Lot A-2 consists of FCC Inventory selected by M. Beaudry with a cost value equal to Two Million Three Hundred Forty Two Thousand Two Hundred Fourteen Dollars ($2,342,214); and

(3)    Lot B consists of: (A) *"Laura's Jewelry"* (as defined in Section 6(c)(ii)(2)); and (B) all other FCC Inventory not included in Lot A-1 or Lot A-2, and has a cost value of no less than Four Million Six Hundred Eighty Seven Thousand Five Hundred Nineteen Dollars ($4,687,519).

(iv)    Liquidation.

(1)    Lot A-1.    The term of the consignment for Lot A-1 will commence if and when the Consignment Agreement becomes operative pursuant to Section 4(b) (*"Effective Consignment Date"*) and shall continue through August 31, 2010, subject to customary consignment terms and defaults as provided in the Consignment Agreement. Beaudry will be authorized to sell Lot A-1 Inventory through any and all Sales Channels, at Beaudry's discretion; however, the Consignment Agreement will set parameters with respect to pricing as mutually agreed by FCC and Beaudry. FCC will receive one hundred percent (100%) of the proceeds from the sale of Lot A-1 Inventory.

(2)    Lot A-2.    The term of the consignment for Lot A-2 will commence on the Effective Consignment Date and continue through August 31, 2010, subject to customary consignment terms and defaults as provided in the Consignment Agreement. Beaudry will be authorized to sell Lot A-2 Inventory only through wholesale channels, such as department stores and other wholesale clients approved in advance by FCC, at wholesale prices determined by M. Beaudry, but subject to floors set forth in the Consignment Agreement as mutually agreed by FCC and Beaudry. FCC will receive all proceeds from the sale of Lot A-2 Inventory up to one hundred percent (100%) of the cost value of the Lot A-2 Inventory. Beaudry will retain all proceeds from the sale of Lot A-2 Inventory in excess of the cost value of the Lot A-2 Inventory.

(3)    Lot B.    The term of the consignment for Lot B will commence on the Effective Consignment Date and continue through February 28, 2011, subject to customary consignment terms and defaults as provided in the Consignment Agreement. Beaudry will be authorized to sell Lot B Inventory through any and all Sales Channels, at Beaudry's discretion, subject to FCC's right to approve credit sales as provided in Section 4(c)(v)(3), at prices determined by M. Beaudry, but subject to floors set forth in the Consignment Agreement as mutually agreed by FCC and Beaudry. FCC will receive proceeds from the sale of Lot B Inventory as follows: (i) for the first fifty percent (50%) of the cost value of Lot B Inventory sold, FCC will receive one hundred five percent (105%) of the cost value of such Lot B Inventory sold; and (ii) for the second fifty percent (50%) of the cost value of Lot B Inventory sold, FCC will receive one hundred ten percent (110%) of such Lot B Inventory sold. Beaudry

will retain all proceeds from the sale of Lot B Inventory in excess of the amounts owed to FCC pursuant to the previous sentence.

(4)    Extension of Consignment Terms for Lot A-1 and Lot A-2.

a.    In the event that Beaudry has not sold all FCC Inventory in Lot A-1 or Lot A-2, respectively, by August 31, 2010, the term of the consignment for Lot A-1 and/or Lot A-2 will be extended, as applicable, to February 28, 2011, subject to customary consignment terms and defaults as provided in the Consignment Agreement, *if* from the Effective Date and continuing through August 31, 2010, Beaudry has made payments, excluding the Adequate Protection Payments, to FCC, or has caused payments to be made to FCC from any Source (as hereinafter defined), on account of amounts owed by Beaudry to FCC pursuant to this Agreement or the Consignment Agreement (collectively, *"Consignment Payments"*), in the aggregate amount of no less than Two Million Five Hundred Thousand Dollars ($2,500,000). As used herein, *"Source"* means: (i) M. Beaudry or any Affiliate of M. Beaudry; (ii) the Cash Supplement; (iii) proceeds from the sale of FCC Inventory from Lot A-1, Lot A-2 and/or Lot B, whether such sale is made by FCC (with respect to FCC Retained Inventory during the Operative Consignment Term following an Event of Default), Beaudry, any Third Party Consignee (as defined in Section 4(d)(i)) or any Affiliated Consignee (as defined in Section 4(d)(ii)); (iv) proceeds from the collection of the Assigned New AR or amounts paid by Beaudry to FCC under its guaranty of amounts to be paid under the Assigned New AR pursuant to Section 4(a); (v) amounts paid pursuant to the New Guaranties (as defined in Section 6(c)) or the sale or other disposal of any security given for either of the New Guaranties; and (vi) any insurance proceeds paid to FCC pursuant to any insurance policies covering the FCC Inventory held by FCC or held by Beaudry and naming FCC as an additional insured, either pursuant to the Consignment Agreement, the Security Agreement (as defined in Section 6(b)(i)) or otherwise.

b.    If the term of the consignment for Lot A-1 and Lot A-2 has been extended pursuant to the preceding subparagraph and Beaudry has not sold all FCC Inventory in Lot A-1 or Lot A-2, respectively, by February 28, 2011, the term of the consignment for Lot A-1 and/or Lot A-2 will be extended, as applicable, to August 31, 2011, subject to customary consignment terms and defaults as provided in the Consignment Agreement, *if* from the Effective Date and continuing through February 28, 2011, Beaudry has made Consignment Payments to FCC in the aggregate amount of no less than Five Million Seven Hundred Fifty Thousand Dollars ($5,750,000).

(5)    Extension of Consignment Terms for Lot B.

a.    In the event that Beaudry has not sold all FCC Inventory in Lot B by February 28, 2011, the term of the consignment for Lot B will be extended to August 31, 2011, subject to customary consignment terms and defaults as provided in the Consignment Agreement, *if* from the Effective Date and continuing through June 30, 2011, Beaudry has made Consignment Payments to FCC in the aggregate amount of no less than Five Million Seven Hundred Fifty Thousand Dollars ($5,750,000).

b.    If the term of the consignment for Lot B has been extended pursuant the preceding subparagraph and Beaudry has not sold all FCC Inventory in

Lot B by August 31, 2011, the term of the consignment for Lot B will be extended to February 28, 2012, subject to customary consignment terms and defaults as provided in the Consignment Agreement, *if* from the Effective Date and continuing through August 31, 2011, Beaudry has made Consignment Payments to FCC in the aggregate amount of no less than Six Million Five Hundred Thousand Dollars ($6,500,000).

(6)    Return of FCC Inventory to FCC.  At the end of the initial consignment term or any extended consignment term, as provided either in this Agreement or to which the parties may otherwise agree in writing, for Lot A-1, Lot A-2 or Lot B, respectively (collectively, *"Designated Consignment Period"*), Beaudry shall forthwith return to FCC all unsold Consigned Inventory in such Lot and the consignment of such Consigned Inventory, as well as Beaudry's right to sell FCC Inventory from such Lot, shall terminate, but such termination, so long as Beaudry is not then in default under this Agreement or the Consignment Agreement, shall not terminate the consignment of any Consigned Inventory in, or any right Beaudry may then have to sell FCC Inventory from, the remaining Lots.  In the event that FCC receives payment, in cash, from any Source in the aggregate amount of Seven Million Dollars Three Hundred Thousand Dollars ($7,300,000) (*"Consignment Value"*) prior to the return of all Consigned Inventory to FCC as such return may be required pursuant to the preceding sentence, Beaudry may, at its election and so long as it is not in default under this Agreement or the Consignment Agreement, continue to market and sell the Consigned Inventory in each Lot then still in Beaudry's possession, for the duration of the initial consignment term and all applicable extended consignment terms for each such Lot, in accordance with the provisions of this Agreement and the Consignment Agreement, including, without limitation, the right to share in the proceeds of such sales of FCC Inventory in each such Lot pursuant to Section 4(c)(iv)(1), (2) and (3), until the consignment term for each such Lot can no longer be extended pursuant to Section 4(c)(iv)(4), (5) and (6).  In the event that FCC does not receive Consignment Payments in the amount of the Consignment Value prior to the return, pursuant to the first sentence of this paragraph, of any FCC Inventory in any Lot, then the fair market value of the FCC Retained Inventory in such Lot as of the end of the Designated Consignment Term, and the fair market value of the returned Consigned Inventory in such Lot as of the date such Consigned Inventory is returned, shall be treated as a payment to FCC for purposes of determining the balance of the Consignment Value and the Guaranteed Amounts (as defined in Section 6(e)(1)).  The fair market value of such FCC Inventory shall be determined by agreement of FCC and Beaudry or, if FCC and Beaudry cannot agree upon such fair market value, by one or more independent appraisers selected by FCC and Beaudry pursuant to the appraiser selection procedure set forth in Exhibit C.

(v)    Payment Terms.

(1)    Collection Efforts.  So long as Beaudry is not in default under this Agreement or the Consignment Agreement: (A) Beaudry shall be responsible for preparing and delivering all invoices for all amounts due from all customers for the purchase and sale of FCC Inventory sold by Beaudry (*"Invoices"*); (B) Beaudry shall have sole control of all collection efforts with respect to the Invoices; and (C) FCC shall have no right to contact any customers to which Beaudry has sent Invoices or to otherwise engage in any collection efforts with respect to Invoices.  Irrespective of whether Beaudry is in default under this Agreement or the Consignment Agreement, Beaudry shall account to FCC for each transfer, transaction, sale or

movement of FCC Inventory in strict accordance with the procedures and processes set forth in the FCC Inventory Control Memorandum (*"FICM"*) attached as a Schedule to the Consignment Agreement.

(2)    Lockbox.

a.    All Invoices will provide for payments to be made payable to MBI, but to be addressed and mailed, or wire transferred, directly to an account (*"Lockbox"*) opened by FCC solely for the deposit of payments to MBI for FCC Inventory (*"MBI Payments"*). The Lockbox will be controlled by, and any and all funds in the Lockbox will be accessible only by, FCC; however, MBI will have electronic access to the Lockbox for the sole purpose of monitoring and recording all deposits into the Lockbox. M. Beaudry shall execute any and all documents, and take all other action, reasonably necessary to authorize direct deposit into the Lockbox of all MBI Payments. In the event that any payments for FCC Inventory sold during the period from March 12, 2010 through the Effective Date are delivered to Beaudry prior to the Effective Date, no later than seven (7) days following the Effective Date, Beaudry will deposit FCC's share of such payments, pursuant to Section 4(c)(iv), into the Lockbox. In the event that, following the Effective Date, any payments for FCC Inventory come directly to Beaudry, in any form, including cash, then, within two (2) business days following Beaudry's receipt of such payments, Beaudry will deliver any such payments to the Lockbox.

b.    At least once every twenty-four (24) hours during business days, Beaudry will deliver to FCC an accounting (*"Beaudry Accounting"*) which shall contain a list of each MBI Payment deposited into the Lockbox since the later of (I) the opening of the Lockbox or (II) the last Beaudry Accounting delivered to FCC, which Beaudry Accounting shall state: (A) the name of the customer submitting each MBI Payment; (B) the amount of each MBI Payment; (C) the Invoice number: (D) the item(s) of Inventory for which each MBI Payment was made (in whole or in part) and, for each item of Inventory on the list: (y) the Lot from which such item of FCC Inventory was sold; and (z) an allocation of the payment for such item of FCC Inventory between FCC and Beaudry in accordance with Section 4(c)(iv). In the event Inventory is sold that is: (I) comprised of FCC Inventory from more than one Lot, the proceeds from such sale will be treated as sales from each such Lot, prorated in proportion to the cost value of each item of FCC Inventory; or (II) comprised of FCC Inventory and Inventory that is not FCC Inventory; (x) the proceeds from such sale will be prorated in proportion to the cost value of the FCC Inventory and the cost value of the Inventory that is not FCC Inventory, respectively; (y) the portion that is allocated to FCC Inventory will be further allocated between FCC and Beaudry in accordance with Section 4(c)(iv); and (z) the balance will be allocated one hundred percent (100%) to Beaudry. In the event that payments are delivered to the Lockbox for Inventory sold by Beaudry but not included in the FCC Inventory at all, Beaudry shall list such Inventory on the Beaudry Accounting separate from the FCC Inventory and allocate one hundred percent (100%) of such payments as due to MBI. So long as Beaudry is in full compliance with the FICM, then, no later than two (2) business days following FCC's receipt of each Beaudry Accounting, unless FCC notifies Beaudry by email, facsimile or otherwise in writing of its objection to the Beaudry Accounting, FCC will deliver all amounts due to Beaudry as shown on the Beaudry Accounting by wire transfer to an account designated by Beaudry, without any deduction or offset for any reason except as expressly authorized by the Consignment Agreement. In the event FCC gives Beaudry notice of its objection to the Beaudry Accounting,

the dispute resolution procedures set forth in Section 25 of the Consignment Agreement shall control.

        c.     Each of FCC and Beaudry shall pay one-half (1/2) of all costs associated with opening and maintaining the Lockbox, as follows. FCC shall pay one hundred percent (100%) of all such costs to the provider of the Lockbox, and shall deliver to Beaudry, no more frequently than once a month, copies of all invoices for such costs for Beaudry's review and reasonable approval. Unless, within seven (7) business days following FCC's delivery of any such invoice to Beaudry, Beaudry notifies FCC by facsimile, email or otherwise in writing that Beaudry objects to such invoice or any charge thereon, Beaudry will be deemed to have approved such invoice and all charges thereon and FCC will have the right to offset against amounts due to Beaudry, as shown on any then outstanding Beaudry Accounting, an amount equal to Beaudry's one-half (1/2) share of such invoice. In the event Beaudry timely notifies FCC that it objects to any invoice, FCC and Beaudry shall resolve such objection in accordance with the dispute resolution provisions of the Consignment Agreement.

        (3)    Credit Sales.

        a.     Notwithstanding anything in this Section 4(c)(v) to the contrary, Beaudry will have the right to make sales of FCC Inventory pursuant to credit agreements or other credit arrangements (*"Credit Sales"*) to any customer to which Beaudry had made Credit Sales prior to the Effective Date and has, by the Effective Date, notified FCC of Beaudry's intention to make Credit Sales to such customer subsequent to the Effective Date, unless, within fifteen (15) days following the Effective Date, FCC gives written notice to Beaudry that FCC does not consent to Credit Sales to any one or more named customers, and upon receipt of such notice, Beaudry will not make any further Credit Sales to any customer named in such notice without FCC's prior written consent. Following the Effective Date, Beaudry will not make any Credit Sales to any customer to which Beaudry has not made Credit Sales prior to the Effective Date unless and until Beaudry has given FCC notice that Beaudry desires to make a Credit Sale to such customer (*"Credit Sales Notice"*), which Credit Sales Notice will include the name of the customer, the amount of such sale and all credit information that such customer has provided to Beaudry in connection with such Credit Sale, and FCC has approved such Credit Sale to such customer, which approval FCC shall not unreasonably withhold, condition or delay. FCC will have three business days from Beaudry's delivery of the Credit Sales Notice to approve or disapprove the Credit Sale subject to the Credit Sales Notice; if FCC fails to approve or disapprove such Credit Sale in such three business days, FCC will be deemed to have approved the Credit Sale.

        b.     Notwithstanding Beaudry's right to make credit sales pursuant to Section 4(c)(v)(3)(a), Beaudry will, no later than ninety (90) days following the date of each such Credit Sale (*"Credit Sale Payment Deadline"*), pay to FCC an amount equal to FCC's share of amounts due from the Credit Sale customer on account of such Credit Sale, computed in accordance with the allocation formula set forth in Section 4(c)(iv), if, by that date (I) FCC has not previously received payment of its share of the proceeds of such sale or (II) the FCC Inventory sold in such credit sale has not been returned to Beaudry. Failure of FCC to receive, in cash, the amount due by the Credit Sale Payment Deadline, unless the subject FCC

Inventory has been returned to Beaudry by the Credit Sale Payment Deadline, shall constitute an Event of Default under this Agreement and the Consignment Agreement.

(vi)    <u>Default</u>.    Notwithstanding anything in this Agreement to the contrary, the Consignment Agreement will define Events of Default by Beaudry thereunder and provide that, upon an Event of Default, FCC will have the right, among other remedies, to immediately terminate the consignment *("Early Consignment Termination")* granted therein and retake possession of the Consigned Inventory.

(vii)    <u>MBI Exclusive Right to Sell and Limited Right of First Refusal</u>.

(1)    At all times prior to an Early Consignment Termination or the end of the Designated Consignment Period, whichever occurs first *("Operative Consignment Term")*, and provided that Beaudry is not in default under this Agreement or the Consignment Agreement, FCC will not market or otherwise attempt to sell any of the FCC Inventory, and Beaudry will have the exclusive right to sell the FCC Inventory pursuant to Section 4(c)(ii)(1).

(2)    At any time during the Operative Consignment Term that Beaudry is in default under this Agreement or the Consignment Agreement, and regardless of whether the Consignment Agreement has been terminated as a result of such default, FCC may sell any item of FCC Retained Inventory that has not been released to Beaudry pursuant to Section 4(c)(ii)(3), or that has not otherwise been deemed to be Consigned Inventory. FCC may make such sales, and may use the Beaudry Trademark (as defined in Section 6(b)(i)(1)) in connection therewith, without the need to obtain any assignment of or license to the Beaudry Trademark in connection therewith. Following any sale by FCC of FCC Retained Inventory, FCC shall deposit all proceeds from such sale into the Lockbox and Beaudry shall allocate such proceeds between FCC and Beaudry in accordance with the provisions of Section 4(c)(iv) and (v), and thereafter, all such proceeds shall be included as payments toward the Consignment Value and the Guaranteed Amounts for all purposes under this Agreement, including without limitation Section 6(b) and (c), and under the Consignment Agreement.

(3)    Following the end of the Operative Consignment Term, FCC may sell any of the then unsold FCC Inventory, wherever located, and on whatever terms and conditions, and at whatever prices, at FCC determines in its sole and absolute discretion; provided that, if there has not occurred an Early Consignment Termination and none of the Consigned Inventory was returned to FCC due to a default by Beaudry under this Agreement or the Consignment Agreement, M. Beaudry, or his designee, will have a right of first refusal to purchase any of such FCC Inventory on the same terms and conditions as any third party to which FCC intends to sell such FCC Inventory.

(4)    The Consignment Agreement will set forth the terms, conditions and mechanisms for notice of any intended sale by FCC as to which M. Beaudry, or his designee, possesses a right of first refusal, along with the manner of M. Beaudry's, or his designee's, exercise of such right of first refusal with respect thereto, as mutually agreed by FCC, Beaudry and M. Beaudry.

(d)    Further Consignment of FCC Inventory.

(i)    Notice to Third Party Consignees.  Following the consummation of the 363 Sale, Beaudry will deliver written notice to each Person who is not an Affiliate of Beaudry and who then holds any FCC Inventory on consignment from Beaudry (*"Third Party Consignee"*) that ownership of the FCC Inventory has been transferred to FCC, and that FCC requires that Beaudry and each such Third Party Consignee enter into a new agreement with Beaudry (*"Third Party Consignee Agreement"*), which Third Party Consignee Agreement will: (i) acknowledge FCC's ownership of the FCC Inventory and consignment of the Consigned Inventory to Beaudry, as well as FCC's right to terminate the Third Party Consignee Agreement, in accordance with the provisions of this Agreement and the Consignment Agreement; (ii) authorize, upon the commencement of the consignment to Beaudry in accordance with this Agreement and the Consignment Agreement (*"Consignment Commencement"*), the further consignment by Beaudry to such Third Party Consignee of the FCC Inventory then consigned, but only after such Third Party Consignee's express consent, along with its taking of such action as FCC may reasonably request, to enable FCC to record appropriate financing statements, or take other reasonable and appropriate action, to evidence FCC's ownership and consignment of the FCC Inventory; (iii) provide for the consignment of additional FCC Inventory to such Third Party Consignee on terms acceptable to FCC; (iv) provide for such Third Party Consignee's acknowledgment and agreement that FCC shall have the right to deliver notice to such Third Party Consignee that FCC is terminating the Third Party Consignee Agreement with such Third Party Consignee upon the occurrence of either of the following: (A) the expiration or termination of the term of the consignment from FCC to Beaudry of the FCC Inventory that is consigned to such Third Party Consignee; or (B) following any breach or default by Beaudry under this Agreement or the Consignment Agreement; and that, upon such Third Party Consignee's receipt of such notice, such Third Party Consignee immediately will return to FCC all FCC Inventory subject to the such Third Party Consignee Agreement; and (v) contain such other terms and conditions as reasonably requested by FCC and agreed to by Beaudry and such Third Party Consignee.  The Third Party Consignee must execute the Third Party Consignee Agreement before Beaudry may make any further consignment of FCC Inventory to such Third Party Consignee.

(ii)    Consignment to Affiliates.    Following the Consignment Commencement, and so long as Beaudry is not in default under this Agreement or the Consignment Agreement, Beaudry will have the right to consign Consigned Inventory to any Affiliate of Beaudry (*"Affiliated Consignee"*) without requiring the advance consent of FCC; provided that all transfers of Consigned Inventory to any Affiliated Consignee will be made by cash sale or pursuant to an agreement with terms and conditions, including, without limitation, terms for payment by the Affiliated Consignee, substantially the same as the terms and conditions in a standard Third Party Consignee Agreement; and provided that the Affiliated Consignee must execute an agreement with terms and conditions substantially the same as those in the Third Party Consignee Agreement before Beaudry may make any further consignment of FCC Inventory to such Affiliated Consignee.

(iii)    Payment for Inventory on Further Consignment.  Notwithstanding Beaudry's right to further consign FCC Inventory pursuant to Section 4(d)(i) and (ii), Beaudry shall, no later than ninety (90) days following the date of its receipt of notice of any sale of FCC

Inventory by a Third Party Consignee, and no later than ninety (90) days following the date of any sale of FCC Inventory by an Affiliated Consignee (*"Consignment Payment Deadline"*), pay to FCC an amount equal to FCC's share of amounts due from such Consignee or Affiliated Consignee from such sale, computed in accordance with the allocation formula set forth in Section 4(c)(iv), if, by the Consignment Payment Deadline, FCC has not previously received payment of its share of the proceeds of such sale, and regardless of whether the Consignee or the Affiliated Consignee has made payment for such sale to Beaudry by the Consignment Payment Deadline. Failure of FCC to receive, in cash, the amount due by the Consignment Payment Deadline shall constitute an Event of Default under this Agreement and the Consignment Agreement

(e)    Costs.    Beaudry will pay: (i) all costs incurred in connection with preparing invoices and its collection efforts pursuant to Section 4(c)(v)(1); (ii) all costs associated with any Third-Party Consignee Agreement or any agreement with any Affiliated Consignee entered into or maintained pursuant to Section 4(d); (iii) one-half (1/2) of all costs associated with opening and maintaining the Lockbox, pursuant to Section 4(c)(v)(2)(c) hereof; and (iv) all costs otherwise incurred in performing its obligations under the Consignment Agreement. FCC will pay: (i) the costs of any audit of the FCC Inventory during the term of the Consignment Agreement, including without limitation upon the return of any Consigned Inventory pursuant to Section 4(c)(iv)(6); (ii) one-half (1/2) of all costs associated with opening and maintaining the Lockbox, pursuant to Section 4(c)(v)(2)(c) hereof; and (iii) all costs otherwise incurred in performing its obligations under the Consignment Agreement. Under no circumstances shall FCC have any right to charge Beaudry for any such costs or, except as expressly provided in Section 4(c)(v)(2)(c) hereof or in the Consignment Agreement, to deduct or offset any sums from amounts owed to Beaudry pursuant to any Beaudry Accounting.

(f)    Applicability of Consignment Provisions.    All provisions of this Agreement relating to consignment by FCC to Beaudry, including without limitation Section 4(b), (c) and (d), shall not apply if: (i) a Third-Party Purchaser is the successful bidder at the 363 Sale; (ii) FCC does not otherwise purchase the FCC Inventory as a result of the 363 Sale; or (iii) Beaudry is in default under this Agreement at the time FCC would otherwise be required to enter into the Consignment Agreement pursuant to the terms of this Agreement.

5.    AR.    Subject to FCC's right to receive proceeds from the FCC Inventory sold from the Lots in accordance with Section 4(c)(iv) and 4(c)(v)(3), the assignment of Assigned New AR to FCC in accordance with Section 4(a), and the enforcement of FCC's rights and remedies under the security interest to be given FCC pursuant to Section 6(b), Beaudry will have the right to collect and retain all residual proceeds, not otherwise due or owed to FCC, from AR, including, without limitation, all AR generated before October 14, 2009, all New AR and all AR generated after March 12, 2010, and the right to use all such retained AR in its sole discretion.

6.    Security; Trademark License; Guarantees.

(a)    Release of Existing Security Interests.    Effective upon the occurrence of a Full Satisfaction, whether by Free And Clear Delivery or a Full Satisfaction Payment (*"Full Satisfaction Event"*):

(i)    FCC hereby releases its security interest in, and all its right, title and interest in and to, all assets subject to the FCC Lien, including, without limitation, all Cash, the AR, the Inventory and the Personal Property;

(ii)    Beaudry will have the right to file UCC-3 terminations for all UCC-1 financing statement(s) filed in any State with respect to the FCC Lien;

(iii)    M. Beaudry will be exonerated from all obligations under the M. Beaudry Guaranty and MGB will be exonerated from all obligations under the MGB Guaranty, each of those guaranties are terminated and of no further force or effect and as soon as commercially reasonable following the Effective Date, FCC will return each of the original Guaranties marked "Cancelled" to M. Beaudry;

(iv)    FCC will deliver to M. Beaudry a Full Reconveyance of the Camino Trust Deed, duly executed by FCC and notarized, in a form acceptable for recording in the El Dorado County Records and a Full Reconveyance of the 8th Street Trust Deed, duly executed by FCC and notarized, in a form acceptable for recording in the Los Angeles County Records and thereafter, M. Beaudry and MGB will have the right to record such Full Reconveyances in the El Dorado County Records and the Los Angeles County Records, respectively; and

(v)    upon Beaudry's request, FCC shall deliver such further documents and take such further actions as may be necessary to fully release, and to memorialize the full release of, all such assets, liens and guaranties.

(b)    <u>New Security Interests.</u>

(i)    <u>Creation.</u>    Upon the occurrence of a Free and Clear Delivery, Beaudry and/or M. Beaudry, as applicable, will grant to FCC a security interest, pursuant to a Security Agreement in a form reasonably acceptable to FCC and Beaudry, in the following assets of Beaudry and/or M. Beaudry, as applicable, to secure payment of all amounts due to FCC under Section 4 of this Agreement and the Consignment Agreement, and to secure any rights or remedies of FCC which may arise from any failure by Beaudry to return or account for any Inventory as may be required pursuant to this Agreement or the Consignment Agreement:

(1)    <u>Beaudry Trademark.</u>    The service marks owned by Michael Beaudry, Inc. and registered with the United States Patent and Trademark Office listed on <u>Exhibit D</u> hereto, together with all trade dress, logos, insignias, designs or variations thereof associated with such service mark (collectively, ***"Beaudry Trademark"***).

(2)    <u>Accounts and Inventory.</u>    All of Beaudry's Inventory and AR, including, to the extent Beaudry has rights in AR generated by the sale of FCC Inventory in the Lots (***"Lot AR"***).

(ii)    <u>Further Documents.</u>    Following the Effective Date, upon FCC's request, Beaudry and M. Beaudry, respectively, will execute and deliver such documents and take such actions as may be necessary to grant and allow FCC to perfect the security interests provided in this Section 6(b).

(c)    <u>Trademark License</u>.  In the event that FCC is the successful bidder at the 363 Sale, if at the end of the Operative Consignment Term there is any FCC Retained Inventory still in FCC's possession, or if MBI returns any Consigned Inventory to FCC pursuant to Section 4(c)(iv)(6), Beaudry will grant to FCC, by separate agreement in form and substance acceptable to both FCC and Beaudry, a non-exclusive license to use the Beaudry Trademark solely in connection with the sale of the remaining FCC Inventory (***"Trademark License"***), without the requirement of any payment by FCC for such Trademark License.  Following the Effective Date, upon FCC's request, Beaudry and M. Beaudry, respectively, will execute and deliver such documents and take such actions as may be necessary to grant and allow FCC to perfect the interests of FCC granted in the Trademark License.  Upon FCC's sale or other disposal of all remaining FCC Inventory, FCC will execute and deliver to Beaudry all such documents and take all such actions as may be necessary to terminate the Trademark License and all registrations and/or recordations of the Trademark License in any public records.

(d)    <u>Release</u>.  Upon FCC's receipt, in cash, of Consignment Payments at least equal to the Consignment Value, or the return of all Consigned Inventory to FCC and payment to FCC of all amounts due to FCC under Section 4 of this Agreement and the Consignment Agreement, FCC will release its security interests and all liens in and against the Beaudry Trademark, all Inventory, all AR and all other assets of Beaudry granted pursuant to Section 6(b), and M. Beaudry and FCC will deliver to Beaudry or file or record, as appropriate, all documents, and take all actions, as may be necessary to fully release, and to memorialize the full release of, all such assets from such security interests and liens.

(e)    <u>Guaranties; Trust Deed</u>.  On the Effective Date, M. Beaudry will deliver to FCC a new performance guaranty (***"New M. Beaudry Guaranty"***) and MGB will deliver to FCC a new performance guaranty (***"New MGB Guaranty"*** and together with the New M. Beaudry Guaranty ***"New Guaranties"***) each of which New Guaranties will guaranty payment to FCC of the amounts set forth in Section 6(c)(i), in form and substance mutually acceptable to Beaudry, M. Beaudry and MGB, on the one hand, and FCC, on the other hand, respectively.  The New M. Beaudry Guaranty will be unsecured and the New MGB Guaranty will be secured by a Deed of Trust on the 8th Street Property (***"New 8th Street Trust Deed"***) which MGB will deliver to FCC concurrently with the New MGB Guaranty and which FCC will have the right to record in the Los Angeles County Records at any time thereafter.  The New Guaranties will further provide, in part, as follows:

(i)    <u>Guaranteed Amount</u>.  The guaranty under each of the New M. Beaudry Guaranty and the New MGB Guaranty is of an aggregate minimum payment, in cash, to FCC from Consignment Payments, on or before the last day of the term of the Consignment Agreement, as such term may be extended as provided in Section 4(c)(iv)(4), (5) and/or (6), of: (I) with respect to the M. Beaudry Guaranty, Six Million Five Hundred Thousand Dollars ($6,500,000) (subject to potential reduction under Section 6(c)(i)(1) (***"M. Beaudry Guaranteed Amount"***); and (II) with respect to the New MGB Guaranty, Seven Million Three Hundred Thousand Dollars ($7,300,000) (***"MGB Guaranteed Amount"*** and together with the M. Beaudry Guaranteed Amount, ***"Guaranteed Amounts"***); provided, however, that MGB's maximum liability under the New MGB Guaranty will be One Million Five Hundred ($1,500,000), and provided, further, that neither guaranty will be increased.

(ii)    <u>Reduction; Release of Laura's Jewelry.</u>

(1)    Each of the Guaranteed Amounts will be reduced by the amount of all Consignment Payments made to FCC, dollar for dollar, and by the fair market value of: (A) any Consigned Inventory returned to FCC pursuant to Section 4(c)(iv)(7) and (B) any unsold FCC Retained Inventory in the same Lot as such returned Consigned Inventory, so that, notwithstanding that the Consignment Value is Seven Million Three Hundred Thousand Dollars ($7,300,000), upon Beaudry's making of Consignment Payments to FCC of the M. Beaudry Guaranteed Amount, the M. Beaudry Guaranty will be released and terminated, and upon Beaudry's making of Consignment Payments to FCC of the MGB Guaranteed Amount, the MGB Guaranty will be released and terminated.

(2)    In addition to reductions to the M. Beaudry Guaranteed Amount pursuant to Section 6(c)(ii)(1), if from the Effective Date and continuing through August 31, 2010, Beaudry has made Consignment Payments to FCC in the aggregate amount of no less than Two Million Five Hundred Thousand Dollars ($2,500,000) (excluding the Adequate Protection Payments), FCC will: (A) reduce the M. Beaudry Guaranteed Amount by an additional One Million Dollars ($1,000,000); and (B) transfer to Beaudry by a bill of sale in a form reasonably acceptable to FCC and Beaudry all right, title and interest in and to certain jewelry described and itemized on a list separately delivered to and approved by FCC (*"Laura's Jewelry"*), which separate listing has been approved by FCC, is signed by all parties to this Agreement and, by this reference is incoporated herein and made a part hereof.

(3)    If from the Effective Date and continuing through February 28, 2011, Beaudry has made Consignment Payments in the aggregate amount of no less than Five Million Dollars ($5,000,000) (excluding the Adequate Protection Payments), FCC will release the New M. Beaudry Guaranty in its entirety.

(4)    In addition to the right to have Laura's Jewelry transferred to Beaudry pursuant to Section 6(c)(ii)(2), M. Beaudry and/or L. Beaudry will have the right, at any time during the Operative Consignment Term for Lot B, in accordance with this Agreement or the Consignment Agreement, to purchase Laura's Jewelry or any portion thereof, by paying to FCC an amount equal to one hundred five percent (105%) of the cost value of Laura's Jewelry. Upon FCC's receipt of such payment, FCC will apply such amount as part of the aggregate payments made toward the Consignment Value and the Guaranteed Amounts. Following any transfer of any portion of Laura's Jewelry to Beaudry, pursuant to Section 6(c)(ii)(2), this Section 6(c)(ii)(4) or otherwise, then, upon M. Beaudry's or L. Beaudry's request, FCC will deliver such further documents and take such further actions as may be reasonably necessary to evidence or memorialize the transfer to such acquirer of all right, title and interest to such portion of Laura's Jewelry as may be acquired.

(iii)    <u>Release of New Guaranties and/or New 8th Street Trust Deed.</u>

(1)    <u>Upon Payment of Guaranteed Amount.</u>  Upon the release of each of the New Guaranties, respectively, FCC will return the respective original New Guaranties marked "Cancelled" to M. Beaudry, and upon the release of the MGB Guaranty, FCC additionally will deliver to M. Beaudry a Full Reconveyance of the New 8th Street Trust Deed,

duly executed by FCC and notarized, in a form acceptable for recording in the Los Angeles County Records and thereafter, M. Beaudry will have the right to record such Full Reconveyance in the Los Angeles County Records.

(2) <u>Upon Sale of 8th Street Property</u>. Notwithstanding anything in Section 6(c) to the contrary, at the written request of MGB, FCC will release and cause a full reconveyance of the New 8th Street Trust Deed prior to FCC's receipt of the MBG Guaranteed Amount under the following circumstance: (A) if MGB enters into an arms-length sale of the 8th Street Property for a purchase price that will allow MGB to realize net proceeds of at least Five Hundred Thousand Dollars ($500,000) in excess of the aggregate amount of all liens and encumbrances against the 8th Street Property senior to the New 8th Street Trust Deed; and (B) at the close of escrow for such sale, FCC is paid Five Hundred Thousand Dollars ($500,000). Upon FCC's receipt of such Five Hundred Thousand Dollars ($500,000) and such written request, FCC will: (I) apply such Five Hundred Thousand Dollars ($500,000) as part of the aggregate payments made toward the Consignment Value, the M. Beaudry Guaranteed Amount, the MGB Guaranteed Amount and MGB's maximum liability under the New MGB Guaranty; and (II) deliver to M. Beaudry a Full Reconveyance of the New 8th Street Trust Deed, duly executed by FCC and notarized, in a form acceptable for recording in the Los Angeles County Records, and, thereafter, M. Beaudry will have the right to record such Full Reconveyance in the Los Angeles County Records.

7.  <u>Mutual Releases.</u>

(a)  <u>Of CDI, MBI, M. Beaudry and L. Beaudry</u>.  Except for the terms, conditions and obligations set forth in this Agreement and the documents executed in connection with or specifically referenced in this Agreement (**"Ancillary Agreements"**), and except for Claims (as hereinafter defined) arising as a result of any breach by Beaudry of any representation or warranty made in connection with any financial information pertaining to Beaudry delivered to FCC during the Interim Period or in connection with the negotiation and execution of this Agreement, in consideration of the mutual promises and covenants contained herein, effective upon the occurrence of a Full Satisfaction Event, FCC, for itself and to the full extent legally possible, on behalf of each of its predecessors, successors, assigns, members, managers, officers, employees, agents, Affiliates, representatives, insurers and all Persons acting through or on behalf of it, hereby fully and forever releases and discharges each of CDI, MBI, M. Beaudry, L. Beaudry and MGB, and each of their respective predecessors, successors, assigns, shareholders, directors, officers, employees, trustees, beneficiaries, executors, administrators, heirs, agents, representatives, insurers and all Persons acting through or on behalf of any of them, from any and all claims, demands, causes of action, actions, obligations, costs, expenses, damages, losses and liabilities, of whatever kind or nature, in law, in equity or otherwise, whether known or unknown, anticipated or unanticipated, or certain or speculative, arising or occurring prior to the Agreement Date, which FCC had, now has or at any time may hereafter have, for or by reason of any matter whatsoever (**"Claims"**), including without limitation, any and all Claims arising in connection with or in any way related to the Factoring Facility or any matters alleged in any documents filed in the FCC Action, the Bankruptcy Cases or the Beaudry Complaint.

(b)  <u>Of FCC</u>  Except for the terms, conditions and obligations set forth in this Agreement and the Ancillary Agreements, in consideration of the mutual promises and

covenants contained herein, effective upon the occurrence of a Full Satisfaction Event, each of CDI, MBI, M. Beaudry, L. Beaudry and MGB, for themselves and to the full extent legally possible, on behalf of each of their respective predecessors, successors, assigns, shareholders, members, directors, officers, employees, trustees, beneficiaries, executors, administrators, heirs, agents, representatives, insurers and all Persons acting through or on behalf of any of them, hereby release and forever discharge FCC and each of its predecessors, successors, assigns, members, managers, officers, employees, agents, representatives, insurers and all Persons acting through or on behalf of it, from any and all Claims, arising or occurring prior to the Agreement Date, which any of CDI, MBI, M. Beaudry, L. Beaudry or MGB had, now has or at any time may hereafter have, for or by reason of any matter whatsoever, including without limitation, any and all Claims arising in connection with or in any way related to the Factoring Facility or any matters alleged in any documents filed in the FCC Action, the Bankruptcy Cases or the Beaudry Complaint.

   (c)  1542 Waiver. In granting the mutual releases set forth in Section 7(a) and (b), each of CDI, MBI, M. Beaudry, L. Beaudry, MGB and FCC expressly waives the provisions of Section 1542 of the California Civil Code which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR,

and all similar provisions or rules of law. In this connection and to the greatest extent permitted by law, each of CDI, MBI, M. Beaudry, L. Beaudry, MGB and FCC hereby agrees, represents and warrants that it, he or she realizes and acknowledges that factual matters now unknown to it, him or her may have given or may hereafter give rise to Claims released herein which are presently unknown, unanticipated and unsuspected, and further agrees, represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization, and that each of CDI, MBI, M. Beaudry, L. Beaudry and MGB, on the one hand, and FCC, on the other hand, nevertheless intends to release, discharge and acquit the other, and each of them, from any and all such unknown Claims.

   8.  Dismissal of Actions and Withdrawal of Motions. No later than ten (10) days following the Effective Date, counsel for FCC will dismiss the FCC Action without prejudice and Beaudry will dismiss the Beaudry Complaint without prejudice. No later than ten (10) days following the Effective Date, counsel for Beaudry will dismiss without prejudice the adversary proceeding commenced pursuant to the Beaudry Complaint (*"Adversary Proceeding"*). No later than two (2) business days following the Agreement Date, Beaudry will: (a) withdraw without prejudice all motions filed by it which are then pending in the Bankruptcy Cases or in the Adversary Proceeding, including, without limitation, the Motion For Approval Of Joint Disclosure Statement And Plan Of Reorganization For Centerstone Diamonds, Inc. And Michael Beaudry, Inc. (Bankruptcy Cases Docket No. 241), the Motion For Authority To Use Cash Collateral (Bankruptcy Cases Docket No. 243), and the Motion For A Preliminary Injunction Against FCC, LLC (Adversary Proceeding Docket No. 2); and (b) file, on behalf of Beaudry and

FCC, a stipulation extending FCC's time to respond to the Beaudry Complaint to the later of ten (10) days following the Effective Date or ten (10) days following the Termination Date.

9.    Events of Default. The occurrence of any one of the following shall constitute an "Event of Default" under this Agreement:

(a)    The failure to pay timely, and in the required manner, any sum due FCC under this Agreement or the Consignment Agreement;

(b)    The failure to perform timely, and in the required manner, any of Beaudry's other obligations, agreements, or covenants under this Agreement or the Consignment Agreement; or

(c)    Any statement, representation or warranty made by Beaudry herein or in any certificate, statement or agreement furnished in connection with this Agreement should prove to be false or misleading in any material respect; or

(d)    Beaudry: (i) makes an assignment for the benefit of creditors, other than with respect to or in the Bankruptcy Cases: (ii) files or suffers the filing of any voluntary or involuntary petition under any chapter of the United States Bankruptcy Code, other than the Bankruptcy Cases; (iii) applies for or permits the appointment of a receiver, trustee or custodian of any of its property or business, including any trustee appointed in either of the Bankruptcy Cases; (iv) seeks to take any action (including, without limitation, proposing or supporting any chapter 11 plan) in either of the Bankruptcy Cases that FCC, in its reasonable discretion, believes is inconsistent with, or might adversely affect, FCC's rights hereunder; or (v) allows an attachment on any of the Consigned Inventory to continue for fifteen (15) days after Beaudry received written notice thereof.

10.    Remedies of FCC Upon An Event Of Default.

(a)    With respect to an Event of Default described in subsections (a) and (b) of Section 9: (i) FCC shall give notice to Beaudry, in the manner prescribed in this Agreement, of Beaudry's default; (ii) Beaudry shall have ten (10) business days following such notice to cure such default, unless an extension of the time to cure is granted by FCC in writing; and (iii) if Beaudry fails to cure such default within the time allotted, then FCC may, at its sole option, exercise any and all rights and remedies available to it under this Agreement or the Consignment Agreement or pursue any other right or remedy available at law or equity, including, without limitation, the right to provide written notice of the immediate termination of the Consignment Agreement, upon receipt of which notice Beaudry shall be obligated, within thirty (30) days of the receipt of such termination notice, to:  (A) return to FCC all Consigned Inventory then in Beaudry's possession; (B) deposit all proceeds from the sale of FCC Inventory into the Lockbox; and (C) submit a final Beaudry Accounting to FCC; *provided, however,* that Beaudry shall have the right to purchase any of the Consigned Inventory in Beaudry's possession by providing notice to FCC in such final Beaudry Accounting in accordance with the procedure set forth in Section 23(c) of the Consignment Agreement; and *provided, further,* that if any non-monetary Event of Default under subsection (b) of Section 9 is incapable of being cured within ten (10) business days of FCC's notice to Beaudry of such default in performance, then so long as

Beaudry commences such performance within such ten (10) business days and thereafter diligently prosecutes such performance to completion, no remedies for such Event of Default shall arise in favor of FCC under this Section 10; and *provided, further* that FCC's remedies shall not include any termination of this Agreement nor otherwise impair the releases provided in Section 7.

(b)    With respect to an Event of Default described in subsections (c) and (d) of Section 9, FCC shall have the right to exercise and pursue all rights and remedies as described in Section 10(a)(iii) immediately upon the occurrence of such Event of Default.

(c)    The rights and remedies available to FCC hereunder are cumulative, and FCC shall have the right to exercise any one or more of such rights and remedies as whatever time, in whatever order, or however many times as FCC may, in its sole discretion, deem advisable or appropriate.

11.    <u>General Provisions</u>

(a)    <u>Continuing Duty to Cooperate</u>.    Each of CDI, MBI, M. Beaudry, L. Beaudry, MGB and FCC will, at any time hereafter, make, execute and deliver any and all papers or documents, and take such further actions, as any of the Parties may reasonably require for the purpose of giving full effect to this Agreement and each of its provisions and attachments.

(b)    <u>No Admission of Fact</u>.    Nothing in this Agreement is nor will be construed to be an admission of any fact, or any liability or wrongdoing by or right of, any of CDI, MBI, M. Beaudry, L. Beaudry, MGB or FCC, and nothing in this Agreement will be used in any proceeding, other than a proceeding to enforce, defend or construe the terms of this Agreement, for any purpose whatsoever.

(c)    <u>Notices</u>.    Any notice, request, demand or other communication given pursuant to the terms of this Agreement will be deemed given: (a) upon delivery, if hand delivered; (b) the first business day after delivery to an overnight delivery service; or (c) the day of any email; (d) three business days following the date shown on the proof of mailing attached on a certified or registered mail receipt, with return receipt requested, correctly addressed to the Parties as follows:

To CDI, MBI, M. Beaudry, L. Beaudry and MGB:

Centerstone Diamonds, Inc.
323 West 8th Street
Los Angeles, CA 90014
Attn: Michael Beaudry
Facsimile: (213) 623-2261
Email: michaelbeaudry@michaelbeaudry.com

With a copy to:    Ervin, Cohen & Jessup
9401 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

Attn: Michael S. Kogan, Esq.
Facsimile: (310) 859-2325
Email: mkogan@ecjlaw.com

To FCC:                 FCC, LLC
                        4355 Technology Way, Suite 500
                        Boca Raton, FL 33431
                        Attn: Lance Baker
                        Facsimile: (561) 623-1902
                        Email: Lbaker@FirstCapital.com

With a copy to:         Peitzman Weg & Kempinsky LLP
                        10100 Santa Monica Blvd., Suite 1450
                        Los Angeles, CA 90067
                        Attn: Louis Kempinsky, Esq.
                        Facsimile: (310) 552-3101
                        Email: lkempinsky@pwkllp.com

or to such other address or person as a Party may designate to the other Parties from time to time
for such purpose in the manner set forth herein.

(d)    Entire Agreement.  This Agreement, the Exhibits hereto and the Ancillary
Agreements contain the entire agreement and understanding between CDI, MBI, M. Beaudry, L.
Beaudry and MGB, on the one hand, and FCC, on the other hand, concerning the subject matter
herein, and supersede and replace any prior negotiations and agreements among CDI, MBI, M.
Beaudry, L. Beaudry and MGB, or any of them, on the one hand, and FCC, on the other hand,
whether written or oral, with respect to the subject matter herein.  Each of CDI, MBI, M.
Beaudry, L. Beaudry, MGB and FCC acknowledges that no other Party to this Agreement nor
any agent, representative or attorney of any such Party has made any promise, representation, or
warranty whatsoever, express or implied, not contained in this Agreement, concerning the
subject matter hereof, to induce the other Parties to execute this Agreement, and each of CDI,
MBI, M. Beaudry L. Beaudry, MGB and FCC acknowledges that it, he or she, as the case may
be, has not executed this Agreement in reliance upon any such promise, representation or
warranty not contained herein.

(e)    Governing Law.  This Agreement will be construed and interpreted in
accordance with the laws of the State of California, without regard to the rules of such State
relating to conflicts of law.

(f)    Costs, Attorneys' Fees and Costs of Action.  Upon the occurrence of a
Full Satisfaction Event, each of CDI, MBI, M. Beaudry, L. Beaudry and MGB, on the one hand,
and FCC, on the other hand, waives the right, and will bear their respective
costs incurred in, or otherwise related to, the FCC Action, the Bankruptcy Cases and the Beaudry
Complaint, and all costs incurred in connection with preparing for and the negotiations and
drafting of this Agreement, including without limitation: (i) for FCC, all costs incurred in
connection with its review of all records and inventories of Beaudry, including all costs of each
audit of the FCC Inventory conducted by FCC or auditors retained by FCC prior to the

Agreement Date; and (ii) for each of FCC and Beaudry, all attorneys' fees and costs. Notwithstanding the foregoing, if any of CDI, MBI, M. Beaudry, L. Beaudry or MGB, on the one hand, or FCC, on the other hand, should commence any legal proceeding to enforce, defend or construe the provisions of this Agreement, the losing Party will pay to the prevailing Party all reasonable attorneys' fees and costs and experts' fees and costs incurred in such proceeding, whether bringing or defending such suit and/or enforcing any judgment granted therein, all of which fees and costs will be deemed to have accrued upon the commencement of such proceeding and will be due, owing and payable whether or not such action is prosecuted to judgment.

(g)     Authority. Each Party signing this Agreement and any document executed in connection with this Agreement, whether signed individually or on behalf of any person or entity, represents and warrants that it, he or she, as the case may be: (a) has full power and authority to enter into and execute this Agreement on behalf of such Party; and (b) has the full authority to bind the Party or Parties for whom it is signing.

(h)     Ownership of Claims. Each of CDI, MBI, M. Beaudry, L. Beaudry, MGB and FCC represents and warrants that it, he or she, as the case may be, is the holder of all Claims released by such party in this Agreement and that such party has not sold, assigned, transferred, conveyed or otherwise disposed of, or purported to have assigned, transferred, conveyed or otherwise disposed of any Claim released herein.

(i)     Advice of Counsel. Each of CDI, MBI, M. Beaudry, L. Beaudry, MGB and FCC represents and warrants that it, he or she, as the case may be: (a) has been represented by legal counsel with respect to the negotiation of this Agreement; (b) has been advised by legal counsel as to such party's respective rights and obligations with respect to this Agreement; and (c) has participated in the review and drafting of this Agreement, so that no construction of the terms or effect of this Agreement will be made against any Party to this Agreement on the basis of such Party's capacity as principal drafter of this Agreement.

(j)     Amendment. This Agreement may not be modified or amended, nor any of the provisions waived, except by a written agreement executed by all of Parties to this Agreement.

(k)     Binding Effect. This Agreement will be binding upon and inure to the benefit of the Parties to this Agreement and to their predecessors and former, present and future successors, assigns, trustees, administrators, beneficiaries and heirs.

(l)     Counterparts. This Agreement may be executed in multiple counterpart copies, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

(m)     Execution. This Agreement may be executed by transmitting an executed signature page by facsimile or email in pdf format to the other Parties, and by promptly sending to all other Parties an originally executed signature page; provided, however, that the failure of any Party to subsequently send an originally executed signature page to all other Parties shall not

affect the validly of this Agreement, which shall remain validly executed by such facsimile or pdf format signature.

(n)     Titles; Words.  The titles, captions or headings herein are for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.   The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".   The use of the terms "shall" or "will" in this Agreement, to describe or enumerate any action to be taken, or obligation undertaken, by a Party, shall have the exact same meaning, indicating that such action or obligation is mandatory and must be taken or undertaken by such Party.

(o)     Affiliate Defined.  As used herein, the term *Affiliate* of a specified Party means any person or entity which directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with the Party specified.   The term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity.

*[Signatures On Next Page]*

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date and year first above written.

FCC, LLC

By: _____
Name: _RONALD E. GARBER_____
Title: _E.V.P_____

**CENTERSTONE DIAMONDS, INC.**

By: _____
Name: _____
Title: _____

**MICHAEL BEAUDRY, INC.**

By: _____
Name: _____
Title: _____

By: _____
    **MICHAEL BEAUDRY,** an individual

By: _____
    **LAURA BEAUDRY,** an individual

**MGB – 8th STREET, L.P.**

By: _____
    MICHAEL BEAUDRY, general partner

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date and year first above written.

XXX, XXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXX

By: XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
Name: XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
Title: XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**CENTERSTONE DIAMONDS, INC.**

By: _____
Name: Michael C. Beaudry
Title: President

**MICHAEL BEAUDRY, INC.**

By: _____
Name: Michael C. Beaudry
Title: President

By: _____
MICHAEL BEAUDRY, an individual

By: _____
LAURA BEAUDRY, an individual

**MGB – 8th STREET, L.P.**

By: _____
MICHAEL BEAUDRY, general partner

**EXHIBIT "A"**

## EXHIBIT A

### Agreements Between FCC and Beaudry Constituting the Factoring Facility

1.  Factoring and Inventory Advances and Security Agreement dated May 2, 2007 by and among Michael Beaudry, Inc. and Centerstone Diamonds, Inc. and FCC, LLC, a Florida limited liability company doing business as First Capital Western Region LLC

2.  First Amendment to Factoring and Inventory Advances and Security Agreement dated September 14, 2007 by and among Michael Beaudry, Inc. and Centerstone Diamonds, Inc. and FCC, LLC, a Florida limited liability company doing business as First Capital Western Region LLC

3.  Second Amendment to Factoring and Inventory Advances and Security Agreement dated April 10, 2008 by and among Michael Beaudry, Inc. and Centerstone Diamonds, Inc. and FCC, LLC, a Florida limited liability company doing business as First Capital Western Region LLC

4.  Continuing Guaranty dated May 2, 2007 between Michael Gerard Beaudry, an individual as his sole and separate property in favor of FCC, LLC, a Florida limited liability company doing business as First Capital Western Region, LLC

5.  Deed of Trust, Assignment of Rents, and Fixture Filing dated May 3, 2007 by and among Michael G. Beaudry, First American Title Insurance Company and FCC, LLC, a Florida limited liability company doing business as First Capital Western Region, LLC

6.  Continuing Guaranty dated May 3, 2007 by MGB 8th Street, L.P., a California limited partnership in favor of FCC, LLC, a Florida limited liability company doing business as First Capital Western Region, LLC

7.  Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated May 3, 2007, by MGB 8th Street, L.P., a California limited partnership ("Trustor") to First American Title, as trustee for the benefit of FCC, LLC, a Florida limited liability company, doing business as First Capital Western Region, LLC

8.  UCC Financing Statement filed on April 30, 2007 as document number 12472540002, Michael Beaudry, Inc., Debtor.

9.  UCC Financing Statement filed on April 30, 2007 as document number 124726410002, Centerstone Diamonds, Inc., Debtor.

10.  UCC Financing Statement filed on March 25, 2007 as document number 20495050002, Michael Beaudry, Inc., Debtor.

11.  Forebearance Agreement dated January 4th, 2008 by and among FCC, LLC, a Florida limited liability company, doing business as First Capital Western Region, LLC and Michael Beaudry, Inc. and Centerstone Diamonds, Inc.

12.  Letter dated March 20, 2007 from FCC, LLC to Michael Beaudry, Inc. and Centerstone Diamonds, Inc.

**EXHIBIT "B"**

# EXHIBIT B

## Inventory Summary

| | |
|---|---|
| Lot A1 | $ 2,347,520.16 |
| Lot A2 | $ 2,342,214.18 |
| Lot B | $ 4,439,161.41 |
| Lot B- WIP | $ 82,593.01 |
| Lot B- memo in | $ 165,764.92 |
| | $ 9,377,253.68 |

| | |
|---|---|
| PER PB Summary | $ 9,377,253.68 |
| Variance | $ - |

**EXHIBIT "C"**

## EXHIBIT C

### Fair Market Appraisal Mechanism

As used in this Agreement, the "Fair Market Value" of any item of FCC Inventory means the highest price that such item will bring in the Los Angeles jewelry market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably and with typical motivation, and assuming that payment is made in cash or its equivalent. The Fair Market Value of each item of FCC Inventory returned to FCC pursuant to Section 4(c)(iv)(6) (each a "Returned Item" and collectively "Returned Items") will be determined by mutual agreement of FCC and Beaudry within fifteen (15) business days following the date of each such return ("FMV Agreement Date"); provided, if FCC and Beaudry are unable to reach such mutual agreement by the end of the FMV Agreement Date, the Fair Market Value of the Returned Items will be determined by appraisal ("Appraisal"), pursuant to the following procedures.

The Appraisal will be conducted by two or more reputable appraisers, each certified by the American Society of Appraisers in the discipline of gems and jewelry and each with at least ten years experience appraising gems and jewelry in Los Angeles County, California ("Appraiser"). No later than five (5) business days following the FMV Agreement Date, each of FCC and Beaudry will select an Appraiser to determine the Fair Market Value of each Returned Item. The Appraisal will be conducted in accordance with the standards set forth in the first paragraph of this Exhibit D, the standards of the gems and jewelry division of the American Society of Appraisers and the standards customary in the gems and jewelry industry in Los Angeles, California for items of gems and jewelry similar to the Returned Items.

No later than twenty (20) business days following the FMV Agreement Date, each Appraiser will deliver its Appraisal to each of FCC and Beaudry, which Appraisal will include a total of the Fair Market Value of each Returned Item ("Total FMV"). If the Total FMVs in the two Appraisals differ, and the difference is less than or equal to ten percent (10%) of the higher Total FMV, then the average of the two Total FMVs will be deemed to be the Total FMV for the Returned Items, and the amount of such deemed Total FMV will be credited against the Consignment Value and the Guaranteed Amounts. If the difference is greater than ten percent of the higher Total FMV, then the two Appraisers will select a third unaffiliated Appraiser, who will conduct a third Appraisal in the same manner as the first two Appraisals, the average of the two closest Total FMVs will be deemed to be the Total FMV for the Returned Items, and the amount of such deemed Total FMV will be credited against the Consignment Value and the Guaranteed Amounts.

Each of FCC and Beaudry will pay the cost of its Appraiser and should a third Appraiser be necessary, each shall pay one-half (1/2) of the costs of the third Appraiser.

**EXHIBIT "D"**

## EXHIBIT D

### Beaudry Service Marks

## SCHEDULE OF TRADEMARKS/APPLICATIONS

**A.**   **Registrations in the Name of Michael Beaudry, Inc.**

| REGISTRATION NO. | MARK |
|---|---|
| 3,005,451 | BEAUDRY |
| 3,010,074 | BEAUDRY (Stylized) |
| 3,147,288 | BEAUDRY (Stylized) |
| 2,215,591 | BEAUDRY and Design |
| 3,437,698 | BEAUDRY BEAUTIQUE |
| 3,005,450 | BEAUDRY SIGNED ORIGINALS and Design |
| 2,183,822 | MICHAEL BEAUDRY |

**B.**   **Application Owned by Michael Beaudry, Inc.**

| SERIAL NO. | MARK |
|---|---|
| 77/276,641 | BEAUDRY |

| In re: CENTERSTONE DIAMONDS INC. | CHAPTER: 11 |
| *(Jointly Administered with)* | |
| In re: MICHAEL BEAUDRY, INC. | CASE NUMBER: 2:09-bk-23944-VZ |
| Debtor(s). | *(Jointly Administered with)* 2:09-bk-23945-VZ |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 9401 Wilshire Boulevard, 9th Floor, Beverly Hills, California 90212

A true and correct copy of the foregoing documents described as: **MOTION TO APPROVE COMPROMISE OF CONTROVERSY WITH FCC, LLC; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF MICHAEL BEAUDRY IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On May 28, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On May 28, 2010, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 28, 2010 | Kimberly Anthony | |
| --- | --- | --- |
| *Date* | *Type Name* | *Signature* |

IDOCS:12999.3:906626.1/

| In re: CENTERSTONE DIAMONDS, INC. /MICHAEL BEAUDRY INC.    Debtor(s). | CHAPTER: 11<br><br>CASE NUMBER: 2:09-bk-23944-VZ<br>(Jointly Administered With 2:09-bk-23945-VZ) |
|---|---|

**ADDITIONAL SERVICE INFORMATION (if needed):**

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

Glen Dresser on behalf of Creditor BANK OF AMERICA - gombd@aol.com
Elaine T Fuller on behalf of Creditor INTERNAL REVENUE SERVICE - elaine.t.fuller@irscounsel.treas.gov
Scott F Gautier on behalf of Creditor FCC LLC - sgautier@pwkllp.com
Julian I Gurule on behalf of Interested Party Courtesy NEF - jgurule@pwkllp.com
Jeff D Kahane on behalf of Defendant Bernie Robbins Jewelers, Inc., a New Jersey corporation dba Bernie Robbins Jewelers - jkahane@duanemorris.com
Louis E Kempinsky on behalf of Creditor FCC LLC - lkempinsky@pwkllp.com
Andy Kong on behalf of Creditor Committee Official Committee of Unsecured Creditors of Centerstone Diamonds, Inc., and Michael Beaudry, Inc. - Kong.Andy@ArentFox.com
Mette H Kurth on behalf of Creditor Committee Official Committee of Unsecured Creditors of Centerstone Diamonds, Inc., and Michael Beaudry, Inc. - kurth.mette@arentfox.com
Dare Law on behalf of U.S. Trustee United States Trustee (LA) - dare.law@usdoj.gov
Jennifer Leland on behalf of Creditor FCC LLC - jleland@pwkllp.com
Monserrat Morales on behalf of Creditor First Capital Western Region, LLC - mmorales@pwkllp.com
Aram Ordubegian on behalf of Creditor Committee Official Committee of Unsecured Creditors of Centerstone Diamonds, Inc., and Michael Beaudry, Inc. - ordubegian.aram@arentfox.com
United States Trustee (LA) - ustpregion16.la.ecf@usdoj.gov
Kimberly S Winick on behalf of Interested Party Courtesy NEF - kwinick@clarktrev.com
Matthew A Gold on behalf of Creditor Argo Partners - courts@argopartners.net
Deborah Terranova on behalf of Creditor Jason Hoffman - dterranova9@yahoo.com

<u>Via U.S. Mail</u>

Hon. Vincent P. Zurzolo
U.S. Bankruptcy Court
255 E. Temple St. #1360
Los Angeles, CA 90012

<u>Debtors</u>
Centerstone Diamonds Inc./
Michael Beaudry Inc.
323 W. 8th St.
Los Angeles, CA 90014

<u>Request for Special Notice</u>

Yahalomei Espeika International Ltd.
c/o Benjamin Kiss
Fischer Zisblatt & Kiss
1901 Avenue of the Stars # 1020
Los Angeles, CA 90067

L.A. County Treasurer and Tax Collector
Attn: Linda D. Ramos, Tax Service Specialist
POB 54110
Los Angeles, CA 90051

EDF Resource Capital Inc.
c/o Real Estate Law Group LLP
Jason L. Hoffman
3455 American River Dr. Ste. C
Sacramento, CA 95864

<u>COMMITTEE OF UNSECURED CREDITORS</u>

Olympic Diamonds Corp.
c/o Barry R. Edwards, Esq.
433 N. Camden Dr. 6th Floor
Beverly Hills, CA 90210

Modern Luxury Inc.
Mike Eisenberg, Assistant Credit Manager
5455 Wilshire Blvd. #1412
Los Angeles, CA 90036

Curtco Robb Media LLC
Chris Fabian, CFO
29160 Heathercliff Rd.
Malibu, CA 90265

C. Publishing LLC
Nicholas Hale, CFO
1543 7th St., 2nd Floor
Santa Monica, CA 90401

Ambrish Sethi, Executive Officer
101 Utah St. #207
San Francisco, CA 94103