1  Louis E. Kempinsky (State Bar No. 90068)
   *lkempinsky@pwkllp.com*
2  John C. Keith (State Bar No. 229755)
   *jkeith@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   2029 Century Park East, Suite 3100
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile: (310) 552-3101

6  Attorneys for FCC, LLC
   d/b/a First Capital Western Region, LLC
7

8               **UNITED STATES BANKRUPTCY COURT**

9                **CENTRAL DISTRICT OF CALIFORNIA**

10                      **LOS ANGELES DIVISION**

| | |
|---|---|
| In re CENTERSTONE DIAMONDS, INC., | Case No. 2:09-bk-23944-VZ |
| Debtor. | (Jointly Administered with 2:09-bk-23945 VZ) |
| *Jointly Administered with* | Chapter 11 |
| In re MICHAEL BEAUDRY, INC., | **OBJECTION OF SECURED CREDITOR FCC, LLC TO CONFIRMATION OF DEBTORS' THIRD AMENDED JOINT DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION; MEMORANDUM OF POINTS AND AUTHORITIES** |
| Debtor. | |
| ☐ *Applies only to Centerstone Diamonds, Inc* <br> ☐ *Applies only to Michael Beaudry, Inc.* | **[Declaration of Louis E. Kempinsky filed concurrently]** |
| | **Confirmation Hearing**: <br> Date:    March 24, 2011 <br> Time: 1:30    p.m. <br> Place: Courtroom    1368 <br>          Roybal Federal Building <br>          255 E. Temple Street <br>          Los Angeles, CA 90012 |

FCC, LLC d/b/a First Capital Western Region, LLC ("FCC"), a secured creditor of Michael Beaudry, Inc. ("MBI") and Centerstone Diamonds, Inc. ("CDI," and collectively with MBI, the "Debtors"), debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Bankruptcy Cases"), hereby submits its objection (the "Objection") to the confirmation of the Debtors' Third Amended Joint Disclosure Statement And Plan Of Reorganization (the "Plan"). FCC submits this objection pursuant to Bankruptcy Code section 1129(a), including subsections (11) and (3) thereof, on the grounds that the Debtors' Plan is not feasible and has not been proposed in good faith. The Debtors' own cash flow projections included in the Plan provide no basis to conclude that the Debtors will be able to make the payments currently contemplated under the Plan. To make matters worse, the Debtors' key source of money earmarked to pay creditors, proceeds from sales of inventory consigned to the Debtors by FCC under the parties' post-petition consignment agreement (the "Consignment Agreement"), is no longer available, as FCC has terminated that agreement – a fact not mentioned in the Plan. Finally, the Plan does not provide any estimation of, provide for any payment of, or address in any way the Request For Payment Of Administrative Expense that FCC recently filed, which seeks the allowance of administrative claim in an amount no less than $600,000 (the "Administrative Claim") based upon, among other things, the Debtors' breaches of the Consignment Agreement.

FCC's Objection is based upon this Objection, the attached Memorandum of Points and Authorities, the concurrently-filed Declaration of Louis E. Kempinsky, the records and files in the Bankruptcy Cases, and such additional evidence and argument as may be presented at or before the hearing on confirmation of the Plan.

Date: March 23, 2011                                         PEITZMAN, WEG & KEMPINSKY LLP


By:  _____/s/ Louis E. Kempinsky_____
     Louis E. Kempinsky
Attorneys for FCC, LLC d/b/a First Capital
Western Region, LLC

**MEMORANDUM OF POINTS AND AUTHORITIES**

I. **INTRODUCTION**

The Debtors' Plan is cannot be confirmed because it is not feasible and has not been proposed in good faith. The Debtors' own cash flow projections included in the Plan provide no basis to conclude that the Debtors will be able to make the payments currently contemplated under the Plan. To make matters worse, the Debtors' key source of money earmarked to pay creditors, proceeds from sales of inventory under the Debtors' Consignment Agreement with FCC, is no longer available, as FCC has terminated that agreement – a fact not mentioned in the Plan. Finally, the Plan does not provide any estimation of, provide for any payment of, or address in any way, FCC's $600,000 Administrative Claim.

FCC filed its Administrative Claim, along with a related adversary proceeding against the Debtors and certain related parties, based upon, among other things, the Debtors' breaches of the Consignment Agreement, as well as their willful and malicious conversion of FCC's inventory consigned to them under the agreement ("Consigned Inventory"). The stated amount of FCC's Administrative Claim is in excess of seventy percent (70%) of the total amount of all other payments contemplated by the Plan. Even if the Plan were otherwise feasible (which it is not), the Administrative Claim renders the Plan unfeasible because the Debtors have failed to reserve for or demonstrate any capacity at all to pay even a meaningful portion of the Administrative Claim. Although the Debtors would appear unable to satisfy the Administrative Claim even if its allowed amount were significantly reduced, there is, at any rate, no basis for the Debtors to claim that the Plan is feasible without, at the least, an estimation of the allowed amount of the Administrative Claim, along with a credible proposal for the payment of that amount and all other amounts due under the Plan.

While FCC only filed its Administrative Claim recently, after the Debtors filed the Plan, that does not excuse compliance with the feasibility requirements of Bankruptcy Code section 1129(a), and does not justify confirming a plan that fails to account for a sizeable potential liability. Moreover, FCC provided the Debtors with notice of their breaches as far back as November 2010. The Debtors have thus been on notice, for quite some time, that they faced the

risk not only that they would be subject to significant liability to FCC, but also that their key source of funds – sales of Consigned Inventory – would become unavailable. That the Debtors have not sought to amend their Plan, or otherwise alerted the Court or other creditors to the true state of affairs, is indicative of their lack of good faith in proposing the Plan.

FCC is aware that the deadline to file objections to the Plan has passed. However, FCC's Objection is based primarily on its Administrative Claim, which FCC filed only recently, and only after the failure of FCC's strenuous efforts to work with the Debtors in good faith to obtain a cure for their serious and systemic breaches of their obligations. FCC's efforts to convince the Debtors to comply with their obligations have continued almost to the present day, and it was not until very recently that it became clear that those efforts would not bear fruit and that this Court's intervention would be required for FCC to obtain what is owed it. FCC has been generally supportive of the Debtors' reorganization efforts, and has sought to avoid interfering in those efforts, so long as they did not prejudice FCC's rights. FCC should not be punished for its restraint, or for seeking to resolve its disputes with the Debtors without court intervention. Because FCC has proceeded reasonably, and because the Debtors themselves are largely responsible for the current situation, the Debtors cannot credibly claim to be unfairly prejudiced if the Objection is considered.

## II. FACTUAL BACKGROUND

### A. The Debtors' Serious And Systemic Misconduct Gives Rise To FCC's Claims

On March 21, 2011, FCC filed its Request For Payment Of Administrative Expense, which is Claim 33-1 in the Claims Register in the Bankruptcy Cases. Declaration of Louis E. Kempinsky attached hereto ("Kempinsky Decl.), ¶ 2. On March 22, 2011, FCC also filed a complaint in this Court against the Debtors and certain related parties, for, among other things, recovery of possession of personal property, breaches of the parties' agreements, and conversion (the "Complaint" [Docket No. 363]). *Id.* at ¶ 3. The basis for FCC's claims against the Debtors is set forth in more detail in those documents. *Id.* at ¶ 4. Generally speaking, the claims relate to the Debtors' breaches under the Consignment Agreement, pursuant to which FCC consigned back to the Debtors certain inventory FCC had purchased from them as part of a settlement of

certain pre-petition disputes between the parties. *Id.* More specifically, FCC's claims arise from the Debtors' pattern of serious and systemic misconduct in their dealings with FCC concerning the Consigned Inventory. *Id.* As alleged in the Complaint, the Debtors' contractual breaches and tortious conduct towards FCC includes the following:

- the Debtors have failed to pay FCC substantial sums due it under the parties' Consignment Agreement;

- the Debtors have failed to return to FCC a substantial amount of Consigned Inventory;

- the Debtors, on information and belief, engaged in transactions with their affiliates and their principal Michael Beaudry that were not at "arms length" and that were designed to, among other things, divert to those related parties monies due from the Debtors to FCC;

- the Debtors made purported credit sales of Consigned Inventory to their affiliates, in contravention of the terms of the Consignment Agreement, and thereafter failed and refused to return those items to FCC or to account to FCC for those transactions;

- the Debtors, on information and belief, concealed, diverted and misappropriated, to the benefit of themselves, their affiliates, and Michael Beaudry, substantial amounts of Consigned Inventory and sales proceeds;

- the Debtors, on information and belief, intentionally misrepresented to FCC information concerning transactions involving Consigned Inventory (including, without limitation, by describing sales as consignments, and vice-versa, and by representing sales as being completed when they were not), in furtherance of their efforts to conceal, divert and misappropriate Consigned Inventory and sales proceeds;

- the Debtors, on information and belief, falsified and/or manipulated invoices and other documentation concerning transactions involving Consigned Inventory, in

furtherance of their efforts to conceal, divert and misappropriate Consigned Inventory and sales proceeds; and

- the Debtors have failed to turn over to FCC, following its demand, FCC's collateral (the "Collateral") under the parties' security agreement securing the Debtors' performance under the Consignment Agreement (the "Security Agreement").

*See, e.g.,* Complaint, ¶¶ 38, 68.

### B. FCC's Efforts To Secure The Debtors' Performance Break Down Only Very Recently

Practically from the time FCC and the Debtors entered into the Consignment Agreement and the Security Agreement, the Debtors committed a number of material breaches thereunder. Kempinsky Decl. ¶ 5. Commencing in November 2010, FCC, without waiving the Breaches, provided the Debtors, on multiple occasions, with notice of the Debtors' breaches and an opportunity to cure them. *Id.*, Ex. A. However, many breaches persisted, and, accordingly, on February 9, 2011, FCC provided the Debtors with notice that FCC was terminating the Consignment Agreement, effective immediately (the "Termination Notice"). *Id.* at ¶ 6, Ex. B. FCC demanded, pursuant to the Consignment Agreement, that the Debtors return forthwith to FCC all of the Consigned Inventory. *Id.* at ¶ 7, Ex. B. Under the Consignment Agreement, the Debtors were obligated to return any Consigned Inventory they were not purchasing by no later than thirty days following the Termination Notice, and would be liable for any Consigned Inventory not returned by that deadline. *Id.* FCC also demanded, pursuant to the Consignment Agreement, that the Debtors pay to FCC all monies due and owing it under the Consignment Agreement. As with the return of Consigned Inventory, the Debtors had a maximum of thirty days following the Termination Notice to pay to FCC all proceeds from the sale of Consigned Inventory. *Id.*

Following the Termination Notice, the Debtors returned to FCC certain of the Consigned Inventory, and paid to FCC certain monies due it under the Consignment Agreement. *Id.* at ¶ 8. In addition, at the Debtors' request, FCC, without waiving any of its rights, permitted the

Debtors to maintain certain inventory, based upon the Debtors' assurances, among other things, that they would provide to FCC a full and complete reconciliation of all inventory and outstanding accounts receivable, would present proposals for the prompt payment to FCC of any amounts owed it to cover any shortfall in the Consigned Inventory and to satisfy all amounts owed by the Debtors' affiliates, and would not engage in any conduct proscribed by the now-terminated Consignment Agreement. *Id.* The Debtors did not comply with any of those promises. *Id.*

Accordingly, on February 22, 2011, FCC demanded the return to FCC of all of the remaining Consigned Inventory. *Id.* at ¶ 9, Ex. C. FCC also requested that the Debtors provide to FCC certain documents and information relating to FCC's inventory, to which FCC was entitled pursuant to the Consignment Agreement and the Security Agreement, including, without limitation, any diamond certifications, cost cards, pictures, and bills of materials for FCC's inventory (the "Inventory Documentation"). *Id.* By the beginning of March 2011, FCC had substantiated significant shortfalls in the payment to FCC of monies due and owing it under the Consignment Agreement ("Payment Shortfalls") and in the return to FCC of the Consigned Inventory ("Return Shortfalls"). *Id.* at ¶ 10. Based thereon, on March 10, 2011, FCC made demand upon the Debtors under the Security Agreement, that the Debtors either make payment to FCC for the existing Payment and Inventory Shortfalls, or else assemble and deliver to FCC, or allow FCC to take possession of, the Collateral. *Id.*, Ex. D.

Even following FCC's demand under the Security Agreement, FCC continued to be in almost daily contact with the Debtors. *Id.* at ¶ 11. During this time, FCC continued to try to obtain, without court intervention, either the requested payment of monies due it, or the turnover of the Collateral, including the Inventory Documentation. *Id.* As a part of these discussions, the Debtors represented to FCC on more than occasion that the Debtors would, under certain conditions, turn over to FCC certain items of Inventory Documentation. *Id.* The Debtors requested in exchange, and for several days FCC and the Debtors explored the possibility of, a standstill agreement between the parties. *Id.* It was not until on or about March 16 or 17, 2011, that the Debtors made it clear to FCC that the Debtors either could not or would not pay FCC

what was owed it or turn over to FCC the Inventory Documentation pertaining to the bulk of FCC's inventory. *Id.* As reflected by the foregoing facts, FCC has made good faith efforts, for some time, to obtain without court intervention the return of its inventory and the payment of monies owed it. Consistent with those efforts, FCC has refrained, for some time, from filing an administrative claim or other litigation against the Debtors.

### C. The Plan Provides No Basis To Conclude That The Debtors Can Make The Proposed Payments To Other Creditors, Much Less FCC

On January 18, 2011, the Debtors filed the operative version of their proposed plan of reorganization. *See generally* Plan (Docket No. 348). The Plan provides for, among other things, payments to a variety of creditors, of various classes, totaling $841,170. *Id.* at 12-20. The proposed payments include an estimated total of $285,000 for administrative expenses, along with more than $500,000 for claims subordinate to administrative expenses (specifically, $56,170 for priority tax claims, and $500,000 for claims by general unsecured creditors). *Id.* The Plan does not provide for any payment to be made to FCC on account of its Administrative Claim or the Debtor's potential liability to FCC under FCC's Complaint. *See generally id.* The Debtors' cash flow projections in the Plan indicate that, through 2012, the Debtors' total cash available will be $561,617, *i.e.*, nearly $300,000 less than the total amount of payments proposed under the current Plan (which does not account for FCC's Administrative Claim). *Id.* at 20.

The Plan also provides that "the sources of money earmarked to pay creditors" are "[p]roceeds from the sale of the consigned inventory and from sales following the production of new items for sale." *Id.* at 10-11. The Plan does not mention that the first of these sources of money is no longer available to the Debtors, since FCC terminated the Consignment Agreement and demanded the return of the Consigned Inventory. *See generally id.*

### III. ARGUMENT

#### A. Good Cause Exists To Consider FCC's Objection, Even Though Filed Late

FCC acknowledges that the deadline for opposing confirmation of the Plan expired on March 10, 2011. *See* Jan. 18, 2011 Notice Of Plan Confirmation Hearing (Docket No. 349) (providing that any opposition to the Debtors' motion to confirm the plan "shall be filed and

served 14 days before the confirmation hearing"). However, as set forth above, FCC was, at that time, still engaged in good faith efforts to try to resolve its disputes with the Debtors consensually. When FCC subsequently determined that those efforts would not be successful, it moved diligently to prepare and file its Request For Payment Of Administrative Expense and its Complaint (upon which this Objection is based), and thereafter to prepare and file this Objection. Because FCC has acted reasonably and with sufficient diligence, and because the Debtors's own conduct created the necessity for FCC to file its objection at this time, the Debtors cannot credibly complain if FCC's Objection is considered despite its late filing.

### B. The Plan Is Not Feasible, Is Not Proposed In Good Faith, And Cannot Be Confirmed

Section 1129(a) of the Bankruptcy Code sets forth the requirements for confirming a plan of reorganization. *See* 11 USC § 1129(a). Among those is the requirement, pursuant to Section 1129(a)(11), that the plan be "feasible" – in other words, that "'[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization.'" *In re Harbin*, 486 F.3d 510 (9th Cir. 2007) (quoting 11 U.S.C. §1129(a)(11)). Another requirement for confirmation, pursuant to Section 1129(a)(3), is that the plan be proposed in good faith. In addition, unless the claimant agrees otherwise, the plan must provide for the payment, on the plan's effective date, of the allowed amount of any administrative claim. 11 U.S.C. §1129(a)(9).[1]

It is manifest that the Debtors have not satisfied, and will not be able to satisfy, these requirements. FCC has not agreed to any deferred payment arrangement, and it possesses a valid administrative claim. It is well-settled that claims for breach of post-petition contracts and post-petition torts qualify as administrative claims under Bankruptcy Code section 503(b), as consisting of "the actual, necessary costs and expenses of preserving the estate." *See, e.g., Reading Co. v. Brown*, 391 U.S. 471, 476-84 (1968) (granting administrative priority to

---

[1] The Debtors themselves acknowledge this last point in the Plan, stating that "[t]he Code requires that allowed administrative expenses be paid on the effective date unless the party holding the administrative expense agrees otherwise." Plan at 16. *See also In re North Valley Mall, LLC,* 432 B.R. 825, 837 (Bankr. C.D. Cal. 2010) (citing 11 U.S.C. § 1129(A)(9)).

postpetition tort claims); *In re Dennis Ponte, Inc.*, 61 B.R. 296, 298 (9th Cir. BAP 1986) (stating that "[i]t is well established that damages for a post-petition tort become an administrative expense"); *In re Abercrombie*, 139 F.3d 755, 757 (9th Cir. 1998) (holding that "[p]ostpetition contracts may qualify for administrative expense priority"). Accordingly, if the Plan is to be confirmed, it must provide for appropriate treatment of FCC's Administrative Claim, while still satisfying Section 1129's feasibility requirements.

That the Plan does not do, and most likely will never be able to do. The Debtors' own cash flow projections demonstrate that they are not able to make even the payments already proposed under the Plan, much less pay, in addition, FCC's Administrative Claim.[2] It only makes matters worse for the Debtors that – as they have failed to adequately disclose to the Court or other creditors – their key source of funds (sales of Consigned Inventory) has evaporated. Conceivably, other administrative claimants could agree to defer payment on their claims past the plan's effective date. However, even if every one of those claimants did so, there would still not be enough money left to pay both the other classes of claims and FCC's claim.

Ultimately, the Debtors' cannot reasonably assert that their Plan is feasible and proposed in good faith without the benefit of a determination that the allowed amount of the Administrative Claim is essentially zero. Though a less likely result is hard to imagine, plan confirmation would thus require, at the least, an estimation of the allowed amount of the Administrative Claim, along with a credible proposal for the timely payment of both that amount and all other amounts due under the Plan. The Ninth Circuit reached essentially that conclusion in *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1377, 1382 (9th Cir. 1985). The district court in that case held that, "without the benefit of an estimate of [the creditor's] claim, the bankruptcy court could not have adequately judged the plan's feasibility, and remanded to the bankruptcy

---

[2] It is true that the allowed amount of FCC's Administrative Claim has not yet been determined, and that the claim was filed very recently. However, that does not eliminate the requirement that a plan of reorganization make available sufficient funds to satisfy a potential claim of which the debtor is or should be aware. *See In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1377, 1382 (9th Cir. 1985) (affirming "district court's order vacating the plan and remanding to the bankruptcy court to reconsider the plan's feasibility in light of its estimate of [creditor's] claim," where, among other things, documents creditor filed in a civil case, along with its active participation in the bankruptcy case, constituted an "amendable informal proof of claim").

court to determine the plan's feasibility in light of the estimate." *Id.* at 1382. The Ninth Circuit "agree[d] with the district court that the bankruptcy court's finding of feasibility was clearly erroneous because the plan failed to provide for the possibility that [the creditor] would recover a large judgment in the civil case." *Id.* at 1382. Subsequent holdings from the Ninth Circuit and Ninth Circuit Bankruptcy Appellate Panel are consistent with *Pizza of Hawaii*, and stand for the eminently logical principle that, "[t]o be feasible for purposes of section 1129(a)(11), a plan must take into account the possibility that a potential creditor may, following confirmation, recover a large judgment against the debtor." *In re Harbin*, 486 F.3d at 517.[3] Among its other deficiencies, the Plan here fails to take into account just such a possibility. For that and the other reasons stated herein, there is no basis to confirm the Plan currently before the Court.

## IV. CONCLUSION

For the foregoing reasons, FCC respectfully requests that the Court deny confirmation of the Debtors' Plan and continue the Confirmation Hearing for such time as is necessary for the Debtors to file with this Court a further amended Plan that provides for payment of the Administrative Claim in accordance with Bankruptcy Code section 1129(a)(9), that satisfies the feasibility requirements of Bankruptcy Code section 1129(a)(11), and that otherwise complies with all requirements for plan confirmation under Bankruptcy Code section 1129(a).

Date: March 23, 2011          PEITZMAN, WEG & KEMPINSKY LLP


By:     /s/ Louis E. Kempinsky
          Louis E. Kempinsky
Attorneys for FCC, LLC d/b/a First Capital
Western Region, LLC

---

[3] *See also id.* at 519 ("Because the bankruptcy court failed to consider the consequences of Sherman's potential success on appeal, it clearly erred in failing to discharge its obligations under section 1129(a)(11)."); *In re Dennis Ponte*, 61 B.R. at 300 ("The nature and extent of the claim substantially affected the debtor's ability, under its plan, to make or meet a commitment to any class of creditors subordinate to the administrative class . . . Confirmation of the plan . . . shows disregard of the need to evaluate and at least estimate the counterclaim.").

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**PEITZMAN, WEG & KEMPINSKY LLP**
**2029 CENTURY PARK EAST, SUITE 3100**
**LOS ANGELES, CA 90067**

A true and correct copy of the foregoing document described as ***OBJECTION OF SECURED CREDITOR FCC, LLC TO CONFIRMATION OF DEBTORS' THIRD AMENDED JOINT DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION; MEMORANDUM OF POINTS AND AUTHORITIES,*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **March 23, 2011***,* I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Dan E Chambers     dan.chambers@troutmansanders.com
- Glen Dresser     gombd@aol.com
- Daniel K Fujimoto     wdk@wolffirm.com
- Elaine T Fuller     elaine.t.fuller@irscounsel.treas.gov
- Scott F Gautier     sgautier@pwkllp.com
- Matthew A Gold     courts@argopartners.net
- Julian I Gurule     jgurule@milbank.com
- Peter F Jazayeri     pjazayeri@ecjlaw.com
- Jeff D Kahane     jkahane@duanemorris.com
- Louis E Kempinsky     lkempinsky@pwkllp.com
- Michael S Kogan     mkogan@ecjlaw.com
- Andy Kong     Kong.Andy@ArentFox.com
- Mette H Kurth     kurth.mette@arentfox.com
- Dare Law     dare.law@usdoj.gov
- Jennifer Leland     jleland@pwkllp.com
- Michael V Mancini     mmancini@ecjlaw.com
- Frank F McGinn     ffm@bostonbusinesslaw.com
- Monserrat Morales     mmorales@pwkllp.com
- Aram Ordubegian     ordubegian.aram@arentfox.com
- John W Shenk     jshenk@ecjlaw.com
- Meghan C Sherrill     meghan.sherrill@troutmansanders.com
- Deborah Terranova     dterranova9@yahoo.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
- Kimberly S Winick     kwinick@clarktrev.com

☐    Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                                                                                     **F 9013-3.1.PROOF.SERVICE**

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____*,* I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **March 23, 2011***,* I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

**Served by Personal Delivery:**
Honorable Vincent P. Zurzolo
United States Bankruptcy Court
255 E. Temple Street, Suite 1360
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| **March 23, 2011** | **Grazel Garcia** | **/s/ Grazel Garcia** |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*    **F 9013-3.1.PROOF.SERVICE**